**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MASSACHUSETTS**
**(Eastern Division)**

| | |
|---|---|
| In re:<br><br>**BUILDING #19, INC.,**<br><br>　　　　　　Debtor. | Chapter 11<br><br>Case No. 13-16429-(___)<br><br>Joint Administration Requested[1] |

**MOTION FOR (1) THE INTERIM AND PERMANENT USE OF CASH COLLATERAL, (2) THE GRANTING OF REPLACEMENT LIENS, (3) THE ENTRY OF SCHEDULING ORDER REGARDING CONTINUED USE OF CASH COLLATERAL AND (4) ADDITIONAL RELIEF**
(*Emergency Determination Requested*)

Pursuant to Sections 105 and 363 of the United States Bankruptcy Code (the "Bankruptcy Code"), Federal Rules of Bankruptcy Procedure 2002, 4001, and 9014, and MLBR 4001-2, Building #19, Inc. (the "Debtor"), the debtor and debtor-in-possession, moves the Court for the entry of an order authorizing the use of Cash Collateral (as defined below) to maintain the value of the Debtor's assets through continued operations.

The Debtor requests:

(i) The entry, on an emergency basis, of an interim order authorizing the use of Cash Collateral on the terms set forth in this motion, in an amount necessary to avoid immediate and irreparable harm;

(ii) The entry of a permanent order authorizing use of Cash Collateral on the terms set forth in this motion;

(iii) Subject to the Carve Out (as defined below), the granting of replacement liens to the Secured Creditors[2] (as defined below) that: (A) are limited to the same types

---

[1] The request for joint administration relates to the Chapter 11 cases filed by the following debtors : (a) Paperworks #19, Inc., (b) Beth's Basics, Inc., (c) Furniture #19, Inc., (d) PB&J Kids #19, Inc., and (e) Footwear #19 Plus, Inc.

[2] As is described below, the Secured Creditors are insiders of the Debtors. The Debtors have not conceded the extent, priority or validity of the Secured Creditors' asserted liens, and all of the Debtors' rights, claims and defenses with respect to the asserted liens are preserved.

of post-petition property of the estate against which the Secured Creditors held liens as of the Petition Date (as defined below); (B) maintain the same priority, validity and enforceability as the Secured Creditors' pre-petition liens; (C) shall be recognized only to the extent of the diminution in value of the Secured Creditors' pre-petition collateral after the Petition Date resulting from the Debtor's use of the Cash Collateral during the bankruptcy case; and (D) shall not attach to any causes of action under Chapter 5 of the Bankruptcy Code or any proceeds of those causes of action.

(iv)    The entry of an order setting a final hearing on the continued use of Cash Collateral.

The Debtor operates a chain of ten (10) discount stores located in Massachusetts, New Hampshire and Rhode Island, selling a wide variety of goods, including food, furniture, giftware, house wares, clothing, shoes, domestics and mattresses. The affiliates of the Debtor that have also filed Chapter 11 petitions (collectively the "Jointly Administered Debtors") operate departments within the Debtor's retail stores and pay the Debtor a license fee to conduct those operations. The Debtor and the Jointly Administered Debtors (sometimes collectively the "Debtors") acquire their inventory from purchases of surplus, salvage goods, overstocks, closeouts and irregulars, and are therefore able to offer the goods to consumers at substantially discounted prices.

Contemporaneously with the filing of this motion, the Debtors have filed joint motions to conduct store closing sales (the "Sales") at each of the Debtor's ten (10) locations. There are no liens asserted against the Jointly Administered Debtors' assets. The Debtor requires the use of Cash Collateral to continue its operations while all of the Debtors conduct the Sales. Immediate relief is necessary to prevent any interruption in the Debtor's operations, which would have a material negative impact on all of the Debtors' respective assets.

In further support of this motion, the Debtor avers as follows:

## I.   BACKGROUND

1. On November 1, 2013 (the "Petition Date"), each of the Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Massachusetts (the "Court").

2. The Debtors continue to operate as debtors-in-possession pursuant to Sections 1107 and 1108 of the Code. As of the date of this motion, no official committee of creditors has been appointed.

### A.   The Debtors.

3. The Debtor is a Massachusetts corporation founded in 1966. The Debtor is headquartered in Hingham, Massachusetts. The Jointly Administered Debtors are all Massachusetts Corporations.

4. The Debtor operates ten (10) retail stores and also maintains a corporate headquarters and warehouse space. The Debtor does not own any real estate, but instead leases all of its retail stores, its corporate headquarters and its warehouse. Four (4) of the Debtor's stores are leased from third parties, and the remainder of the Debtor's facilities are leased from non-debtor affiliates (collectively the "Real Estate Affiliates"). The Debtor is a party to separate leases for each of its leased locations.

5. The Debtor employs approximately ninety-nine (99) full time and part time employees, primarily in Massachusetts, approximately seventy-five (75) of whom work in the Debtor's retail stores and approximately twenty-four (24) of whom work in the Debtor's corporate headquarters or warehouse facility.

6. The Jointly Administered Debtors employ an aggregate of approximately seventeen (17) full time and fourteen (14) part time employees.

7. Six (6) non-debtor entities (collectively the "Licensees") operate departments within the Debtor's retail stores pursuant to license agreements with the Debtor. Two (2) of the Licensees, International Floor Crafts, Inc. ("IFC") and Gee Zee, Inc. ("Gee Zee"), are affiliates of the Debtor. Under the license agreements with the Licensees, the Debtor is entitled to retain a percentage of the respective Licensees gross sales as a license fee. The license fees payable by the Licensees range between twenty percent (20%) and thirty-five percent (35%) of the Licensees gross sales proceeds.

B. **Events Precipitating The Bankruptcy Filings.**

8. The advent of internet shopping has dramatically altered the retail landscape, particularly for so-called "big box" stores such as are operated by the Debtor. As a result, the Debtors' respective sales have declined. The decline in sales and the resulting losses, among other things, eroded the Debtor's working capital. Without sufficient working capital, the Debtor was left with little flexibility to make inventory purchases. Since much of the Debtor's inventory consists of surplus, salvage goods, overstocks, closeouts and irregulars that become available erratically, the Debtor's business model relies, in part, on having sufficient working capital on hand to make erratic inventory purchases. The Debtor's lack of working capital impaired its ability to capitalize on erratic opportunities to purchase inventory.

9. The combined impact of declining sales, continuing losses and a lack of working capital forced the Debtors to file for Chapter 11 bankruptcy protection.

10. The Debtors have determined that the orderly liquidation of their inventory through store closing sales will generate the maximum value for that inventory. Contemporaneously with the filing of this motion, the Debtors have filed joint motions to sell their inventory at one or more store closing sales.

## II.     ASSETS AND LIABILITIES[3]

A.    **Assets.**

11.    The Debtor's tangible assets consist of its inventory which, as of the Petition Date, was valued at approximately $2.25 million, at cost, and its furniture, fixtures and equipment. The Debtor's intangible assets consist of its trademarks and trade names, and its accounts receivable from affiliates, the collectability of which is uncertain.[4]

12.    The Jointly Administered Debtors' assets consist of inventory and furniture, fixtures and equipment. The aggregate value, at cost, of the Jointly Administered Debtors' inventory as of the Petition Date was approximately $770,000.

B.    **Liabilities.**

i.    **Secured Claims.**

13.    Between 2000 and 2003, various insiders of the Debtor loaned an aggregate of approximately $2,715,000 to the Debtor. The loans were used for working capital and general corporate purposes. The loans were evidenced by various demand promissory notes (collectively the "JFLP Notes") with an interest rate of the prime rate plus one percent (1%). The JFLP Notes were subsequently assigned to three insider entities, the Judi Family Limited Partnership, the Judi Family Limited Partnership II, and Judith Elovitz. These three entities formed the JFLP Financial Group ("JFLP"), and, on August 8, 2008, the Debtor executed a security agreement in favor of JFLP that granted a lien on substantially all of the Debtor's assets to secure the amounts

---

[3] The Debtors have not determined the amount of any claims against it and/or the extent, priority or validity of any of the liens asserted against its assets, and reserves the right to challenge any claims and liens on any grounds.

[4] IFC and Gee Zee, two non-debtor affiliates that operate departments in the Debtor's stores, are creditors of the Debtor, being owed an aggregate of approximately $6.1 million.

5

due under the JFLP Notes.  As of the Petition Date, the amount allegedly due to JFLP was approximately $4.6 million, inclusive of accrued interest.

14. William Elovitz ("Mr. Elovitz", and together with JFLP the "Secured Creditors"), the Debtor's president, loaned approximately $2,900,000 to the Debtor, on the same terms as the JFLP Notes, as evidenced by various notes (collectively the "Elovitz Notes").  The loans were used for working capital and general corporate purposes.  On January 6, 2004, the Debtor executed a security agreement in favor of Mr. Elovitz that granted a lien on the Debtor's corporate names, trade names, trademarks, service marks, trademark registrations, pending registrations, and all goodwill associated with the foregoing, to secure the amounts due under the Elovitz Notes.  As of the Petition Date, the amount allegedly due to Mr. Elovitz was approximately $4.8 million, inclusive of accrued interest.

15. The Debtor has not conceded the amount of the Secured Creditors' claims nor the extent, priority or validity of the liens asserted by the Secured Creditors.

16. The Secured Creditors have agreed to a carveout from their respective collateral and/or the proceeds of any such collateral (the "Carveout") for: (a) for any quarterly or other fees payable to the U.S. Trustee pursuant to 28 U.S.C. § 1930(a); (b) the allowed fees and expenses incurred by any trustee appointed by the Court, not to exceed $10,000 in the aggregate; (c) the allowed fees and expenses incurred by professionals and agents retained by the Debtor, prorated among such professionals after taking in to account any pre-petition or other retainers then on account; and (d) the allowed fees and expenses incurred by professionals and agents retained by any statutory committee, in an aggregate amount not to exceed $25,000, prorated among such professionals.  The Replacement Liens shall also be subject to the Carveout.

6

    **ii.**     **Priority Claims.**

17. As of the Petition Date, the Debtor owed sales taxes to the Commonwealth of Massachusetts and the State of Rhode Island of approximately $136,000 and $30,000, respectively. The Debtor does not owe any other material taxes.

18. Contemporaneously with the filing of this motion, the Debtors have filed motions for authority to pay pre-petition wages and benefits owed to their employees. Those motions detail the amounts owed to employees that would constitute priority unsecured claims.

    **iii.**     **Non-Priority Unsecured Debt.**

19. As of the Petition Date and excluding inter-affiliate debt, the Debtor's non-priority unsecured debt totaled approximately $5.38 million, consisting largely of trade debt.

20. As of the Petition Date, the Debtor owed affiliates the following amounts: (a) approximately $15.5 million owed to affiliates for amounts owed under license agreements between the Debtor and such affiliates; and (b) approximately $40.0 million owed to the Real Estate Affiliates for unpaid rent and other charges under the Debtor's leases of its retail, corporate and warehouse facilities.

    **III.**     **USE OF CASH COLLATERAL**

    **A.**     **Requested Use of Cash Collateral.**

21. The Debtor requests the use of cash collateral, as that term is defined in Section 363(a) of the Bankruptcy Code (the "Cash Collateral") pursuant to the terms of the Proposed Cash Collateral Order.

22. Attached as Exhibit A is a budget for the Debtor's operations (the "Budget") setting forth estimated receipts and disbursements for the period from November 1, 2013 through

7

December 14, 2013 (the "Budget Period").  As the Budget demonstrates, the Debtor has sufficient Cash Collateral to fund its operations during the Budget Period.

23.     The use of Cash Collateral will enable the Debtor to pay post-petition obligations while it conducts its store closing sales and otherwise effects and orderly wind-down of its operations.  Absent the use of Cash Collateral, the continued operation of the Debtor's business would not be possible, resulting in serious and irreparable harm to the Debtors.

### B.     Adequate Protection.

24.     Section 363(e) of the Bankruptcy Code provides that a party with an interest in property proposed to be used, sold or leased by the debtor must receive adequate protection for such interest before the debtor may use, sell or lease such property.  11 U.S.C. § 363(e).

25.     Section 361 of the Bankruptcy Code provides that when adequate protection is required under Section 363 of the Bankruptcy Code, such adequate protection may be provided by, *inter alia*, "providing to such entity an additional or replacement lien to the extent that such stay, use, sale, lease, or grant results in a decrease in the value of such entity's interest in such property."  11 U.S.C. § 361(2).

26.     The entitlement to and measure of the protection required is always determined by the extent of the anticipated or actual decrease, if any, in the value of the secured creditor's collateral during course of the bankruptcy case.  *See In re First South Savings Assoc.*, 820 F.2d 700, 710 (5th Cir.1987).

27.     Adequate protection requires only that the value of the creditor's interest in the cash collateral be protected from diminution while the Debtor is using the cash collateral.  *United Savings Association of Texas v. Timbers of Inwood Forest Assoc., Ltd.*, 484 U.S. 365 (1988). Said another way, it is "intended by the Bankruptcy Code only to assure that a secured creditor,

8

during the pendency of a bankruptcy case, does not suffer a loss in the value of its interest in property of the bankruptcy estate." *In re Markos Gurnee Partnership*, 252 B.R. 712, 716 (Bankr.N.D.Ill.1997).

28.     It appears that only JFLP asserts a lien on the Cash Collateral.  Out of an abundance of caution, the Debtor, however, proposes to provide both of the Secured Creditors with replacement liens (the "Replacement Liens").  The Replacement Liens would be limited to the same types of post-petition property of the estate against which the Secured Creditors held liens as of the Petition Date, and would maintain the same priority, validity and enforceability as the Secured Creditors' pre-petition liens.  The Replacement Liens would be recognized only to the extent of the diminution in value of the Secured Creditors' pre-petition collateral after the Petition Date resulting from the Debtor's use of the Cash Collateral during the bankruptcy case.  Lastly, the Replacement Liens would be subject to the Carveout and, in any event, would not attach to any causes of action under Chapter 5 of the Bankruptcy Code or any proceeds of those causes of action.

29.     The Debtor has not conceded the amount of any claims asserted by the Secured Creditors nor the extent, priority or validity of any asserted liens.  There is no deadline for the Debtor to bring any challenge to the claims and/or liens asserted by the Secured Creditors. The proposed Replacement Liens do not prejudice any rights, claims or defense the Debtor may have with respect to the Secured Creditors' asserted liens and claims.  The proposed Replacement Liens do not violate any provision of MLBR 4001-2(c).

30.     The use of Cash Collateral and the granting of the proposed Replacement Liens are reasonable and in the best interest of the Debtor, its creditors and its bankruptcy estate.

9

## IV. NOTICE

31. Pursuant to MLBR 4001-2(b), the Debtor will serve this Motion on (a) the Secured Creditors, (b) any taxing authority that has a claim against the estates, (c) the 20 largest unsecured creditors of each Debtor, (e) the Office of the United States Trustee, and (f) all parties who have filed a notice of appearance in these cases. The Debtor believes that such service provides sufficient notice in light of the nature of the relief requested and request that the Court approve such notice.

**WHEREFORE**, the Debtor respectfully requests that this Court enter an Order: (a) approving the notice of this motion as described above; (b) authorizing the Debtor to use Cash Collateral on an emergency basis as proposed in this motion pending the scheduling of a hearing on the continuing use of Cash Collateral; (c) authorizing the Debtor to use Cash Collateral as proposed in this motion on a continuing basis in an amount necessary to conduct ordinary business operations; (d) granting the Secured Creditors replacement liens in accordance with the terms of this motion; and (e) granting such other relief as is just and proper.

Respectfully Submitted,

BUILDING #19, INC.,
By its proposed counsel,

/s/ *D. Ethan Jefferyt*
Harold B. Murphy (BBO #362610)
D. Ethan Jeffery (BBO #631941)
MURPHY & KING, Professional Corporation
One Beacon Street
Boston, MA  02108-3107
Tel: (617) 423-0400
Fax: (617) 556-8985
dej@hanify.com

Dated: November 1, 2013
658623