UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| INSPIRATION BIOPHARMACEUTICALS, | ) | |
| INC., | ) | Case No. 12-18687-WCH |
| Debtor. | ) | |

**FIRST AMENDED DISCLOSURE STATEMENT WITH RESPECT TO
FIRST AMENDED LIQUIDATING PLAN OF REORGANIZATION OF INSPIRATION
BIOPHARMACEUTICALS, INC.**

MURPHY & KING, Professional Corporation
One Beacon Street
Boston, MA 02108
Harold B. Murphy, Esq.
Andrew G. Lizotte, Esq.
Tel:    (617) 423-0400
Fax:    (617) 556-8985

Counsel to Inspiration Biopharmaceuticals, Inc.

Dated: October 22, 2013

# I.    INTRODUCTION[1]

Pursuant to Section 1125 of the United States Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"), Inspiration Biopharmaceuticals, Inc. (the "Debtor") provides this first amended disclosure statement (the "Disclosure Statement") to all of the Debtor's known creditors and parties in interest. The purpose of this Disclosure Statement is to provide the information deemed necessary for creditors to make an informed decision in exercising their rights to vote on the *First Amended Liquidating Plan of Reorganization (the "Plan") of Inspiration Biopharmaceuticals, Inc.* dated as of the date of this Disclosure Statement. The Debtor has filed the Plan simultaneously with the filing of this Disclosure Statement. The description of the Plan in this Disclosure Statement is in summary form and is qualified by reference to the actual terms and conditions of the Plan, which should be reviewed carefully before making a decision to accept or reject the Plan.

The information contained in this Disclosure Statement has been provided by the Debtor based upon the knowledge of its records, business and affairs. Except as otherwise expressly indicated, such information has not been subject to audit or independent review. Although great effort has been made to be accurate, neither the Debtor nor its respective professional advisors warrant the accuracy of the information contained in this Disclosure Statement.

No representations concerning the Debtor, including the value of its Assets or the aggregate dollar amount of Claims which may be allowed, are authorized other than as set forth in this Disclosure Statement. Any representations, warranties or agreements made to secure acceptance or rejection of the Plan that differ from those contained in this Disclosure Statement should not be relied upon in voting on the Plan.

Any descriptions of legal principles contained in this Disclosure Statement do not constitute a legal opinion and may not be relied upon by any creditor or party in interest. Each creditor or party in interest should consult with its own legal advisors with respect to any legal principles described in this Disclosure Statement.

This Disclosure Statement has been prepared by the Debtor to provide creditors with adequate information so that they can make an informed judgment about the Plan. Each creditor should read this Disclosure Statement and the Plan in their entirety before voting on the Plan. No solicitation of votes on the Plan may be made except pursuant to this Disclosure Statement, and no person has been authorized to utilize any information concerning the Debtor's business or Assets other than the information contained in this Disclosure Statement.

The Debtor believes that the Plan provides the quickest recovery to creditors and will maximize the return to such parties. **ACCORDINGLY, THE DEBTOR URGES ALL CREDITORS TO VOTE IN FAVOR OF THE PLAN. The Official Committee of Unsecured Creditors, which has been appointed in this Bankruptcy Case to represent the**

---

[1] Capitalized terms not otherwise defined in this Disclosure Statement have the meanings ascribed to them in the Plan.

**interests of unsecured creditors, recommends that creditors cast a ballot in favor of the Plan.**

## II.   SUMMARY OF THE PLAN

The Plan is a plan of liquidation and provides that the Assets will vest on the Effective Date in a Liquidating Trust. The assets of the Debtor include its interest in the proceeds that it has received and is entitled to receive under the Waterfall, which was established during the Bankruptcy Case to allocate the Asset Sale Consideration. The Debtor has to date received proceeds of $2,750,000 under the Waterfall. The proceeds that the Liquidating Trust realizes from the Waterfall will be used to satisfy Allowed Administrative Expense Claims, Priority Claims, and Priority Tax Claims, post-confirmation taxes and costs of administration, and then to pay holders of Allowed General Unsecured Claims, as well as the Allowed Ipsen Unsecured Claims. The Assets other than the Debtor's interest in the Waterfall are expected to have little or no value. To the extent of any recovery on such other Assets, those proceeds will be distributed to holders of Allowed Claims. As further set forth in Section 6.6herein, the Debtor estimates that holders of Allowed General Unsecured Claims will receive an initial dividend equal to all or a substantial portion of their Allowed Claims with such payment likely to be made in the middle of 2014. Payment of any additional amounts, to the extent Allowed Claims are not paid in full by the initial dividend, will be dependent upon the success of Baxter and Cangene in developing and commercializing the drug products so as to trigger the contingent milestone and sale payments under the Asset Purchase Agreements.

This Disclosure Statement has been prepared by the Debtor to provide creditors with adequate information so that they can make an informed judgment about the Plan. Each creditor should read this Disclosure Statement and the Plan in their entirety before voting on the Plan. No solicitation of votes on the Plan may be made except pursuant to this Disclosure Statement, and no person has been authorized to utilize any information concerning the Debtor's business or Assets other than the information contained herein for purposes of solicitation.

## III.   INFORMATION ABOUT THE REORGANIZATION PROCESS

### 3.1   Purpose Of Disclosure Statement

This Disclosure Statement includes background information about the Debtor and also identifies the Classes into which creditors and equity holders have been placed by the Plan. The Disclosure Statement describes the proposed treatment of each of those Classes if the Plan is confirmed. In addition, this Disclosure Statement contains information concerning the prospects for creditors and equity holders in the event of confirmation or, in the alternative, the prospects if confirmation is denied or the proposed Plan does not become effective.

Upon approval by the Bankruptcy Court and in accordance with the provisions of the Bankruptcy Code, this Disclosure Statement and any exhibits will have been found to contain adequate information of a kind and in sufficient detail that would enable a reasonable, hypothetical investor typical of a holder of Impaired Claims to make an informed judgment about the Plan. Approval of this Disclosure Statement by the Bankruptcy Court, however, does not constitute a recommendation by the Bankruptcy Court either for or against the Plan.

### 3.2      Voting Procedure

All creditors entitled to vote on the Plan may cast their votes for or against the Plan by completing, dating, signing and causing the Ballot accompanying this Disclosure Statement to be returned to the following address in the enclosed envelope:

Andrew G. Lizotte, Esq.
Murphy & King, Professional Corporation
One Beacon Street
Boston, MA 02108

Ballots must be completed in accordance with the instructions set forth therein and must be received at the address above **on or before 4:30 P.M. (Eastern Time) on** _____ to be counted in the voting. Ballots received after this time will not be counted in the voting unless the Bankruptcy Court so orders.

The Debtor recommends a vote for "ACCEPTANCE" of the Plan.

### 3.3      Ballots

Accompanying this Disclosure Statement is a ballot for acceptance or rejection of the Plan (a "Ballot"). Each party in interest entitled to vote on the Plan will receive a Ballot. Classes 2, 3, and 4 are Impaired and may vote on the Plan. Each member of a voting Class will be asked to vote for acceptance or rejection of the Plan. A party who holds claims in more than one Class should complete a Ballot for each Class with respect to the applicable portion of its claim included in each Class.

### 3.4      The Confirmation Hearing

The Bankruptcy Court has scheduled a hearing on confirmation of the Plan to commence on _____, or as soon thereafter as the parties can be heard. The Confirmation Hearing will be held before the Honorable William C. Hillman, United States Bankruptcy Judge, 12th Floor, 5 Post Office Square, Boston, Massachusetts, 02109. At the hearing, the Bankruptcy Court will consider whether the Plan satisfies the various requirements of the Bankruptcy Code, including whether it is feasible and whether it is in the best interests of holders of Claims and Equity Interests. The Bankruptcy Court will also receive and consider a Report of Plan Voting prepared by the Debtor and its agents and summarizing the votes for acceptance or rejection of the Plan by the parties entitled to vote.

### 3.5      Acceptances Necessary to Confirm Plan

At the Confirmation Hearing, the Bankruptcy Court must determine, among other things, whether each Impaired Class has accepted the Plan. Under Section 1126 of the Bankruptcy Code, an Impaired Class of Claims is deemed to have accepted the Plan if at least two-thirds (2/3) in amount and more than 1/2 in number of the Claims of Class members who have voted to accept or reject the Plan have voted for acceptance of the Plan. Unless there is acceptance of the Plan by all members of an Impaired Class, the Bankruptcy Court must also determine that Class

-4-

members will receive under the Plan property of a value, as of the Effective Date, that is not less than the amount that such Class members would receive or retain if the Debtor was liquidated under Chapter 7 of the Bankruptcy Code on the Effective Date.

### 3.6    Confirmation of the Plan Without The Necessary Acceptances.

The Plan may be confirmed notwithstanding that one or more Impaired Classes have not accepted the Plan if the Bankruptcy Court finds that the Plan does not discriminate unfairly against and is fair and equitable as to such Class or Classes. This provision is set forth in Section 1129(b) of the Bankruptcy Code and requires that, among other things, the class of Claims or Equity Interests must either receive the full value of their Claims or Equity Interests or, if they receive less, no Class with junior distribution priority may receive or retain anything on account of such junior interest unless the junior class provides "new value" or other consideration to the Debtor. The Debtor intends to proceed toward confirmation provided that at least one Impaired Class has voted to accept the Plan. The Debtor reserves the right to seek to confirm the Plan under Section 1129(b) of the Bankruptcy Code.

## IV.    GENERAL INFORMATION

### 4.1    Description of the Debtor

The Debtor commenced this Chapter 11 case by filing a voluntary Chapter 11 petition on October 30, 2012 (the "Petition Date"). The Debtor continues to operate as a debtor-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code. The Debtor, which was founded in 2006, is a Delaware corporation whose headquarters were located at One Kendall Square in Cambridge, Massachusetts.

The Debtor is a biopharmaceutical company focused principally on the treatment of hemophilia. The Debtor was founded by John R. Taylor, Jr., its Chairman of the Board of Directors, and Scott Martin, both of whom have sons with hemophilia. Hemophilia is a genetic disorder resulting in low levels of a clotting factor protein that is essential for blood clotting. Without the necessary levels of the clotting factor protein, individuals are at risk for excessive internal bleeding, which may occur following an injury or surgery. These bleeds can result in severe joint and organ damage.

There are two types of congenital hemophilia: hemophilia A, which is caused by a deficiency of factor VIII (80% of the hemophilia population has hemophilia A); and hemophilia B, which is caused by a deficiency of factor IX. Another type of hemophilia is acquired hemophilia. Acquired hemophilia is rare, though possibly life-threatening, and caused by the development of inhibitors against blood coagulation factors. Unlike congenital hemophilia, acquired hemophilia is typically found in older adults, and occurs in both men and women. Also, the pattern of bleeding seen in acquired hemophilia is different from that observed in the more common congenital form. In acquired hemophilia, people typically bleed into the skin, muscles, and soft tissues, as opposed to bleeding into joints, which is more typical in congenital hemophilia.

Approximately 400,000 people globally are believed to be affected by hemophilia, with less than one-third obtaining necessary treatment. The primary treatment for hemophilia consists

of clotting factor replacement therapies, including products made from human blood plasma (plasma-derived products) and products made using genetically engineered cells that carry a human factor gene (recombinant products). Therapy for hemophilia can either be provided on demand, to control a bleeding episode, or prophylactically, to avoid spontaneous bleeding episodes. There is a growing amount of data to suggest that prophylactic treatment of hemophilia can prevent permanent joint damage and allow people to live more normal, productive lives.

As of the Petition Date, the Debtor had two proprietary product candidates for hemophilia in advanced clinical development: (i) recombinant factor IX, IB1001 (the "FIX Assets" or "IB1001 Assets"), which is intended to treat and prevent bleeding in people with hemophilia B; and (ii) recombinant porcine factor VIII, OBI-1 (the "OBI-1 Assets"), which is intended to treat people with hemophilia A with inhibitors as well as acquired hemophilia (collectively, the "Products"). Approval of the FIX Assets would provide the first new choice in recombinant therapy available for individuals with hemophilia B in more than 15 years. Approval of the OBI-1 Assets would provide the first and only recombinant porcine factor VIII replacement therapy for individuals with acquired hemophilia. Approval to use this Product in congenital hemophilia A with inhibitors would follow completion of an ongoing study in this disease. As of the Petition Date, the Products had not yet received regulatory approval and cannot be marketed. In addition, Debtor had two product candidates for hemophilia in pre-clinical development: recombinant factor VIIa and recombinant factor VIII.

## A.      Debtor's Relationship with Ipsen

The Debtor had extensive prepetition business relationships with Ipsen, a French company that is engaged in specialty healthcare with a longstanding history in therapeutics. At the time of the filing of the petition, Ipsen and its affiliates asserted Secured and Unsecured Claims against the Debtor and held an ownership interest in the Debtor.

### 1.  Secured Claims

On or about January 20, 2010, Ipsen and the Debtor entered into the OBI-1 License/Sublicense, Development, and Commercialization Agreement (the "Original OBI-1 License Agreement"), pursuant to which Ipsen granted the Debtor certain exclusive licenses and sublicenses to develop, obtain approval for, and commercialize the OBI-1 Assets worldwide (the "OBI-1 License"). In consideration for the OBI-1 License, the Debtor agreed to pay Ipsen certain royalties on future sales from the OBI-1 Assets and issued a senior convertible note to Ipsen in the original principal amount of $50,000,000 (the "Initial Note").

On or about January 20, 2010, the Debtor and Ipsen entered into a Series C Stock Purchase and Investment and Development Agreement (the "Investment Agreement") pursuant to which, among other things, Ipsen agreed to advance funds to the Debtor on a phased-in basis contingent upon the achievement of certain milestones. As part of the Investment Agreement, Ipsen made several advances to the Debtor totaling $145,000,000, memorialized by a series of notes (the "Milestone Notes").

On or about January 20, 2010, the Debtor entered into a Security Agreement with Ipsen.[2] Pursuant to the Security Agreement, the Debtor granted a senior lien to Ipsen on substantially all of its existing and future assets to secure repayment of the Debtor's obligations to Ipsen, including those arising under the Initial Note and the Milestone Notes.

On or about July 12, 2012, Ipsen advanced the additional sum of $15,000,000 (the "Bridge Loan") to the Debtor. In return, the Debtor executed and delivered a Senior Secured Note. As a further inducement for the Bridge Loan, the Debtor agreed to grant rights to Ipsen to develop and commercialize the IB1001 and OBI-1 drug candidates in various countries around the world (the "Ipsen Territory"). Specifically, on or about August 16, 2012, the Debtor entered into (1) the IB1001 License/Sublicense, Development and Commercialization Agreement with Ipsen, whereby Ipsen was granted the right to develop and exclusively commercialize IB1001 in the Ipsen Territory, and (2) the OBI-1 License/Sublicense, Development and Commercialization Agreement, whereby Ipsen regained the right to co-develop and exclusively commercialize OBI-1 in the Ipsen Territory (rights which had initially been granted by Ipsen to the Debtor pursuant to the Original OBI-1 License Agreement).

As of the Petition Date, Ipsen asserted a Secured Claim of approximately $203,000,000 under the Initial Note and the Milestone Notes.

### 2.  Unsecured Claim

Ipsen, through its affiliate, Biomeasure, Inc., provided manufacturing support for the development of OBI-1. As of the Petition Date, Biomeasure asserted a claim of approximately $18,900,000 for services rendered under the manufacturing agreement. Ipsen also asserted an unsecured claim of approximately $2,500,000 for amounts owing in connection with a European Union commercialization agreement with the Debtor.

### 3.  Equity Interests

Ipsen also holds an equity interest in the Debtor and has representatives on the Debtor's board of directors.

### B.  Precipitating Causes of Bankruptcy Filing

In June 2012, the United States Food and Drug Administration ("FDA") imposed a clinical hold on IB1001. Consequently, virtually all administration of IB1001 to clinical trial patients was temporarily halted. The clinical hold was due to higher than normal levels of host cell protein in IB1001. Although a manufacturing process change to remedy this issue was later developed, the delays impaired the Debtor's ability to secure additional financing. In addition to the clinical trial delays, the Debtor was in arrears on payments to certain of its key vendors, and the failure to timely pay such amounts threatened its continued drug development.

---

[2] On or about July 9, 2012, the Security Agreement was amended and restated. On or about August 16, 2012, the Debtor and Ipsen entered into a First Amendment to the Amended and Restated Security Agreement.

The Debtor concluded that an orderly sale of its assets in Chapter 11, with the financial support of Ipsen, represented the best and only avenue for maximizing the value of the Debtor's assets.

## V.   SIGNIFICANT POST PETITION EVENTS

### 5.1   General Information

On October 30, 2012, the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Massachusetts. The Debtor continues to operate as a debtor and debtor-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

### 5.2   Appointment of Creditors' Committee

On November 9, 2012, the Office of the United States Trustee appointed an Official Committee of Unsecured Creditors (the "Committee") consisting of the following creditors: (a) Haematologic Technologies, Inc.; (b) Rho, Inc.; (c) Cato Research, Ltd.; (d) Cambridge Biomarketing; and (e) Indiana Hemophilia & Thrombosis Center. The Committee retained Duane Morris, LLP as its counsel and The Hawthorne Consulting Group, Inc. as its financial advisor. As a consequence of the sales and related assumption of Executory Contracts, the prepetition amounts due to Haematologic Technologies, Rho, Cato Research, and Indiana Hemophilia & Thrombosis Center have been satisfied.

### 5.3   Chapter 11 Proceedings

### I.   First Day Pleadings

### A.   Postpetition Financing

Shortly after the petition was filed, the Debtor entered into a debtor-in-possession financing agreement (the "DIP Financing") with Ipsen to ensure that the Debtor had adequate funding to meet its immediate and anticipated cash requirements pending a sale. The DIP Financing originally provided for up to $18,300,000, an amount sufficient to maintain ongoing operations for a period of approximately four (4) months. On November 2, 2012, the Court entered an order approving the DIP Financing facility on an interim basis and on December 19, 2012, the DIP Financing was approved on a final basis. On or about January 30, 2013, the Debtor and Ipsen entered into a modification to the DIP Financing to increase availability from $18,300,000 to $23,642,000 and to extend the maturity date to March 12, 2013. The DIP Financing was repaid in full on March 28, 2013 from proceeds of the Waterfall, except for a small amount voluntarily deferred by Ipsen to enable the Debtor to receive the $2,750,000 threshold under the Waterfall. The Debtor continued to use cash collateral thereafter with the consent of Ipsen and in accordance with agreed-upon budgets.

The DIP Financing was entered into as part of a comprehensive agreement between the Debtor and Ipsen respecting the marketing and sale of the drug candidates. The DIP Financing required, among other things, the entry of the Compromise Order on or before November 26, 2012, which deadline was later extended on several occasions by agreement of the parties. As

further discussed in Section 5.3(II), the Compromise Order established a mechanism for the sale of the interest of both the Debtor and Ipsen in the drug candidates (the "Combined Products") [3] and the allocation of the proceeds from the sale of the Combined Products to the Debtor's creditors and equity holders.

### B.    Retention of Professionals and First Day Affidavit

Shortly after filing its Chapter 11 petition, the Debtor filed applications to retain: (a) Murphy & King as its general bankruptcy counsel; (b) Edwards Wildman as its special intellectual property counsel to maintain its portfolio of trademarks and patents; (c) Ropes & Gray as its special corporate counsel to address tax, regulatory, and transactional matters; (d) FTI Consulting as its financial advisors; and (e) McGladrey as its tax advisors. The Debtor and Ipsen also jointly retained Evercore Partners as their investment bankers to assist in the sale of the Combined Products.

### C.    Retention of Key Personnel

On the Petition Date, the Debtor filed a motion for authority to enter into a severance program ("Severance Program") as well as a key employee incentive program (as amended, the "KEIP"). The Severance Program provided employees with a baseline of protection in consideration for their agreement to remain in the Debtor's employ through the bankruptcy process. The KEIP provided employees with an opportunity to be paid incentive compensation in the event that exceptional results were achieved in connection with the proposed sale of the estate's assets. The motion to authorize the Severance Program and KEIP was approved by the Bankruptcy Court, and payments in accordance with the motion have been made or will be made by the Effective Date.

As a result of an extension of the sale closing dates, Ipsen and certain equity holders (collectively, the "Interested Parties") agreed to contribute a percentage of sale proceeds otherwise payable to them under Priority 6 and Priority 7 of the Waterfall to those employees who remained with the Debtor through the sale closings (the "Additional Consideration"). A notice of this agreement was filed with the Court on April 12, 2013. The Additional Consideration is to be paid solely from the assets of the Interested Parties and not from any Estate assets.

### D.    Modification of CMC Contract

Shortly after the bankruptcy was filed, the Debtor entered into an agreement with CMC, the manufacturer of its FIX Assets, to modify the terms of the prepetition supply agreement. The modification, among other things, fixed the amount of CMC's claim that had previously been in dispute and favorably altered the Debtor's purchase obligations under the contract. Because CMC was the sole manufacturer of the FIX Assets and transition to a new manufacturer would

---

[3] Hereinafter, the joint interest of the Debtor and Ipsen in the FIX Assets shall be referred to as the "Combined FIX Assets" and the joint interest of the Debtor and Ipsen in the OBI-1 Assets shall be referred to as the "Combined OBI-1 Assets".

be expensive and would substantially delay and disrupt drug development, the continuation of the CMC relationship was essential to preserving the value of the FIX product line.

## II.   Bid Procedures and Waterfall

On November 5, 2012, the Debtor filed its motion to approve bidding procedures in connection with the sale of the Combined Products and related relief (the "Bid Procedures Motion"). In addition to the bidding procedures, the Bid Procedure Motion sought approval of the Waterfall and a Shareholder Protocol, which provided Waterfall Participants with the right to share in the recoveries under the Waterfall subject to the execution and timely delivery of releases in favor of Ipsen. On December 11, 2013, an amendment to the Bid Procedures Motion was filed which included, among other things, certain revisions to the Waterfall reflecting agreements reached among the Debtor, Ipsen, the Committee, and the Shareholder Representative. The United States Trustee and Scott Martin, a shareholder, objected to the Bid Procedures Motion but the objections were overruled and the Bid Procedures Motion was approved by entry of the Compromise Order.

The Waterfall provides for the distribution of the proceeds from the sale of the Combined Products as follows:[4]

(i)     Priority 1 provides for payment of certain accrued and unpaid administrative expenses, including employee retention payments, success fee payments due to FTI and Evercore, and amounts due to Biomeasure for postpetition services rendered, as well as retention payments due to Biomeasure employees;

(ii)    Priority 2 provides for repayment of the DIP Financing, as well as certain fees and expenses incurred by Ipsen in connection with the DIP Financing and the asset sale;

(iii)   Priority 3 provides for payment to Ipsen of fifty percent (50%) of the amount due to Ipsen in Priority 2 plus $375,000 to repay Ipsen for prepetition advances, as well as $2,750,000 to be paid to Inspiration to satisfy claims other than Priority 1 claims, the CMC Claims, and the Ipsen Unsecured Claims;

(iv)    Priority 4 provides for payment of up to $400,000 in unpaid fees and expenses of Professionals not paid pursuant to Priority 1;

(v)     Priority 5 provides for payment of the CMC Claim (which totals $8,400,000) in an amount equal to ten percent (10%) of the extent to which the upfront cash consideration from the sales exceeds $40,000,000;

(vi)    Priority 6 provides, generally, for a split of proceeds amongst Ipsen (80%), Inspiration (5%), CMC (5%), and Waterfall Participants (10%) provided that Ipsen subordinated any claim to the first $3,820,000 payable in Priority 6 and

---

[4] The description of the Waterfall herein is in summary form only. Parties should refer to the Waterfall, attached as <u>Exhibit A</u> to the Plan, for additional information.

provided further that the Ipsen Unsecured Claims partially subordinated the right to participate in that portion of the proceeds payable to Inspiration.  Priority 6 payments continue until Ipsen has been paid $304,000,000 in present value of aggregate payments;

(vii)    Priority 7 provides for an equal split of remaining sale proceeds between Ipsen and Waterfall Participants, after Ipsen has been paid all amounts owing in Priority 6.

As set forth in the table below, approximately $50,000,000 in sale proceeds has been distributed to date, resulting in payment or reserve for payment of substantially all claims in Priorities 1, 2, and 3 of the Waterfall.

| | Total Amount Due | Paid to Date | Amount Due |
|---|---|---|---|
| **Priority 1 Distributions** | | | |
| Accrued Liabilities | 4,793,743 | 4,793,743 | - |
| Evercore Success Fee | 2,000,000 | 2,000,000 | - |
| FTI Consulting Success Fee | 300,000 | 300,000 | - |
| Retention Payments to Debtor Employees | 2,243,500 | 2,243,500 | - |
| Retention Payments to Biomeasure Employees | 2,870,000 | 2,870,000 | - |
| Post-Petition Biomeasure Payments | 1,032,258 | 1,032,258 | - |
| **Subtotal, Priority 1** | 13,239,501 | 13,239,501 | - |
| | | | |
| **Priority 2 Distributions** | | | |
| DIP Financing Principal and Interest | 18,766,476 | 18,766,476 | - |
| DIP Financing Fees & Expenses | 4,501,474 | 4,501,474 | - |
| **Subtotal, Priorty 2** | 23,267,950 | 23,267,950 | - |
| | | | |
| **Priority 3 Distributions** | | | |
| DIP Financing Principal, Interest, and Fees (50%) | 11,633,975 | 10,673,055 | 960,920 |
| Ipsen Pre-petition advances | 375,000 | 346,214 | 28,786 |
| Ipsen Deferral | 443,898 | 232,798 | 211,100 |
| Payment to Debtor's Estate | 2,750,000 | 2,750,000 | - |
| **Subotal, Priority 3** | 15,202,873 | 14,002,067 | 1,200,806 |
| **Total, Priority 1-3** | 51,710,324 | 50,509,518 | 1,200,806 |

## III.    Marketing and Sale of Assets

Evercore actively marketed the Combined Products for a period of approximately three (3) months, preparing a bid package, contacting likely strategic and financial purchasers, assisting the Debtor and Ipsen in compiling due diligence materials, and providing regular updates to the Debtor, Ipsen, and other parties in interest as to the level of interest expressed by potential suitors.  On or about December 21, 2012, the Debtor filed its motion to sell the Debtor's interest in the Combined Products (the "Sale Motion"), and a sale hearing was scheduled for January 24, 2013.

The sale process provided for a two-stage bidding process. Stage 1, preliminary bids (the "Stage 1 Bids") were required to be submitted on or before December 14, 2012. Stage 2 bids (the "Stage 2 Bids") were required to be submitted on or before January 15, 2013 (the "Stage 2 Bid Deadline"). The Debtor received multiple Stage 1 Bids. Following the submission of the Stage 1 Bids, bidders were provided with a form of asset purchase agreement to utilize in conjunction with the submission of Stage 2 Bids. Although the Debtor had initially contemplated the sale of the Combined Products through an entireties bid, it became clear after a review of initial bids that the maximization of value might require the separate sale of OBI-1 and FIX. Multiple Stage 2 Bids were received by the Stage 2 Bid Deadline (the "Stage 2 Bidders"). The Debtor and Ipsen requested that Stage 2 Bidders submit final bids by January 22, 2013 (the "Final Bids").

### A.    Sale of Combined OBI-1 Assets to Baxter

The Debtor filed a notice identifying Baxter as the high bidder for the Combined OBI-Assets, and the Bankruptcy Court entered an order on January 29, 2013 approving the sale. The Baxter sale was subject to a satisfactory completion of an antitrust review under the provisions of the Hart Scott Rodino Antitrust Act ("HSR"). After completing its initial thirty (30) day review of the transaction under HSR, the Federal Trade Commission ("FTC") issued a second request for information which could have delayed the closing for an additional four (4) to six (6) months. The Debtor and Ipsen engaged in discussions with the FTC in an effort to address their concerns. Immediately following the meeting, the FTC withdrew its second request and the Baxter sale closed on March 20, 2013.   Pursuant to the terms of the Asset Purchase Agreement, Baxter agreed to pay:

(i)    upfront cash consideration of $50,000,000, which included approximately $2,000,000 in cure costs and other closing costs;

(ii)    up to $50,000,000 in developmental milestones, as follows: (a) $25,000,000 payable upon Food and Drug Administration ("FDA") approval of the Combined OBI-1 Assets for use in CHAWI surgery; and (b) $25,000,000 payable upon FDA approval of the Combined OBI-1 Assets for CHAWI non-responders or poor responders to bypass agents;

(iii)    up to $85,000,000 in performance-based milestones, as follows: (a) $10,000,000 payable when global annual calendar-year net sales of OBI-1 exceed $100,000,000; (b) $25,000,000 payable when global annual calendar-year net sales of OBI-1 exceed $200,000,000; and (c) $50,000,000 payable when global annual calendar-year net sales of OBI-1 exceed $300,000,000; and

(iv)    contingent sale payments as follows: (a) twelve and one-half percent (12.5%) of that portion of net sales of OBI-1 during an applicable calendar year that is equal to or less than $100,000,000, plus (b) fifteen percent (15%) of that portion of net sales of OBI-1 during an applicable calendar year that exceeds $100,000,000 but is equal to or less than $200,000,000, plus (c) seventeen and one-half percent (17.5%) of that portion of net sales of OBI-1 during an applicable calendar year that exceeds $200,000,000.

## B.    Sale of Combined FIX Assets to Cangene

Because no Final Bid for the Combined FIX Assets was accepted, a public auction sale (the "Auction") for the Combined FIX Assets was scheduled. After several days of bidding, it was determined that Cangene had submitted the highest and best bid. The Bankruptcy Court entered an order approving the sale of the Combined FIX Assets to Cangene on February 14, 2013, and the sale closed on February 15, 2013. Pursuant to the terms of the Asset Purchase Agreement, Cangene agreed to pay:

(i)     upfront cash consideration of approximately $5,900,000, which included approximately $3,400,000 in cure costs associated with the assumption and assignment of Executory Contracts;

(ii)    up to $50,000,000 in performance-based milestone payments, as follows: (a) $12,500,000 payable when annual net sales of FIX in the United States and Canada exceed $50,000,000 in the aggregate, provided that such milestone is achieved on or before December 31, 2019; (b) $12,500,000 payable when annual net sales of FIX in the United States and Canada exceed $65,000,000 in the aggregate, provided that such milestone is achieved on or before December 31, 2019; (c) $15,000,000 payable when annual net sales of FIX in the European Union and Japan exceed $50,000,000 in the aggregate, provided that such milestone is achieved on or before December 31, 2025; and (d) $10,000,000 payable when annual net sales of FIX in the European Union and Japan exceed $75,000,000 in the aggregate, provided that such milestone is achieved on or before December 31, 2025; and

(iii)   contingent payments for sales in the United States and Canada combined (collectively, "NA") as follows: (a) twenty-five percent (25) of net sales in NA that are greater than $25,000,000 and up to and including $75,000,000; and (b) sixteen and seven-tenths percent (16.7%) of net sales in NA that are greater than $75,000,000;

(iv)    contingent payments for sales in the European Union and Japan combined (collectively, "EUJ") as follows: (a) fifteen percent (15%) of net sales in EUJ that are greater than $25,000,000 and up to and including $75,000,000; and (b) ten percent (10%) of net sales in EUJ that are greater than $75,000,000; and

(v)     contingent payments for sales in all countries outside of NA and EUJ in an amount equal to seven percent (7%) of net sales, without a minimum.

## IV.    Approval of Cash Collateral Stipulation

Following repayment of the DIP Financing, the Debtor and Ipsen entered into a stipulated order for the continued use of cash collateral, which: (i) provided for continued consensual use of cash collateral through June 28, 2013 to facilitate the wind down of the Debtor and rendition of post-sale transition services; (ii) confirmed that neither the $2,750,000 initial distribution received by the Debtor under the Waterfall nor any future distributions paid to the Debtor under

Priority 6 of the Waterfall would constitute cash collateral of Ipsen; and (iii) resulted in a voluntary reduction by Ipsen of approximately $700,000 in claims for reimbursement of professional fees and expenses. Since June 28, 2013, the Debtor has continued to use cash collateral with the consent of Ipsen and in accordance with agreed-upon budgets.

### V.    Extension of The Exclusivity Periods

The exclusivity period during which only the Debtor could file a plan was originally scheduled to expire on February 27, 2013, or 120 days after the Petition Date. As a result of three extension requests granted by the Bankruptcy Court, the Debtor's exclusivity period for filing a plan was extended to July 31, 2013, and the deadline for solicitation of acceptances for the Debtor's plan was extended to September 30, 2013.

### VI.    DESCRIPTION OF THE PLAN

### A.    Waterfall and Liquidating Trust Distributions

The Plan provides for the distribution of the Debtor's interest in the Waterfall by the Liquidating Trustee. The Debtor's interest in the Waterfall terminates upon payment in full of the Allowed General Unsecured Claims and the Ipsen Unsecured Claims. Amounts due under the Waterfall to CMC, Ipsen, other than the Ipsen Unsecured Claims, and the Waterfall Participants shall be paid by the Sellers Representative pursuant to the terms of the Sellers Representative Agreement and the Waterfall outside of the Plan.

### B.    Unclassified Claims

### 6.1    Administrative Expense Claims.

Administrative Expense Claims consist of Professional Fee Claims as well as operational expenses incurred and paid by the Debtor in the ordinary course of its business. On or about November 21, 2012, the Court entered an order approving procedures for the payment of interim compensation to Professionals (the "Interim Fee Order", docket entry no. 120). The Interim Fee Order provided for monthly payment of ninety percent (90%) of fees and one hundred percent (100%) of expenses in the absence of an objection filed within twenty-one (21) days of delivery of the monthly fee statement. The Interim Fee Order further provided for the filing of applications for compensation every four (4) months, with the first interim application due April 15, 2013 for services rendered and expenses incurred during the period from the Petition Date through February 28, 2013. Any amounts withheld pursuant to the monthly fee statements could be paid upon approval of the interim applications for compensation. All first interim applications for compensation were allowed and amounts due thereunder have been paid. The Debtor has continued to pay Professionals on a monthly basis in accordance with the Interim Fee Order and does not anticipate there to be any substantial accrued and unpaid Professional Fee Claims or other Administrative Expense Claims as of the Effective Date. Under the Plan, Administrative Expense Claims are treated as follows:

(a)    **General.** On, or as soon as reasonably practicable after, the later of (a) the Effective Date, (b) the date on which an Administrative Expense Claim becomes an Allowed Administrative Expense Claim, or (c) the date on

which an Allowed Administrative Expense Claim becomes payable under any agreement or applicable law relating thereto, each holder of such Allowed Administrative Expense Claim shall receive, in full and final satisfaction, settlement, and release of, and in exchange for, such Allowed Administrative Expense Claim, Cash equal to the unpaid portion of such Allowed Administrative Expense Claim. Notwithstanding the foregoing, (y) any Allowed Administrative Expense Claim based on a liability incurred by the Debtor in the ordinary course of business during the Bankruptcy Case may be paid in the ordinary course of business in accordance with the terms and conditions of any agreement relating thereto and (z) any Allowed Administrative Expense Claim may be paid when payable under applicable law or on such other terms as may be agreed to between the holder of such Claim and the Liquidating Trustee.

(b) **U.S. Trustee's Fees.** The outstanding fees due to the United States Trustee pursuant to 11 U.S.C. § 1930 shall be paid in full on or before the Effective Date.

(c) **Professional Fee Claims.**

(i) Within thirty (30) days after the Effective Date, each Professional shall file a final application for the allowance of compensation for services rendered or reimbursement of expenses incurred through and including the Effective Date.

(ii) Any Allowed Professional Fee Claim shall receive: (i) payment upon entry of a Non-Appealable Order approving such Claim, or (ii) payment as agreed between the holder of the Allowed Administrative Expense Claim and the Liquidating Trustee.

(iii) All fees and expenses of Professionals retained by the Liquidating Trustee for services rendered after the Effective Date shall be paid by the Liquidating Trustee upon the receipt of reasonably detailed invoices in such amounts and on such terms as such Professional and the Liquidating Trustee agree. No further order or authorization from the Bankruptcy Court shall be necessary to permit the payment of the fees and expenses of Professionals for services rendered after the Effective Date.

**6.2    Priority Tax Claims.**

Priority Tax Claims consist of asserted claims for unpaid unemployment or excise taxes. Priority Tax Claims are estimated to be less than $10,000. Under the Plan, Priority Tax Claims are treated as follows:

On or as soon as reasonably practicable after, the later of (a) the Effective Date or (b) the date on which a Priority Tax Claim becomes an Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim shall receive, in full and final satisfaction, settlement, and release of, and in exchange for, such Allowed Priority Tax Claim, (i) payment in accordance with Section

1129(a)(9)(C) of the Bankruptcy Code, or (ii) payment as agreed between the holder of the Allowed Priority Tax Claim and the Liquidating Trustee.

### C. Classified Claims

**6.3    Class 1 – Priority Claims.**

Priority Claims consist principally of any unpaid wage, salary or commission claims of employees or former employees of the Debtor, or employee benefit payments relating thereto, that are entitled to priority under the provisions of 11 U.S.C. §507(a)(4), (5). The estimated amount of Allowed Priority Claims is less than $50,000. Under the Plan, Priority Claims are treated as follows:

(a)    **Classification.**  Class 1 consists of the Allowed Priority Claims.

(b)    **Impairment and Voting.**  Priority Claims are Unimpaired under the Plan and shall be deemed to accept the Plan.

(c)    **Claim Treatment**.  In full and complete satisfaction, settlement and release of the Allowed Priority Claims, the holders of Allowed Class 1 Claims shall be paid in full upon the later of the Effective Date or entry of an order of the Bankruptcy Court allowing such claim.

**6.4    Class 2 – Ipsen Secured Claim.**

The Ipsen Secured Claim consists of Ipsen's Allowed Claim of not less than the approximate amount of $203,000,000 as of the Petition Date, as well as any rights to recovery based upon Ipsen's Equity Interests or ownership interest in the Combined Products. Under the Plan, the Ipsen Secured Claim is treated as follows:

(a)    **Classification.**  Class 2 consists of the Allowed Ipsen Secured Claim.

(b)    **Impairment and Voting.**  The Ipsen Secured Claim is Impaired under the Plan and shall be entitled to vote to accept or reject the Plan.

(c)    **Claim Treatment**.  In full and complete satisfaction, settlement and release of the Allowed Ipsen Secured Claim, the holder of the Class 2 Claim shall receive distributions from the Sellers Representative as contemplated pursuant to Priority 3(a), Priority 6(a) and Priority 7(a) of the Waterfall.

(d)    **Retention of Liens.**  Ipsen shall retain its Liens and security interests in and to the Asset Sale Consideration provided, however, that the proceeds realized from the Asset Sale Consideration shall be distributed by the Sellers Representative in accordance with the Waterfall, free and clear of Ipsen's Liens and security interests.

**6.5    Class 3 – CMC Claim.**

The CMC Claim consists of CMC's Allowed Claim in the amount of $8,400,000 arising out of the modification of the Supply Agreement.   Under the Plan, the CMC Claim is treated as follows:

(a)    **Classification**.  Class 3 consists of the Allowed CMC Claim.

(b)    **Impairment and Voting**.  The CMC Claim is Impaired under the Plan. The holder of the Allowed CMC Claim shall be entitled to vote to accept or reject the Plan

(c)    **Claim Treatment**.  In full and complete satisfaction, settlement and release of the Allowed CMC Claim, the holder of the Class 3 Claim shall receive distributions from the Sellers Representative as contemplated pursuant to Priority 5 and Priority 6(b) of the Waterfall and the proviso applicable to Priority 6 of the Waterfall.

**6.6    Class 4A – General Unsecured Claims.**

The General Unsecured Claims generally consist of all nonpriority unsecured claims against the Debtor other than the Ipsen Unsecured Claims and the CMC Claim. Under the Plan, General Unsecured Claims are treated as follows:

(a)    **Classification**.  Class 4A consists of the Allowed General Unsecured Claims.

(b)    **Impairment and Voting**.  The General Unsecured Claims are Impaired under the Plan.  Each holder of a General Unsecured Claim shall be entitled to vote to accept or reject the Plan.

(c)    **Claim Treatment**. In full and complete satisfaction, settlement, and release of their respective Allowed General Unsecured Claims, each holder of an Allowed General Unsecured Claim shall receive (a) a *Pro Rata* share of the Net Proceeds of the Assets from the Liquidating Trustee, after payment or reserve for payment of any Allowed Administrative Expense Claims, Priority Claims, and Priority Tax Claims, until such time as all Allowed General Unsecured Claims have received the lesser of (i) payment in full and (ii) $4,500,000 (the "General Unsecured Creditor Threshold"), and (b) if all Allowed General Unsecured Claims have not been paid in full when the General Unsecured Creditor Threshold is met, each holder of Class 4A Claim that has not been paid in full shall receive a *Pro Rata* share of the Net Proceeds of the Assets from the Liquidating Trustee, *pari passu* with the holders of Class 4B Claims, until such time as Allowed General Unsecured Claims have been paid in full, as contemplated pursuant to Priority 6(c) of the Waterfall and the proviso applicable to Priority 6 of the Waterfall.

    (d)      **Estimated Amount of Claims**.

Filed General Unsecured Claims totaled approximately $13,000,000. While there may be an additional opportunity for counterparties to certain rejected Executory Contracts to file claims, the Debtor does not project that any such additional claims will be significant. The asserted claims included Claims of unaffiliated third parties totaling approximately $4,000,000 ("Unaffiliated Claims") and Claims filed by three of the Debtor's directors for indemnification under the by-laws for any losses arising from claims made against such directors in connection with the performance of their duties (the "Insider Claims"). As a result of the resolution of certain Disputed Claims, the aggregate amount of Allowed General Unsecured Claims is estimated to be $2,200,000. The Debtor does not believe that an initial distribution or reserve will be required for the Insider Claims for at least three reasons. No claims have been asserted against the directors. The Compromise Order affected a release by the Debtor of claims against the insiders. Finally, there is a director and officer insurance policy that should provide coverage in the event that claims are asserted against the directors.

    (e)      **Amount and Timing of Distributions**.

The Debtor has received $2,750,000 in initial proceeds under the Waterfall. These proceeds will be utilized to fund the Plan. If, as the Debtor expects, it will owe no taxes as a result of the sales,[5] then the Liquidating Trustee will distribute most, if not all, of the balance of the $2,750,000, after payment of administrative costs, to holders of Allowed General Unsecured Claims, which should be sufficient to pay all or a substantial portion of such claims. In the event that the Debtor owes a tax in connection with the sales of Inspiration Transferred Assets or resulting from the transfer of the Assets to the Liquidating Trust, the tax liability will be paid from the initial Waterfall proceeds paid to the Debtor and, to the extent of any insufficiency, from the next available proceeds paid to the Debtor under the Waterfall. While an adverse tax ruling could delay the immediate payment of Allowed General Unsecured Claims, the Debtor believes that there will be no effect on the ultimate recovery, and that holders of Allowed General Unsecured Claims will be paid in full from amounts received by the Debtor under the Waterfall. A discussion of additional amounts that may be received under the Waterfall on account of contingent milestone and sale payments is set forth below.

    (f)      **The Contingent Milestone and Royalty Payments**.

As set forth in Section 5.3(III), Baxter has agreed to pay up to

---

[5] A more detailed discussion of the tax consequences associated with the sale of the Inspiration Transferred Assets is contained in Section XIII herein.

$135,000,000 in developmental and performance-based milestones, as well as contingent sale payments to the extent that global annual sales of OBI-1 exceed $100,000,000. These amounts include an initial developmental-milestone payment of $25,000,000 upon FDA approval of the Combined OBI-1 Assets for use in CHAWI surgery and an initial performance-based milestone of $10,000,000 when global annual calendar year net sales of OBI-1 exceed $100,000,000.

As set forth in Section 5.3(III), Cangene has agreed to pay up to $50,000,000 in performance-based milestones, as well as contingent payments depending upon sale levels achieved in various geographical regions. The performance-based milestones are contingent on being reached within a fixed time period, and sale payments relating to NA and EUJ are contingent upon achieving minimum annual net sales of $25,000,000. The initial performance-based milestone of $12,500,000 is payable when annual net sales of FIX in the United States and Canada exceed $50,000,000 in the aggregate, provided that such milestone is achieved on or before December 31, 2019.

On or about June 14, 2013, Cangene announced its withdrawal of the Marketing Authorization Application ("MAA") for hemophilia compound FIX in Europe and its intention to re-submit the MAA with additional clinical data requested by the European Medicines Agency ("EMA"). In May 2013, Cangene presented an Oral Explanation of FIX at the Committee for Medicinal Products for Human Use. The EMA subsequently requested additional clinical data for FIX as part of the MAA's Centralized Procedure. Because the results of the clinical study producing the requested data will not be available within the timeframe allowed in the Centralized Procedure, Cangene notified the EMA of its withdrawal of the MAA. Cangene intends to re-file the MAA for European Union licensure of FIX when the additional clinical data is available. The resubmission of the MAA will likely delay Cangene's commercialization efforts of FIX in Europe. Cangene continues to address the FDA issued Complete Response Letter with respect to approval in connection with the Biologics License Application in the United States.

(g)   **Prior Waterfall Payments.**

Approximately $50,000,000 has already been distributed pursuant to the Waterfall. See Section 5.3(II). Additional proceeds from the sale of the Combined Products will be distributed under the Waterfall as follows:

(i)  approximately $1,200,000 payable to Ipsen under Priority 3;

(ii) up to $400,000 payable to Professionals for any accrued and unpaid fees and expenses under Priority 4 (the Debtor does not anticipate any amounts will be due in Priority 4);

(iii) approximately $1,000,000 payable to CMC under Priority 5;

(iv) the first $3,820,000 payable under Priority 6 as follows: $1,910,000 to Waterfall Participants, $955,000 to CMC, and $955,000 to the Debtor;

(v) additional amounts to be paid in Priority 6 as follows: eighty percent (80%) to Ipsen; ten percent (10%) to Waterfall Participants; five percent (5%) to CMC; and five percent (5%) to the Debtor.

### 6.7    Class 4B – Ipsen Unsecured Claims.

The Ipsen Unsecured Claims consist of the Claim of Biomeasure for services provided to the Debtor in connection with the manufacture of OBI-1 in the asserted amount of $18,910,000 and an asserted unsecured Claim of Ipsen for amounts owing in connection with a European Union commercialization agreement in the asserted amount of $2,585,000. Under the Plan, Ipsen Unsecured Claims are treated as follows:

(a)    **Classification**. Class 4B consists of the Allowed Ipsen Unsecured Claims.

(b)    **Impairment and Voting**. The Ipsen Unsecured Claims are Impaired under the Plan. Each holder of an Ipsen Unsecured Claim shall be entitled to vote to accept or reject the Plan.

(c)    **Claim Treatment**. Subject to the satisfaction of the General Unsecured Creditor Threshold, each holder of an Allowed Ipsen Unsecured Claim shall receive, in full and complete satisfaction, settlement, and release of their respective Allowed Ipsen Unsecured Claims, a *Pro Rata* share of the Net Proceeds of the Assets from the Liquidating Trustee, after payment or reserve for payment of any Allowed Administrative Expense Claims, Priority Claims, and Priority Tax Claims, *pari passu* with the holders of Class 4A Claims that have not been paid in full, until such time as all Allowed Ipsen Unsecured Claims have been paid in full, as contemplated pursuant to Priority 6(c) of the Waterfall and the proviso applicable to Priority 6 of the Waterfall.

### 6.8    Class 5 – Equity Interests.

(a)    **Classification**. Class 5 consists of all the Equity Interests in the Debtor..

(b)    **Impairment and Voting**. Class 5 is Impaired under the Plan. Each holder of an Equity Interest shall be conclusively deemed to have rejected the Plan.

(c)    **Treatment**. Class 5 Equity Interests shall be deemed canceled and terminated as of the Effective Date, and the holders of Equity Interests

shall not receive or retain any property or interest in property on account
of such Equity Interest.

## VII.  MEANS FOR IMPLEMENTATION OF THE PLAN

### 7.1    Plan Implementation.

Except as otherwise set forth in the Plan and the Confirmation Order, as of the Effective
Date, the Liquidating Trust shall be the successor to the Debtor for all purposes. On the Effective
Date, the Liquidating Trust shall be established and all of the Assets shall vest in the Liquidating
Trust, free and clear of all Liens and encumbrances, but subject to payment of the Liens and
Claims as provided in the Plan.

### 7.2    Sellers Representative Agreement/Waterfall.

(a)     Upon the Effective Date, the Liquidating Trustee shall enter into the Sellers
Representative Agreement, in form and substance similar to that attached as Exhibit "B" to the
Plan, and the Sellers Representative Agreement shall be deemed authorized and approved in all
respects, without any requirement of further action by the Debtor or the Liquidating Trustee.
Confirmation of the Plan shall be deemed a conclusive and final determination of the identity of
the Waterfall Participants and the percentage recovery that each such Waterfall Participant is
entitled to receive from the Sellers Representative, as further set forth on Exhibit C to the Plan.
The Seller Representative shall calculate and distribute amounts received under the Waterfall as
set forth in the Sellers Representative Agreement.

(b)     The Debtor and the other parties bound by the Compromise Order and the Sale
Orders are authorized and directed to perform according to their terms including making
distributions of Asset Sale Consideration pursuant to the Waterfall.  Distributions of Asset Sale
Consideration shall be free and clear of Ipsen's claims, Liens, encumbrances, or other interests.

### 7.3    Corporate Action.

Confirmation of the Plan shall constitute authorization for the Debtor and the Liquidating
Trustee to effectuate the Plan and to execute, issue, deliver, file or record all contracts,
instruments and other agreements or documents, and take such actions as may be necessary or
appropriate to effectuate and further evidence the terms and conditions of the Plan without
further notice to or action, order or approval of the Bankruptcy Court or any other entity except
for those expressly required pursuant to the Plan. All matters provided for in the Plan involving
any corporate action to be taken by or required of the Debtor in connection with the Plan shall be
deemed to have occurred, and be effective as provided herein, and shall be authorized, approved
and, to the extent taken prior to the Effective Date, ratified in all respects, without any
requirement of further action by the Debtor, its agents, representatives, stockholders, members,
managers, officers, directors or Affiliates.

### 7.4    Vesting of Property.

All Assets shall vest in the Liquidating Trust on the Effective Date.  Except as may be
expressly provided in the Plan or in a Non-Appealable Order of the Bankruptcy Court, no Asset

of the Estate shall be deemed abandoned and no defense, set-off, counterclaim or right of recoupment of the Debtor shall be deemed waived, released or compromised. Any tax refunds payable to the Debtor or the Liquidating Trustee on or after the Effective Date shall constitute Assets that shall vest and become property of the Liquidating Trust.

### 7.5    Preservation of Causes of Action.

Except as provided in, and unless expressly waived, relinquished, exculpated, released, compromised or settled in the Plan, the Confirmation Order, any Non-Appealable Order, or in any contract, instrument, release or other agreement entered into or delivered in connection with the Plan, the Liquidating Trust will exclusively retain and may enforce, and the Liquidating Trustee expressly reserves and preserves for these purposes, in accordance with Sections 1123(a)(5)(A) and 1123(b)(3) of the Bankruptcy Code, any Claims, Causes of Action and demands and rights relating thereto that the Debtor or its Estate may hold against any Person or entity. No preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches shall apply to them by virtue of or in connection with the Confirmation, consummation or effectiveness of the Plan.

### 7.6    Dissolution of the Committee.

Unless previously dissolved, the Committee shall dissolve automatically on the Effective Date. Upon such dissolution, its members, professionals, and agents shall be released from any further duties and responsibilities in the Bankruptcy Case and under the Bankruptcy Code, except with respect to applications for Professional Fee Claims or reimbursement of expenses incurred as a member of the Committee.

### 7.7    Default.

No event of default under the Plan shall occur unless, in the event of a breach of the Liquidating Trust's obligations under the Plan, the holder of the Allowed Claim asserting the default shall provide written notice of such breach to the Liquidating Trustee and such breach is not cured: (i) in the event of a breach that can be cured by the payment of a sum of money, within ten (10) days of the Liquidating Trustee's receipt of such notice; and (ii) for any other breach, within thirty (30) days of the Liquidating Trustee's receipt of such notice, provided that, if such non-monetary breach cannot reasonably be cured within such 30-day period and the Liquidating Trustee has commenced curing such breach and continues to cure such breach, the thirty (30) day period shall be extended for such time as is reasonably necessary to cure such breach.

### 7.8    Dissolution of the Debtor.

The Liquidating Trustee shall be authorized to dissolve the Debtor at any time on or after the Effective Date as he deems necessary or appropriate in his sole discretion. The dissolution of the Debtor shall not and shall not be deemed to impair, prejudice, or diminish the Liquidating Trust's rights under the Plan.

**7.9      Resignation of Officers and Directors.**

Upon the Effective Date, all of the Debtor's officers and members of its board of directors shall be deemed to have resigned without the necessity of any further action or writing and they shall be released from any responsibilities, duties and obligations that arise after the Effective Date to the Debtor or its creditors under the Plan or applicable law.

**7.10      Further Authorization.**

The Liquidating Trustee, on behalf of the Liquidating Trust and the Debtor, shall be entitled to seek such orders, judgments, injunctions, and rulings and take such actions as deemed necessary to carry out the intentions and purposes, and to give full effect to the provisions, of the Plan.

**7.11      Final Decree.**

The Liquidating Trustee shall be authorized to prepare and file a motion requesting that the Court enter a Final Decree in the Bankruptcy Case.

## VIII.   DISTRIBUTIONS ON CLAIMS AND EQUITY INTERESTS AND RESOLUTION OF DISPUTED CLAIMS

**8.1      Method of Distributions Under the Plan.**

(a)      In General. Subject to Bankruptcy Rule 9010, and except as otherwise provided in the Plan, all distributions under the Plan to be made by, or on behalf of, the Liquidating Trustee to the holder of each Allowed Claim shall be mailed by first class mail, postage prepaid, to the address of such holder as listed on the Schedules unless the Liquidating Trustee has been notified in writing of a change of address as of the Distribution Record Date, including, without limitation, by the filing of a proof of claim or notice of transfer of claim filed by such holder that provides an address for such holder different from the address reflected on the Schedules. The Liquidating Trustee shall have no obligation to locate such holders whose distributions or notices are properly mailed but nevertheless returned.

(b)      Form of Distributions. Except as otherwise provided in the Plan, any payment of Cash made by, or on behalf of, the Liquidating Trustee pursuant to the Plan shall be made by check.

(c)      Distributions to be on Business Days. Any payment or distribution required to be made under the Plan on a day other than a Business Day shall be made on the next succeeding Business Day.

(d)      Fractional Dollars. Whenever any payment of a fraction of a dollar would otherwise be called for, the actual payment shall reflect a rounding of such fraction to the nearest whole dollar (rounding down in the case of $0.50 or less, and rounding up in the case of more than $0.50).

(e)    <u>Distributions to Holders as of the Distribution Record Date</u>.  The Liquidating Trustee shall be entitled to rely upon the register of Claims as of the Distribution Record Date. Any transfers of an Allowed Claim shall be recognized ten (10) days after written notice of such transfer is received by the Liquidating Trustee as provided herein.

**8.2    Objections to Disputed Claims.**

Prior to the Effective Date, any objections to Claims against the Debtor shall be prosecuted by the Debtor.  On and after the Effective Date, any objections to Claims against the Debtor shall be prosecuted by the Liquidating Trustee.

**8.3    Deadline for Objecting to Disputed Claims.**

Except as otherwise provided by order of the Bankruptcy Court, the Liquidating Trustee may file an objection to a Claim against the Debtor until the later of: (a) the date that such Claim becomes due and payable in accordance with its terms, or (b) 120 days after the Effective Date.

**8.4    Estimation of Claims.**

After the Effective Date, the Liquidating Trustee may, at any time, request that the Bankruptcy Court estimate any Disputed Claim pursuant to Section 502(c) of the Bankruptcy Code regardless of whether the Debtor or the Liquidating Trustee have previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection.  The Bankruptcy Court shall have jurisdiction to estimate a Disputed Claim at any time, including, without limitation, during litigation concerning such Claim or an objection to such Claim.  In the event the Bankruptcy Court estimates any Disputed Claim, the estimated amount shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court.  If the Bankruptcy Court determines the maximum limitation of a Disputed Claim, such determination shall not preclude the Liquidating Trustee from pursuing any supplemental proceedings to object to any payment of such Claim.  All of the aforementioned Claims objections, estimation and resolution procedures are cumulative and not exclusive remedies.  Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

**8.5    Disputed Claims Reserve.**

(a)    <u>Establishment</u>.  A reserve shall be maintained equal to 100% of the distributions to which holders of Disputed Claims would be entitled under the Plan if such Disputed Claims were Allowed Claims or such lesser amount as required by a Non-Appealable Order.

(b)    <u>Investment of Cash</u>.  Cash in the Disputed Claims Reserve may be invested only in Cash Equivalents having maturities sufficient to enable the holder of the Disputed Claim Reserve to make all necessary payments to holders of Disputed Claims if, and when, such Disputed Claims become Allowed Claims.  Any interest, income, distributions or accretions on account of such investment in Cash Equivalents in the Disputed Claims Reserve shall be for the sole benefit and account of the Liquidating Trustee, and the Liquidating Trustee shall be solely responsible for the payment of any income or other taxes arising therefrom.

(c)      <u>Distributions Upon Allowance of Disputed Claims.</u>  The holder of a Disputed Claim that becomes an Allowed Claim after the Effective Date shall receive distributions of Cash from the Disputed Claims Reserve on or after the Payment Date as soon as practicable following the date on which such Disputed Claim becomes an Allowed Claim pursuant to a Non-Appealable Order.  Such distributions shall be made in accordance with the Plan based upon the distributions that would have been made to the holder of such a Claim under the Plan if the Disputed Claim had been an Allowed Claim on or prior to the Effective Date.  No holder of a Disputed Claim shall have any claim against the respective Disputed Claims Reserve or the Liquidating Trust with respect to such Claim until the Disputed Claim shall become an Allowed Claim.

**8.6      Reversion of Unclaimed Checks.**

If a check remains unclaimed for a period of one hundred eighty (180) days after distribution, the party otherwise entitled to such distribution shall be deemed to have forfeited its right to the distribution and any future distributions, and the Liquidating Trustee may redistribute the Cash to other beneficiaries under the Plan as if such Claim or Equity Interest was disallowed.

## IX. LIQUIDATING TRUSTEE

**9.1      Appointment of Liquidating Trustee, and Vesting of Estate Powers..**

As of the Effective Date, Michael Nowlan shall be the Liquidating Trustee.  Upon the Effective Date, the Liquidating Trustee shall be vested with the standing of and with all rights, powers and benefits afforded to a "trustee" under the Bankruptcy Code with respect to all Assets and rights belonging to the Estate, including, without limitation the standing and authority to commence, prosecute and compromise objections to Claims and Causes of Action, whether initially filed by the Debtor or as may be filed by the Liquidating Trustee.  The Liquidating Trustee shall stand in the same position as the Debtor and/or the Estate with respect to any claim the Debtor and/or the Estate may have had to an attorney-client privilege, the work product doctrine, or any other privilege against production, and the Liquidating Trustee shall succeed to all of the Debtor's and/or the Estate's rights to preserve, assert or waive any such privilege.

**9.2      Liquidating Trustee's Rights and Powers.**

The Liquidating Trustee's rights and powers shall include the following (subject to any rights and powers of the Sellers Representative under the Sellers Representative Agreement):

(a)      Sell at public or private sale, or exchange, transfer, or convey, on such terms and conditions, and at such time or times as the Liquidating Trustee shall determine, any or all of the Assets (whether tangible or intangible); to that end, grant options, make contracts, retain brokers, and sign, seal, acknowledge, and deliver any and all proper deeds, or other instruments of conveyance or transfer thereof; and delegate to an attorney in fact the power to execute all documents necessary to accomplish a sale, lease, transfer, or exchange of any such property;

(b)      Obtain and maintain such space, facilities, equipment, supplies and personnel as shall be reasonably necessary for the performance of the Liquidating Trustee's duties hereunder and under the Plan;

(c)      Subject to any limitations contained in the Plan and the Liquidating Trust Agreement, pay, compromise, settle, adjust, agree to, investigate, pursue, or contest any and all claims, including claims described in the Plan and in the Liquidating Trust Agreement, other matters, or taxes;

(d)      Pay all taxes, expenses and obligations of the Liquidating Trust out of the Assets;

(e)      Investigate, prosecute and, if necessary, litigate, any and all Avoidance Actions and Causes of Action that may belong to the Debtor or its Estate, including any Avoidance Action brought by the Debtor prior to the Effective Date, which Causes of Action, rights to payment and claims as of the Effective Date shall vest solely and exclusively in the Liquidating Trustee, for the benefit of the Liquidating Trust, pursuant to the terms of the Plan; and

(f)      (i) Invest funds; (ii) make distributions; (iii) pay taxes and other obligations owed by the Liquidating Trust or incurred by the Liquidating Trustee or the Debtor; (iv) engage and compensate from the Assets, consultants, agents, employees, and Professionals (including, without limitation, attorneys on a contingency fee basis) to assist the Liquidating Trustee with respect to the Liquidating Trustee's responsibilities; (v) retain and compensate from the Assets the services of experienced auctioneers, brokers, and/or marketing agents to assist and/or advise in the sale or other disposition of the Assets; (vi) liquidate and dispose of the Assets; (vii) compromise and settle Claims and Causes of Actions; (viii) act on behalf of the Debtor and its Estate in all adversary proceedings and contested matters (including, without limitation, the Avoidance Actions) pending in the Bankruptcy Court and in all actions and proceedings pending elsewhere; (ix) commence and/or pursue any and all actions involving Assets that could arise or be asserted at any time, unless otherwise waived or relinquished in the Plan; (x) utilize Assets to purchase appropriate insurance to insure the acts and omissions of the Liquidating Trustee; and (xi) act and implement the Plan, the Liquidating Trust Agreement, and orders of the Bankruptcy Court.

**9.3      Selection of Agents.**

The Liquidating Trustee may retain his or her firm or company to provide professional services in conjunction with his duties under the Plan.  The Liquidating Trustee shall not be liable for any loss to the Liquidating Trust or any person with an interest in the Liquidating Trust by reason of any mistake or default of any such agent or consultant unless such mistake or default breaches the standard of care set forth in Section 9.5 herein.

**9.4     Maintenance of Register.**

The Liquidating Trustee shall at all times maintain a register of the names, addresses, and amount of the Claims against the Liquidating Trust as of the Effective Date and as revised from time to time thereafter.

**9.5     Liability of Liquidating Trustee.**

(a)     <u>Standard of Care</u>. The Liquidating Trustee shall not be liable for any action taken or omitted to be taken by him in good faith and in the exercise of reasonable judgment and believed to be within the discretion or power conferred by the Plan, or be responsible for the consequences of any act or failure to act, except for bad faith, gross negligence or willful misconduct. The Liquidating Trustee shall not have any fiduciary relationship with any party by virtue of the Plan except as specifically set forth in this Agreement:

(i)     The Liquidating Trustee shall not, solely by virtue of his position as Liquidating Trustee, be liable or in any way responsible for the acts or omissions of the Debtor, its board of directors, officers, employees, or agents, that occurred prior to the Effective Date.

(ii)     Unless indemnified to his satisfaction against liability and expense, the Liquidating Trustee shall not be compelled to do any act or to take any action toward the execution or enforcement of the powers created under the Plan or to prosecute or defend any suit in respect of the Plan. If the Liquidating Trustee requests approval from the Bankruptcy Court with respect to any act or action in connection with the Plan, the Liquidating Trustee shall be entitled (but shall not be required) to refrain (without incurring any liability to any person by so refraining) from such act or action unless and until he has received such instructions or approval. In no event shall the Liquidating Trustee or any of his representatives be required to take any action which he reasonably determines could lead to criminal or civil liability.

(iii)     The Liquidating Trustee shall not be responsible in any manner to the Debtor, its Estate, any holder of a Claim or Equity Interest, or any party-in-interest for:
(A)     the creditworthiness of any party and the risks involved to the Liquidating Trust or such holder or party-in-interest;
(B)     the effectiveness, enforceability, genuineness, validity, or any due execution of the Plan as to any person other than the Liquidating Trustee;
(C)     any representation, warranty, document, certificate, report, or statement made herein or furnished hereunder or in connection with the Plan that does not constitute a breach of the standard of care set forth in Section 8.5(a) of the Plan on the part of the Liquidating Trustee;
(D)     the existence, priority or perfection of any existing Lien;
(E)     the observation or compliance with any of the terms, covenants, or conditions of the Plan on the part of any party thereto other than the Liquidating Trustee;
(F)     any loss to the Liquidating Trust resulting from the investment of the Assets, or their proceeds, in any Permitted Investments; or

   (G) losses to any retirement, employee benefit, or pension plan of the Debtor in excess of the amounts available to be distributed from such plans.

  The Debtor, holders of Claims or Equity Interests and parties-in-interest, by voting for the Plan and/or accepting the benefits of the Plan, have agreed not to sue or otherwise pursue or seek damages from the Liquidating Trustee except for actions or omissions which violate the standard of care set forth in Section 8.5(a) of the Plan.

   (b) <u>No Liability for Acts of Predecessor</u>.  No successor Liquidating Trustee shall be in any way responsible for the acts or omissions of any preceding Liquidating Trustee, nor shall he be obligated to inquire into the validity or propriety of any such act or omission unless such successor Liquidating Trustee expressly assumes such responsibility.  Any successor Liquidating Trustee shall be entitled to accept as conclusive any final accounting and statement of Assets furnished to such successor Liquidating Trustee by any preceding Liquidating Trustee and shall be responsible only for those Assets included in such statement.

   (c) <u>No Implied Obligations</u>.  The Liquidating Trustee's liability shall be limited to the performance of such duties and obligations as are specifically set forth in the Plan.  The Liquidating Trustee shall not be responsible in any manner whatsoever for the correctness of any recitals, statements, representations, or warranties in the Plan, in the Disclosure Statement or in any documents or instrument evidencing or otherwise constituting a part of the Assets.  The Liquidating Trustee makes no representations as to the value of the Assets.

   (d) <u>Reliance by Liquidating Trustee on Documents or Advice of Counsel or Other persons</u>.  The Liquidating Trustee may rely conclusively and shall be protected in acting upon any order, notice, demand, certificate, opinion or advice of counsel, statement, instrument, report or other paper or document (not only as to its due execution and the validity and effectiveness of its provisions, but also as to the truth and acceptability of any information therein contained) which is believed by the Liquidating Trustee to be genuine and to be signed or presented by the proper persons.  Subject to his obligation to meet the standard of care in Section 8.5 of the Plan, the Liquidating Trustee shall have no liability for any act which he may do or omit to do in reliance upon the foregoing.

   (e) <u>No Personal Obligation for the Debtor's Liabilities</u>.  Holders of Claims, and other persons transacting business with the Liquidating Trustee in his capacity as Liquidating Trustee, shall be limited to the Assets to satisfy any liability incurred by the Liquidating Trustee to such person in carrying out the terms of the Plan, and the Liquidating Trustee shall have no personal obligation to satisfy any such liability.

  **9.6**  **Reports; Tax Returns.**

  The Liquidating Trustee shall prepare and submit any and all reports required under the Plan and as may be further ordered by the Bankruptcy Court.  After the Effective Date, the Liquidating Trustee shall be responsible for the filing of any and all federal and state tax returns required by law to be filed by the Liquidating Trust, including the final tax returns, and any tax liability shall be an obligation of the Liquidating Trust payable from the Assets.

### 9.7     Compensation of Liquidating Trustee and His Agents.

The Liquidating Trustee's compensation shall be based upon hourly rates typically charged in the conduct of the Liquidating Trustee's business and may be paid from the Assets on a monthly basis without further notice or order of the Bankruptcy Court. Agents retained by the Liquidating Trustee, including Professionals, may submit monthly statements to the Liquidating Trustee describing with reasonable particularity the amount of fees and expenses sought, the time expended, and the nature, extent, and value of the services provided during the period covered by such request. In the absence of objection by the Liquidating Trustee, such fees and expenses shall be paid within ten (10) days of issuance of the monthly statement without further notice or order of the Bankruptcy Court. The Liquidating Trustee may retain, compensate, employ and pay agents and Professionals on other terms, including payment on a contingency basis, subject to the agreement of the parties without need for notice or any order of the Bankruptcy Court. In the event of any objection to a compensation request, the Bankruptcy Court shall retain jurisdiction to hear and determine such dispute. Payment of fees and reasonable out-of-pocket expenses of the Liquidating Trustee and any agents or consultants employed pursuant to this Agreement shall be reimbursed as a priority from the Assets.

### 9.8     Liquidating Trustee's Indemnification.

The Liquidating Trustee shall be indemnified by, held harmless, and receive reimbursement from the Assets for any and all claims, actions, demands, losses, damages, expenses, and liabilities, including without limitation court costs, attorneys' fees and accountants' fees incurred, except in the event that a court of competent jurisdiction determines that such losses or claims were the result of a breach of the standard of care set forth in Section 8.5(a) of the Plan.

### 9.9     Removal of Liquidating Trustee.

The Liquidating Trustee may be removed only for cause upon a motion to the Bankruptcy Court. If the Liquidating Trustee is removed for cause, the Liquidating Trustee shall not be entitled to any accrued but unpaid fees, reimbursements or other compensation. The term "cause" shall mean: (a) the Liquidating Trustee's gross negligence or willful failure to perform his duties under the Plan, (b) the Liquidating Trustee's misappropriation or embezzlement of any Assets or the proceeds of the Assets, or (c) the Liquidating Trustee's continued or repeated negligence or failure to perform his duties under the Plan. If a Liquidating Trustee is removed or is unwilling or unable to serve by virtue of his inability to perform his duties due to death, illness, or other physical or mental disability, following the liquidating of all or substantially all of the Assets, or for any other reason whatsoever, subject to a final accounting, such Liquidating Trustee shall be entitled to receive all accrued and unpaid fees, reimbursement of expenses, and other compensation incurred before his removal, and to any out-of-pocket expenses reasonably incurred in connection with the transfer of all powers and duties and all rights to any successor Liquidating Trustee.

### 9.10    Resignation of Liquidating Trustee.

A Liquidating Trustee may resign upon motion to the Bankruptcy Court, which resignation shall become effective at the time specified by the Court. If a Liquidating Trustee

resigns from his position hereunder, subject to a final accounting, such Liquidating Trustee shall be entitled to receive all accrued unpaid fees, reimbursement of expenses, and other compensation incurred before his resignation, and any out-of-pocket expenses reasonably incurred in connection with the transfer of all powers and duties to the successor Liquidating Trustee.

### 9.11   Successor Liquidating Trustee.

In the event that a Liquidating Trustee is removed, resigns, or otherwise ceases to serve as Liquidating Trustee, a successor Liquidating Trustee may be appointed by motion of a party-in-interest, subject to approval by the Bankruptcy Court, or *sua sponte* by order of the Bankruptcy Court.

### 9.12   Third Parties.

Except as set forth in the Plan, there is no obligation on the part of any party transacting business with the Liquidating Trust or any agent of the Liquidating Trustee to: (a) inquire into the validity, expediency, or propriety of any transaction, (b) inquire into the authority of the Liquidating Trustee, or any agent of the Liquidating Trustee, to enter into or consummate the transaction, or (c) to monitor the application of the purchase money or other consideration paid or delivered to the Liquidating Trust.

### 9.13   Bond and Insurance Requirements.

On the Effective Date, or immediately thereafter, the Liquidating Trustee shall procure a bond in an amount equal to undistributed Cash on hand as of the Effective Date. The bond shall be written by an insurance company authorized to do business in the Commonwealth of Massachusetts and written on a standard and customary bond form. The Liquidating Trustee may adjust the amount of the Bond in his business judgment; provided that, in no event shall the amount of the bond be less than the amount of undistributed Cash on hand. No bond shall be required if and when the amount of undistributed Cash on hand shall be less than $200,000.00.

### 9.14   Oversight Committee

(a)   *Composition of Oversight Committee.* The Liquidating Trustee shall be subject to oversight by a two member committee (the "Oversight Committee"), to be comprised of one representative of the holders of Allowed General Unsecured Claims and one representative of Ipsen on behalf of the holders of Allowed Ipsen Unsecured Claims. The member representing the Allowed General Unsecured Claims shall be appointed by the Committee prior to its dissolution under the Plan.

(b)   *Consultation with Oversight Committee.* The Liquidating Trustee shall consult with the Oversight Committee respecting the liquidation of the Assets, the resolution of Disputed Claims, and the distribution of Assets in accordance with the Plan and the Liquidating Trust Agreement, provided that any action to be taken by the Liquidating Trustee shall be in his sole discretion consistent with his duties, rights, and powers set forth in the Plan and the Liquidating Trust Agreement. The Liquidating Trustee shall provide the Oversight Committee with a

statement of expenditures setting forth the amount of fees and expenses paid by the Liquidating Trustee from the Assets for each three (3) month period following the Effective Date.

(c)      *Tenure of the Oversight Committee.*  The Oversight Committee shall be effective as of the Effective Date of the Plan and shall remain and continue in force until the Liquidating Trust Agreement is terminated in accordance with the provisions therein, provided that the representative of holders of Allowed General Unsecured Claims shall no longer be a member of the Oversight Committee after all Allowed General Unsecured Claims have been paid in full.

(d)      *Compensation of Members of the Oversight Committee.*  The members of the Oversight Committee shall be entitled to such compensation as may be agreed to with the Liquidating Trustee and shall be entitled to reimbursement for reasonable out-of-pocket expenses incurred in connection with the performance of their services hereunder.  Reimbursement for such expenses shall be made by the Liquidating Trustee from the Assets within ten (10) days of the Liquidating Trustee's receipt of an invoice evidencing such expenses with reasonable supporting documentation related to same.

## X. SELLERS REPRESENTATIVE AGREEMENT

Upon the Effective Date, the Liquidating Trustee shall be authorized to enter into the Sellers Representative Agreement by and among the Liquidating Trustee, Ipsen, and John R. Taylor, Jr. (on behalf of himself, individually, and the Taylor 2009 Spray Trust and the John R. Taylor III Trust), Stephen Evens-Freke (on behalf of Celtic Pharma FIX Venture Ltd. and Celtic Pharma FIX Ltd.) and Hugh Tilney (on behalf of himself, individually, and International Foreign Exchange Concepts LP), or a duly appointed representative designee for any thereof (collectively, the "Significant Distribution Recipients" and, together with the Liquidating Trustee and Ipsen, the "Recipient Committee"), in form and substance similar to that appended as Exhibit B to the Plan.

The Sellers Representative shall be the party responsible for monitoring and enforcing the rights of the Sellers under the Asset Purchase Agreements. The Sellers Representative Agreement was negotiated amongst the Significant Distribution Recipients, Ipsen, and the Debtor to clarify the scope of responsibility of the Sellers Representative and the extent to which the Sellers Representative is subject to the oversight of the Recipient Committee.  The members of the Recipient Committee represent the principal constituencies anticipated to benefit from any amounts collected under the Asset Purchase Agreements and to be distributed in accordance with the Waterfall.  In the case of the Significant Distribution Recipients, its members comprise approximately eighty percent (80%) of the interests held by the Waterfall Participants.

The Sellers Representative Agreement sets forth a series of actions which may be taken by the Sellers Representative in the course of that party's duties (the "Specified Actions") and prescribes the extent of oversight and control of the Recipient Committee as to each Specified Action.  In the case of the proposed distribution by the Sellers Representative, or his agent, of cash collected pursuant to the provisions of the Asset Purchase Agreements, members of the Recipient Committee will have an opportunity to contest the proposed distributions and submit any dispute to an outside accounting firm (the "Auditors") for determination, with the fees and expenses incurred by the Auditors to be paid either by the disputing member of the Recipient

Committee, or from the Sellers Representative Fund (as defined below), depending upon the outcome of the Auditor's findings.

The Sellers Representative and any professionals retained by him are to be paid out of a fund in an amount equal to $700,000 (the "Sellers Representative Fund") that was deducted from the purchase price paid by Baxter and Cangene to monitor and enforce the Sellers' rights under the Asset Purchase Agreements.

## XI.   EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### 11.1   Assumption of Executory Contracts And Unexpired Leases.

Pursuant to Sections 1123(b)(2) and 365(a) of the Bankruptcy Code, any Executory Contract or Unexpired Lease (excluding insurance policies) that (a) has not expired by its own terms on or prior to the Confirmation Date, (b) has not been assumed, assumed and assigned or rejected with the approval of the Bankruptcy Court on or prior to the Confirmation Date, (c) is not the subject of a motion to assume or reject which is pending at the time of the Confirmation Date, or (d) is not designated by the Debtor as being an Executory Contract or Unexpired Lease to be assumed at the time of Confirmation of the Plan, shall be deemed rejected on the Effective Date. The entry of the Confirmation Order by the Bankruptcy Court shall constitute the approval of the rejection of Executory Contracts and Unexpired Leases pursuant to this section of the Plan and Sections 365(a) and 1123(b)(2) of the Bankruptcy Code.

### 11.2   Payments Related to the Assumption of Executory Contracts And Unexpired Leases.

(a)     Payment of Claims Arising From Assumed Contracts And Leases. Cure Claims arising from the assumption of an Executory Contract or Unexpired Lease shall be paid in such amounts as are or have been determined by the Bankruptcy Court, in full and complete satisfaction, settlement and release of such Claims.

(b)     Disputed Claims and Bar Date. If there is a dispute regarding (i) the amount of any claim arising from the assumption or rejection of an Executory Contract or Unexpired Lease, (ii) the ability of the Debtor or Liquidating Trust or any assignee to provide "adequate assurance of further performance," within the meaning of Section 365 of the Bankruptcy Code, under an Executory Contract or Unexpired Lease to be assumed, or (iii) any other matter pertaining to the assumption or assumption and assignment of any Executory Contract or Unexpired Lease, the payment of any Claim related to the foregoing will be made following entry of a Non-Appealable Order resolving the dispute and approving the assumption.

### 11.3   Rejection Damage Claims.

If the rejection of an Executory Contract or Unexpired Lease by the Debtor pursuant to the Confirmation Order results in a Claim by the other party or parties to such Executory Contract or Unexpired Lease, any claim for damages, if not previously evidenced by a filed proof of claim, shall be forever barred and shall not be enforceable against the Estate, the Liquidating Trust and their respective properties, agents, successors, or assigns, unless a proof of claim is filed with the Bankruptcy Court and served upon the Liquidating Trustee on or before

thirty (30) days following the Confirmation Date. Unless otherwise ordered by the Bankruptcy Court or provided in the Plan, all such Claims for which proofs of claim are timely filed will be treated as General Unsecured Claims subject to the provisions of the Plan. The Liquidating Trustee shall have the right to object to any such Claim for rejection damages in accordance with the Plan.

## XII.   RELEASE AND SATISFACTION OF CLAIMS

### 12.1   Compromise and Settlement of Claims, Interests and Controversies.

Pursuant to Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Equity Interests and controversies relating to the contractual, legal and subordination rights that a holder of a Claim may have with respect to any Allowed Claim or Equity Interest, or any distribution to be made on account of such Allowed Claim or Equity Interest. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Equity Interests and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtor, its Estate and holders of Claims and Equity Interests and is fair, equitable and reasonable. In accordance with the provisions of the Plan, pursuant to Bankruptcy Rule 9019(a), without any further notice to or action, order or approval of the Bankruptcy Court, after the Effective Date, the Liquidating Trustee may compromise and settle Claims against them and Causes of Action against other Persons.

### 12.2   Release of Claims and Termination of Equity Interests.

Pursuant to Section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, the distributions, rights and treatment that are provided in the Plan shall be in full and final satisfaction, settlement, and release, effective as of the Effective Date, of all Claims, Equity Interests and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Equity Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against and Equity Interests in, the Debtor, the Assets, and the Liquidating Trust, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Equity Interests, including demands, liabilities and Causes of Action that arose before the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in Sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, in each case whether or not: (i) a proof of Claim or Equity Interest based upon such Claim, debt, right or Equity Interest is filed or deemed filed pursuant to Section 501 of the Bankruptcy Code; (ii) a Claim or Equity Interest based upon such Claim, debt, right or Equity Interest is Allowed pursuant to Section 502 of the Bankruptcy Code; or (iii) the holder of such a Claim or Equity Interest has accepted the Plan. Except as otherwise provided herein, any default by the Debtor or its Affiliates with respect to any Claim or Equity Interest that existed before or on account of the filing of the Bankruptcy Case shall be deemed cured on the Effective Date. The Confirmation Order shall be a judicial determination of the release of all Claims and Equity Interests subject to the Effective Date occurring, except as otherwise expressly provided in the Plan.

### 12.3    Injunction Relating to the Plan.

As of the Effective Date, all Persons are hereby permanently enjoined from commencing, continuing or enforcing in any manner or in any place, any action or other proceeding, whether directly, indirectly, derivatively or otherwise against the Debtor, its Estate, the Assets and/or the Liquidating Trust and Liquidating Trustee, on account of, or respecting any Claims, Equity Interests, debts, rights, obligations, Causes of Action or liabilities that are released, terminated, or exculpated pursuant to the Plan, except to the extent expressly permitted under the Plan.

### 12.4    Releases by the Debtor.

Pursuant to Section 1123(b) of the Bankruptcy Code and to the extent allowed by applicable law, and except as otherwise specifically provided in the Plan, for good and valuable consideration, including the service of the Debtor Released Parties to facilitate the expeditious reorganization of the Debtor, on and after the Effective Date, the Debtor Released Parties are deemed released and discharged by the Debtor, the Liquidating Trust, and the Estate from any and all claims, obligations, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of the Debtor, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, that the Debtor, the Liquidating Trust, the Estate or their Affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Equity Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtor, the Bankruptcy Case, the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Debtor Released Party, the restructuring of Claims and Equity Interests before or during the Bankruptcy Case, the negotiation, formulation or preparation of the Plan, the Disclosure Statement, or related agreements, instruments or other documents, upon any other act or omission, transaction, agreement, event or other occurrence taking place on or before the Confirmation Date, other than Claims or liabilities arising out of or relating to any act or omission of a Debtor Released Party that constitutes a failure to perform the duty to act in good faith, with the care of an ordinarily prudent person and in a manner the Debtor Released Party reasonably believed to be in the best interests of the Debtor (to the extent such duty is imposed by applicable non-bankruptcy law) where such failure to perform constitutes willful misconduct or gross negligence.  To the extent of any conflict between the foregoing release and the releases approved pursuant to the Compromise Order, the terms of the releases approved pursuant to the Compromise Order shall control.

### 12.5    Releases of Debtor and Liquidating Trust by Holders of Claims.

Except as otherwise set forth in the Plan, as of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, (a) each holder of a Claim that votes in favor of the Plan and (b) to the fullest extent permissible under applicable law, as such law may be extended or interpreted subsequent to the Effective Date, each Person that has held, holds or may hold a Claim or at any time was a creditor of the Debtor and that does not vote on the Plan or votes against the Plan, in each case will be deemed to forever release and waive all claims (including any derivative claims), obligations, suits, judgments, damages, demands, rights, causes of action and liabilities (other than the right to enforce the Liquidating Trustee's

obligations under the Plan and the contracts, instruments, releases, agreements and documents delivered under the Plan), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising in law, equity or otherwise, that are based in whole or in part on any act, omission, transaction, event or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtor, the Estate, the Bankruptcy Case or the Plan that such entity has, had or may have against the Debtor, the Estate, the Assets, or the Liquidating Trust.

### 12.6    Releases of Third Parties by Holders of Claims

Except as otherwise set forth in the Plan, as of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, each holder of a Claim that votes in favor of the Plan will be deemed to forever release and waive all claims (including any derivative claims), obligations, suits, judgments, damages, demands, rights, causes of action and liabilities, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising in law, equity or otherwise, that are based in whole or in part on any act, omission, transaction, event or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtor, the Estate, the Bankruptcy Case or the Plan that such entity has, had or may have against the Released Parties.

### 12.7    Cancellation of Existing Indebtedness and Liens.

Except as may otherwise be provided in the Plan, on the Effective Date: (a) all credit agreements, promissory notes, mortgages, security agreements, invoices, contracts, agreements and any other documents or instruments evidencing Claims against the Debtor, together with any and all Liens securing same, shall be canceled, discharged and released without further act or action by any Person under any applicable agreement, law, regulation, order or rule, (b) the obligations of the Debtor thereunder shall be deemed cancelled and released, and (c) all of the right, title and interest of any holder of such mortgages, deeds of trust, Liens or other security interests, including any rights to any collateral thereunder, will revert to the Liquidating Trust. To the extent deemed necessary or advisable by the Liquidating Trustee, any holder of a Claim shall promptly provide the Liquidating Trustee with an appropriate instrument of cancellation, discharge or release, as the case may be, in suitable form for recording wherever necessary to evidence such cancellation, discharge or release, including the cancellation, discharge or release of any Lien securing such Claim.

### 12.8    Exculpation.

Except as otherwise set forth in the Plan, none of the Released Parties, shall have or incur, and each Released Party is hereby released and exculpated from, any liability to any holder of a Claim or an Equity Interest, or any other party in interest, or any of their respective agents, employees, representatives, advisors, attorneys, affiliates, shareholders, or members, or any of their successors or assigns, for any act or omission, occurring on or after the Petition Date and prior to the Effective Date, in connection with, relating to, or arising out of, the administration of the Bankruptcy Case, the Disclosure Statement, the formulation, negotiation, or implementation of the Plan, the pursuit of Confirmation of the Plan, the Confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be

distributed under the Plan, provided that the terms of this Section shall not apply to any liability for willful misconduct, gross negligence or ultra vires acts.

### 12.9    Setoffs.

Except as otherwise provided in the Plan, nothing contained in the Plan shall constitute a waiver or release by the Estate of any rights of setoff the Estate may have against any Person.

## XIII. TAX ISSUES

### 13.1    Tax Consequences of the Plan.

**IRS CIRCULAR 230 NOTICE: TO ENSURE COMPLIANCE WITH INTERNAL REVENUE SERVICE CIRCULAR 230, EACH CREDITOR AND INTEREST HOLDER IS HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF TAX ISSUES HEREIN IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY CREDITOR OR INTEREST HOLDER FOR THE PURPOSE OF AVOIDING ANY TAX PENALTIES THAT MAY BE IMPOSED ON SUCH PERSON; (B) SUCH DISCUSSION IS INCLUDED HEREIN IN CONNECTION WITH THE PROMOTION OR MARKETING BY THE DEBTOR OF THE TRANSACTIONS DESCRIBED HEREIN; AND (C) EACH CREDITOR AND INTEREST HOLDER SHOULD SEEK ADVICE BASED ON ITS PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

The following is a general summary of certain material federal income tax consequences of the Plan and the distributions provided under the Plan. This summary does not discuss all aspects of federal taxation that may be relevant to a particular creditor in light of its individual investment circumstances or to certain creditors or shareholders subject to special treatment under the federal income tax laws (for example, tax-exempt organizations, financial institutions, broker-dealers, life insurance companies, foreign corporations or individuals who are not citizens or residents of the United States). This summary does not discuss any aspects of state, local or foreign taxation. The impact on foreign holders of Claims and Equity Interests is not discussed.

This summary is based upon the Internal Revenue Code of 1986, as amended (the "IRC"), the Treasury regulations (including temporary regulations) promulgated thereunder, judicial authorities and current administrative rulings, all as in effect on the date hereof and all of which are subject to change (possibly with retroactive effect) by legislation, administrative action or judicial decision. Moreover, due to a lack of definitive judicial or administrative authority or interpretation and the complexity of the transactions contemplated in the Plan, substantial uncertainties exist with respect to various tax consequences of the Plan. The Debtor has not requested a ruling from the Internal Revenue Service (the "IRS") with respect to these matters and no opinion of counsel has been sought or obtained by the Debtor with respect thereto. There can be no assurance that the IRS or any state or local taxing authorities will not challenge any or all of the tax consequences of the Plan, or that such a challenge, if asserted, would not be sustained. **THE DEBTOR IS NOT MAKING ANY REPRESENTATIONS REGARDING THE PARTICULAR TAX CONSEQUENCES OF THE CONFIRMATION AND CONSUMMATION OF THE PLAN AS TO ANY CREDITOR OR INTEREST**

**HOLDER, NOR IS THE DEBTOR RENDERING ANY FORM OF LEGAL OPINION AS TO SUCH TAX CONSEQUENCES.**

### A.      Federal Income Tax Consequences to the Debtor.

The Asset Sale Consideration consists of the initial payment at closing and a series of contingent milestone and sale payments.  For tax purposes, the Asset Sale Consideration will first have to be allocated between the Inspiration Transferred Assets and the Ipsen Transferred Assets.[6] Ipsen and the Debtor are in discussions respecting this allocation.  The Debtor intends to recognize all of the gain allocable to the sale of the Inspiration Transferred Assets or the transfer of Assets to the Liquidating Trust in 2013.Because the Assets consist of the Asset Sale Consideration which includes contingent installment payments, valuation of the Assets necessarily entails, among other things, discounting the estimated amount of future payments to take into account the probability of receiving such payments and the projected present value of such payments.

The Debtor projects that its federal net operating losses will be sufficient to offset  any gain allocable to the Inspiration Transferred Assets or resulting from the transfer of the Assets to the Liquidating Trust and therefore no regular tax will be payable on account of the sale or transfer.  The Debtor believes that it is exempt from payment of any alternative minimum tax ("AMT") pursuant to the small business exemption because the Debtor's average annual gross receipts for all periods preceding calendar year 2013 do not exceed $7,500,000.  Therefore, the Debtor believes that no federal tax will be owing on account of the sale of the Inspiration Transferred Assets.

As discussed below, the Debtor does not project any material tax liability to any state.  At the time of the bankruptcy filing, the Debtor's principal place of business was Massachusetts.  The sale of the Inspiration Transferred Assets constitutes a contingent payment sale of intangible personal property, which may be treated as a license. For purposes of apportioning sale proceeds under Massachusetts law, proceeds generated from the license of intangibles are presumed to occur in the state of the licensee's commercial domicile.  As neither purchaser/licensee of the Inspiration Transferred Assets is domiciled in Massachusetts, no portion of the proceeds from the sale of the Inspiration Transferred Assets would be allocable to Massachusetts for purposes of determining the Debtor's gain to be realized.  The Debtor projects that it has sufficient Massachusetts net operating losses to offset any taxable gain, after adjusting the sales apportionment as set forth above.  Massachusetts does not have a corporate AMT.  Therefore, the Debtor believes that no Massachusetts state tax will be owing on account of the sale of the Inspiration Transferred Assets or the transfer of the Assets to the Liquidating Trust.  The Debtor believes that it has sufficient net operating losses in other states in which it operated to offset any gain attributable to such states.

---

[6] The Inspiration Transferred Assets and the Ipsen Transferred Assets refer to the assets sold by the Debtor and Ipsen, respectively, as further defined in the Asset Purchase Agreements.

Based upon the foregoing, the Debtors project that no tax liability will result from the sale of the Inspiration Transferred Assets or the transfer of the Assets to the Liquidating Trust. The federal and state tax consequences arising from the sale and transfer are complex and are subject to some uncertainties. Allocations and valuation are inherently factual and the Internal Revenue Service is not bound by the parties' determinations. The Liquidating Trustee currently expects to seek, on behalf of the Debtor, prompt determination of the Estate's tax liability for 2013 under Section 505(b) of the Bankruptcy Code, which provides generally that an Estate representative may request a determination of unpaid tax and the Estate is discharged from any liability for such tax upon payment of the amount shown on such return, if (i) the governmental unit does not notify the Estate representative within 60 days that the return has been selected for examination; or (ii) such governmental unit does not complete such examination and notify the Estate representative of any tax due within 180 days after such request or within such additional time as the Bankruptcy Court, for cause, permits.

The tax projections set forth above are premised upon Confirmation of the Plan and the transfer of the Assets to the Liquidating Trust on or before December 31, 2013.

## B.     Tax Consequences to Creditors.

In General.   The federal income tax consequences of the implementation of the Plan to a holder of a Claim will depend, among other things, on: (a) whether such Claim constitutes a debt or a security for federal income tax purposes, (b) whether the holder of the Claim receives consideration in more than one (1) tax year, (c) whether the holder of the Claim is a resident of the United States, (d) whether all the consideration received by the holder of the Claim is deemed to be received by the holder of the  Claim as part of an integrated transaction, (e) whether the holder of the Claim reports income using the accrual or cash method of accounting, (f) whether the holder has previously taken a bad debt deduction or worthless security deduction with respect to the Claim, and (g) whether the Claim was acquired at a discount and whether the market discount rules are applicable to the holder.

Gain or Loss on Exchange.   Generally, a holder of an Allowed Claim will realize a gain or loss on the exchange under the Plan of his or her Allowed Claim for cash and other property in an amount equal to the difference between (i) the sum of the amount of any cash and the fair market value on the date of the exchange of any other property (including an interest in the Assets) received by the holder (other than any consideration attributable to accrued but unpaid interest on the Allowed Claim), and (ii) the adjusted basis of the Allowed Claim exchanged therefor (other than basis attributable to accrued but unpaid interest previously included in the holder's taxable income). Any gain recognized generally will be a capital gain if the Claim was a capital asset in the hands of an exchanging holder, and such gain would be a long-term capital gain if the holder's holding period for the Claim surrendered exceeded one (1) year at the time of the exchange.

Any loss recognized by a holder of an Allowed Claim will be a capital loss if the Claim constitutes a "security" for federal income tax purposes or is otherwise held as a capital asset. For this purpose, a "security" is a debt instrument with interest coupons or in registered form.

Beneficiaries of Liquidating Trust. The transfer of the Assets to the Liquidating Trust is intended for United States federal income tax purposes to be treated as a transfer of the Assets to the holders of Claims followed by a deemed transfer by such holders (the "Beneficiaries") to the Liquidating Trust. The Liquidating Trust is intended to be treated a "grantor" trust, and the Beneficiaries are intended to be treated as the grantors and deemed owners of their pro rata share of the Assets. The Liquidating Trustee will value the Assets and notify the Beneficiaries of such valuations, and the Assets will be valued consistently by the Liquidating Trustee and the Beneficiaries for all federal income tax purposes. In connection with all distributions made pursuant to the Liquidating Trust and all activities of the Liquidating Trust, the Liquidating Trustee shall comply with all withholding and reporting requirements imposed by any federal, state, local or foreign taxing authority and all distributions made pursuant to the Plan and the Liquidating Trust will be subject to any such withholding and reporting requirements.

The federal income tax treatment of payments received by Beneficiaries with respect to their interests in the Assets is not clear. A Beneficiary should take a basis in its pro rata interest in the Assets equal to the fair market of such interest on the Effective Date. A Beneficiary may recognize gain or loss with respect to its interest in the Assets to the extent amounts deemed received by the Beneficiary from the Liquidating Trust are greater than or less than the Beneficiary's basis in its pro rata interest in the Assets. Holders of Allowed Claims are urged to consult their tax advisors concerning the tax consequences of holding an interest in the Liquidating Trust.

## C.    Backup Withholding.

Under the backup withholding rules of the IRC, holders of Claims may be subject to backup withholding at the rate of twenty-eight percent (28%) with respect to payments made pursuant to the Plan unless such holder (i) is a corporation or comes within certain other exempt categories and, when required, demonstrates this fact, or (ii) provides a correct taxpayer identification number and certifies under penalties of perjury that the taxpayer identification number is correct and that the holder is not subject to backup withholding because of a failure to report all dividends and interest income. Any amount withheld under these rules will be credited against the holder's federal income tax liability. Holders of Claims may be required to establish exemption from backup withholding or to make arrangements with respect to the payment of backup withholding.

## XIV. PLAN FEASIBILITY

The Debtor expects to have sufficient funds to pay in full projected Allowed Administrative Expense Claims, Allowed Priority Claims, and Allowed Priority Tax Claim. Accordingly, the Plan satisfies the feasibility requirements of Section 1129 of the Bankruptcy Code.

## XV. BEST INTERESTS OF CREDITORS

In the event of a conversion of the Bankruptcy Case to Chapter 7, the Debtor believes that the amount and timing of distributions would be adversely affected. A Chapter 7 trustee would be appointed who might have no familiarity with the Bankruptcy Case. The Chapter 7

trustee would be entitled to a commission on funds distributed by the Estate as follows: (i) twenty-five percent (25%) of the first $5,000; (ii) ten percent (10%) of any amount distributed in excess of $5,000 up to $50,000; (iii) five percent (5%) of any amount distributed in excess of $50,000 up to $1,000,000; and (iv) three percent (3%) of amounts distributed in excess of $1,000,000. The appointment of a Chapter 7 trustee, and the Chapter 7 trustee's retention of new professionals, would likely result in a substantial learning curve and lessen the institutional knowledge necessary to administer the case. The Bankruptcy Court would establish a supplemental bar date for the filing of Claims. The Estate representative would need to review new Claims filed, which might necessitate the filing of additional objections to claims and further delay payment of the initial distribution. Because the Assets would remain in the Debtor's bankruptcy estate, the Estate would likely incur a greater tax liability associated with the receipt of the Asset Sale Consideration, which would further dilute the recovery to holders of Allowed Claims.

For the reasons set forth above, creditors will receive or retain under the Plan at least the amount or value that such creditors would receive if the Debtor was liquidated under Chapter 7 of the Bankruptcy Code, and such distribution will likely occur on a more expedited basis. Consequently, the best interests of creditors requirement set forth in Section 1129(a)(7) of the Bankruptcy Code has been satisfied.

Based upon the prospects for reduced costs and earlier payment to creditors, the Debtor recommends that the wind-down and liquidation of the Debtor's financial affairs be completed pursuant to the terms of the Plan.

Dated: October 22, 2013

Inspiration Biopharmaceuticals, Inc.

_____

By: Michael Nowlan
Its: Co-Chief Restructuring Officer

_____

MURPHY & KING, Professional Corporation
One Beacon Street
Boston, MA  02108
Attn:   Harold B. Murphy, Esq. (BBO #362610)
        Andrew G. Lizotte, Esq. (BBO #559609)
Telephone: (617) 423-0400
Facsimile:  (617) 556-8985

658417