# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF MASSACHUSETTS

## EASTERN DIVISION

| | |
|---|---|
| **In re**<br><br>**CHARLES STREET AFRICAN METHODIST EPISCOPAL CHURCH OF BOSTON,**<br><br>**Debtor** | **Chapter 11**<br>**Case No. 12-12292-FJB** |

**MEMORANDUM OF DECISION ON**
**(1) CONFIRMATION OF DEBTOR'S SEVENTH MODIFIED**
**FIRST AMENDED PLAN OF REORGANIZATION**
**AND ON**
**(2) MOTION OF ONEUNITED BANK TO DISMISS CHAPTER 11 CASE FOR CAUSE**

The matters before the court are the proposed confirmation of the Seventh Modified First Amended Plan of Reorganization of debtor Charles Street African Methodist Episcopal Church of Boston ("CSAME") and the Motion of OneUnited Bank ("OneUnited") to Dismiss Chapter 11 Case for Cause. OneUnited objects to confirmation and CSAME to dismissal. For the reasons set forth below, including principally that the Plan would release a third-party guaranty without justification, the Court will deny confirmation; the court will also deny dismissal but order the appointment of an examiner.

**PROCEDURAL HISTORY**

**a. The Petition**

CSAME is an incorporated congregation of the African Methodist Episcopal Church (the "AME Church"). OneUnited is CSAME's largest creditor, having extended to it two loans that, as of January 2012, were in default. On March 20, 2012, facing foreclosure on its church building and two other properties, CSAME filed a petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). OneUnited moved to dismiss the case, arguing that CSAME was not eligible to be a debtor. By order of September 11, 2012, the court ruled that CSAME was eligible and denied dismissal.

OneUnited appealed from that order; on September 30, 2013, the District Court affirmed, but that affirmance remains subject to possible further appeal.

### b. Claims of OneUnited

OneUnited filed a proof of claim, asserting secured claims based on two loans made by OneUnited to CSAME on October 3, 2006:  the "Church Loan," through which CSAME refinanced an earlier mortgage, under which CSAME borrowed $1,115,000, with principal and unpaid interest due in full on December 1, 2011; and the "Construction Loan" (together with the Church Loan, "the Loans"), an 18-month non-revolving line of credit of up to $3,652,000 for the purpose of constructing a community center, the Roxbury Renaissance Center ("RRC").  OneUnited claims that the balances on the petition date were $1,188,562.90 on the Church Loan and $3,815,795.70 on the Construction Loan, including "default/maturity interest" of $792,425.92 on the Construction Loan and $58,416 on the Church Loan. In addition to the prepetition balances, OneUnited also asserts entitlement to "post-petition interest, attorney's fees and costs, pursuant to 11 U.S.C. § 506(b)."  CSAME objected to the default/maturity interest component of OneUnited's claim.  After an evidentiary hearing, the Court sustained that objection; OneUnited appealed, and on September 30, 2013, the District Court affirmed, but that affirmance remains subject to possible further appeal.  The OneUnited Claims are also subject to other challenges in state court litigation between CSAME and OneUnited, which litigation was automatically stayed upon CSAME's bankruptcy filing.

The Loans are secured by CSAME's real property.  The Church Loan is secured by mortgages on 551 and 553-565 Warren Street, Roxbury, Massachusetts and on 70 Summer Street, Milton, Massachusetts (the "Milton Parsonage").  The property at 551 Warren Street is the church building itself.  CSAME and OneUnited agree that the current value of the properties securing the Church Loan exceeds the amount of OneUnited's claim on the Church Loan as of the date of the bankruptcy filing. The Construction Loan is secured by mortgages on 567-575 Warren Street, which is the site of the RRC,

and on 5-15 Elm Hill Avenue, Roxbury, known as the Old Parsonage and an adjoining parking lot.  CSAME and OneUnited agree that the current fair market value of the properties securing the Construction Loan is less than the amount of OneUnited's Claim on the Construction Loan as of the date of the bankruptcy filing.  The Construction Loan was also originally secured by an $850,000 cash deposit of CSAME at OneUnited, but no one contends that a cash deposit continues to secure the loan.

### c.    Claim of FEDAME

In order to help CSAME obtain the Construction Loan, the First Episcopal District of the African Methodist Episcopal Church ("FEDAME"), of which CSAME is a member church, guaranteed CSAME's obligation to OneUnited on the Construction Loan (but not the Church Loan).  Facing potential liability on the guaranty, FEDAME filed a proof of claim against CSAME in this case for rights of subrogation and contribution arising from the guaranty.  OneUnited has objected to that proof of claim on two grounds: that FEDAME has waived any right of recourse it may otherwise have had against CSAME for liability arising from the guaranty; and that FEDAME's claim remains only a contingent claim—FEDAME disputes liability on the guaranty and to date has made no payment on it—which, for its contingency, must be denied.  For the reasons set forth in a separate memorandum of decision issued today, the objection to claim has been overruled without prejudice as moot.

### d.    Motion Regarding Designation, Subordination, and Fees

Early in the case, OneUnited moved to prematurely terminate the period in which a debtor enjoys the exclusive right to file a plan (the "Exclusivity Motion").  More to the point, OneUnited described in that motion, and attached to the motion a copy of, a proposed plan (the "OneUnited Plan") that it stood ready to file should its motion be granted.  CSAME opposed the Exclusivity Motion, and the Court denied it.  However, arguing that OneUnited had, through the filing of the Exclusivity Motion, violated CSAME's rights of exclusivity by publishing a competing plan, CSAME further responded by filing

a motion for (i) designation under § 1126(e) of the votes of OneUnited Bank and (ii) costs and attorney's

fees and, in the same document, a statement in support of the equitable subordination of the claims of

OneUnited Bank to those of unsecured creditors (the "Designation, Subordination, and Fee Motion").[1]

By order of September 11, 2012, the Court denied so much of this motion as sought designation of the

votes of OneUnited.  In the memorandum of decision issued in support of that order, the Court

indicated that it would address costs and attorney's fees separately, "when it addresses the issue of

subordination in conjunction with confirmation of the plan."  As set forth below, the plan presently

under consideration would, if the Court agrees that the acts in question warrant equitable

subordination, subordinate the claims of OneUnited to the claims in Classes 3 and 5.  In a separate

memorandum issued today on the Designation, Subordination, and Fee Motion, the Court concludes

that, although OneUnited's conduct warrants fee relief, that conduct is not cause for equitable

subordination.

### e.   The Plan

With its bankruptcy petition, CSAME filed a plan of reorganization, then later an amended plan

and a series of modified versions thereof.  With respect to its Second Modified First Amended Plan,

CSAME filed and, on June 11, 2012, the Court approved an Amended Disclosure Statement (the

"Disclosure Statement").  Pursuant to approved solicitation procedures, CSAME solicited votes on the

plan and obtained the acceptance of two of the plan's four impaired classes; OneUnited, the holder of

the sole claim in each other impaired class, voted to reject as to both and objected to the plan's

confirmation.  No other creditor has opposed confirmation.

---

[1] To be clear, the motion did not itself request subordination but merely set forth the argument for subordination
that would be effected through a plan and is in fact a feature of the plan now under consideration.  Insofar as the
basis for subordination is the same conduct as constitutes the basis for the relief that the motion did request
(designation and fees), the issue was briefed in the context of that motion and will be addressed there.

The court held an evidentiary hearing on confirmation of the Second Modified First Amended Plan, as further modified from time to time, on seven days over a period of ten months, commencing on August 15, 2012 and ending on June 28, 2013.[2]  The evidentiary hearing included a judicial site visit of CSAME's properties.  On September 28, 2012, which was to be the fifth day of the evidentiary hearing, CSAME's counsel indicated that the Disclosure Statement contained inaccuracies in its presentation of certain historical financial information, inaccuracies that he had just discovered and that pertained to the ability of CSAME to make plan payments to OneUnited and Tremont Credit Union.  This occasioned further discovery and eventually a motion by CSAME to approve a supplement to the Disclosure Statement (the "Supplemental Disclosure") and certain resolicitation procedures that would afford OneUnited and Tremont Credit Union an opportunity to change their votes.  Over the objection of OneUnited, the Court approved the Supplemental Disclosure and resolicitation procedures.  The resolicitation resulted in no change of vote.

After approval of the Disclosure Statement as to the Second Modified First Amended Plan, CSAME moved repeatedly to make "nonmaterial" modifications to the plan, nonmaterial in the sense of requiring no resolicitation of votes or further disclosure.  The Court granted these motions in part, resulting in the plan presently under consideration, CSAME's Seventh Modified First Amended Plan of Reorganization ("the Plan").  Its features are as follows.

The Plan classifies claims into six classes:

| Class | Name | Description |
|-------|------|-------------|
| Class 1 | Other Priority Claims | All priority claims (if any) that are not administrative claims or priority tax claims. |
| Class 2 | OneUnited Church Secured Claim | OneUnited's secured claim on the Church Loan. |

---

[2] The first two days also included the evidentiary hearings on OneUnited's first motion to dismiss, CSAME's objection to OneUnited's claim, and CSAME's Designation, Subordination, and Fee Motion; and the last three days also included the evidentiary hearing on a second motion by OneUnited to dismiss the case.  The evidence received in conjunction with those matters was also received in conjunction with confirmation.

| Class 3 | Tremont Secured Claim | Any secured claim on a promissory note in favor of Tremont Credit Union. |
| Class 4 | OneUnited RRC Secured Claim | OneUnited's secured claim on the Construction Loan. |
| Class 5 | General Unsecured Claims | The claims of nonpriority unsecured creditors. |
| Class 6 | Other Secured Claims | All secured claims other than those in Classes 2, 3, and 4. |

Classes 1 and 6 are unimpaired.   Each holder of a Class 1 claim will receive cash equal to the unpaid amount of its claim (except to the extent that it agrees to less favorable treatment) on or as soon as practicable after the latest of (x) the Plan's effective date, (y) the date on which the claim becomes allowed, and (z) such other date as the holder and CSAME may mutually agree.  CSAME contends that there are no Class 1 claimants.  Each holder of a Class 6 claim will have its agreement with CSAME reinstated.  CSAME explains that the Class 6 claims total less than $18,000 and relate to payments CSAME makes in the ordinary course of business: ongoing utility and tax obligations, and purchase-money secured financing of CSAME's audio system.

All other classes are impaired.  In addition, as to all other classes, the Plan provides for two possible treatments:  one that would apply in the event the Court determined that the claims of OneUnited should, as CSAME would effect through diverse provisions of the Plan, be equitably subordinated to the claims in Classes 3 and 5, and another that would apply if not.  Having determined that equitable subordination is not justified, I will limit the description of the treatment of Classes 2 through 5 to their non-subordination alternatives.  Although the Plan requests equitable subordination, CSAME does not regard equitable subordination as necessary to the Plan, and CSAME asks that the Plan be confirmed even if equitable subordination is denied.

On its Class 2 claim, the secured claim on the Church Loan, OneUnited would receive in full satisfaction and discharge of such claim (i) the Milton Parsonage and (ii) a new promissory note from CSAME (the "New OneUnited Church Note"), secured by a new mortgage on the remaining properties that secure the Church Note.  The New OneUnited Church Note would have the following terms: equal

quarterly payments, a 20-year term with 30-year amortization, an original principal amount equal to the

difference of (x) $1,062,120.13 plus accrued interest at 7.875% from November 1, 2011 to the effective

date minus (y) $380,000.00, and an interest rate equal to 5.75% per annum (noncompounding).  The

subtraction of $380,000.00 would effect a credit in that amount for turnover of the Milton Parsonage.

The new promissory note and new mortgage would have fewer and different covenants from the note

and mortgage that form the basis of the Church Claim.  In addition, on the Effective Date, CSAME would

dismiss with prejudice all counterclaims with respect to the Church Note and mortgage that are

currently pending in state court litigation between CSAME and OneUnited.  Section 7.6 of the Plan

establishes a postconfirmation bar date for OneUnited's assertion of any claim for postpetition interest,

fees, and other charges under § 506(b) of the Bankruptcy Code with respect to the OneUnited Church

Secured Claim.  It therefore appears, and I conclude, that CSAME and the Plan contemplate some

adjustment to the principal amount of the New OneUnited Church Note for items that may be allowed

under § 506(b) but that are not otherwise accounted for in the Plan's description of the original principal

amount of the New OneUnited Church Note, up to (but not exceeding) the agreed value of the collateral

securing the OneUnited Church Secured Claim.

On its Class 4 claim, the secured claim on the Construction Loan, OneUnited would receive, in

full satisfaction and discharge of such claim, a new promissory note from CSAME (the "New OneUnited

RRC Note"), secured by a new mortgage on the properties that secure the Construction Loan note.  The

New OneUnited RRC Note would have the following terms: equal quarterly payments (which shall be

paid into escrow between the Effective Date and the entry of a Final Order resolving the pending state

court litigation), a 20-year term with 30-year amortization, an original principal amount equal to the

Litigated OneUnited RRC Note Amount, and an interest rate equal to 5.75% per annum (non-

compounding).  The new promissory note and new mortgage would have fewer and different covenants

from the note and mortgage that form the basis of the Class 4 claim.  In addition, the Plan would release

and discharge the liability of FEDAME to OneUnited on its Guaranty of the Construction Loan.   However,

by ¶ 4.6 of the Plan, if the Court determines that the New OneUnited RRC Note and OneUnited RRC

Loan Mortgage do not provide treatment sufficient to confirm the Plan, then OneUnited shall instead

receive, on its Class 4 claim, a modified New OneUnited RRC Note with an interest rate of 5.25% per

annum (all other terms remaining the same), secured by the OneUnited RRC Loan Mortgage, which note

would be guaranteed by a new guaranty from FEDAME of certain of the Debtor's obligations under the

New OneUnited RRC Note (the "New Guaranty").  The proposed New Guaranty specifies (i) that it is a

guaranty of CSAME's performance under the New OneUnited RRC Note ("each and every debt,

obligation, and liability arising under that certain promissory note given by the Borrower to Bank *under

the Plan*") and (ii) that "any contrary provision hereof notwithstanding, the Obligation of the Guarantor

hereunder at any time shall be limited to [INSERT RRC LOAN AMOUNT MINUS DISTRICT'S PLAN

CONTRIBUTION] (sic)."  The terms RRC Loan Amount and District's Plan Contribution are not defined in

the New Guaranty or the Plan.

　　　　With respect to Class 3, the Plan provides that the holder of the secured claim of Tremont Credit

Union ("Tremont") shall, if Tremont makes an election under § 1111(b) of the Bankruptcy Code, receive

in full satisfaction and discharge of such claim the Restructured Tremont Payments and retain its lien

under the Tremont Mortgage, a mortgage on the church building, in security thereof.  Tremont has

made an election under § 1111(b).  "Restructured Tremont Payments" means equal monthly debt

service payments to Tremont of principal and interest, with a 15-year maturity, an interest rate of

4.625% per annum, and an original principal amount equal to the amount of the Tremont Secured Claim

set forth in the Schedules.  In ¶ 7.5 of the Plan, CSAME expressly agrees that the Tremont Secured Claim

is equal to the Scheduled amount of the Tremont Claim, and that therefore Tremont has no deficiency

and Class 5 Claim.

With respect to Class 5, the class of general unsecured creditors, the Plan provides that if (as is the case) subordination is not approved, Class 5 claimants will receive no distribution.

In addition to the foregoing, the Plan includes four further provisions of note.  First, it provides that on the effective date, FEDAME shall (i), as a condition of the Plan's becoming effective, provide a donation of cash to CSAME of $1.5 million, which donation shall be used exclusively for the costs associated with completion of the RRC, including payments to cure the Thomas Construction Contract (as described below), and (ii) waive its claims against CSAME, including its claim for contribution in connection with its guaranty of the Construction Loan.  Second, the Plan further provides that, also on the effective date, CSAME shall assume its prepetition contract with Thomas Construction Company, Inc. ("Thomas" and the "Thomas Contract")—a 2006 agreement for construction and renovation of the RRC, for which CSAME ran out of funding before the project was completed—as amended by a negotiated amendment to the contract (the "Thomas Contract Amendment"), and shall cure all defaults thereunder by the payment on the Effective Date of $300,000 and allowing Thomas a general unsecured claim of $763,619.50.[3]  Third, at its § 8.7, the Plan further provides that "[s]ubstantial consummation of the Plan under section 1101(2) of the Bankruptcy Code shall be deemed to occur on the Effective Date."  And fourth, in its § 9.2, the Plan would provide to CSAME a discharge:  "Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of all Claims and causes of action of any nature whatsoever arising on or before the Effective Date."

---

[3] This general unsecured claim would be a Class 5 claim for which, consistent with the treatment of Class 5 claims, Thomas would receive nothing.

**f.   Objections to Confirmation**

Only OneUnited has objected to confirmation of the Plan, but it has done so on (by rough count) some 19 distinct grounds.  For immediate purposes, it suffices to hit only the high points.  First, OneUnited objects to the Plan's release of FEDAME's guaranty of the Construction Loan on jurisdictional, substantive, and equitable grounds.  Second, it objects to the equitable subordination of its claims to those of Class 3 and 5 claimants.  Third, it contends that the treatment of its claims is not fair and equitable under § 1129(b) because (i) the 20-year term of repayment is too long, (ii) the interest rates are too small, (iii) the covenants in the new promissory notes and mortgages are inadequate, and (iv) the credit for turnover of the Milton Parsonage is excessive.  And fourth and fifth, OneUnited argues that the Plan is not feasible and that CSAME has not proposed it in good faith.

**g.   Second Motion to Dismiss**

On March 13, 2013, OneUnited filed its second motion to dismiss this bankruptcy case.  It seeks dismissal for cause under 11 U.S.C. § 1112(b)(1) and (4).  CSAME and Tremont have objected to the motion.  The last three days of the evidentiary hearing on confirmation—June 24, 25, and 28, 2013— also served as the evidentiary hearing on this motion to dismiss.

At the commencement of the last day of the evidentiary hearing, OneUnited's counsel brought to the Court's attention a concern about whether CSAME's properties continued to be insured.   The Court inquired of CSAME's counsel, who stated:  "I am informed that the two properties that are occupied that are used are fully insured and that the other three do not have current insurance. . . .  I know that my client is working strenuously to try to rectify that today.  They were working on that yesterday."  This statement was not evidence; and no evidence was submitted regarding this apparent gap in coverage.  OneUnited had not raised the insurance concern as "cause" under § 1112(b)(1) for dismissal of the case and did not then or at any time move to amend its motion or to reopen the evidence with respect to this issue.

**FINDINGS OF FACT**

As to both confirmation of the Plan and the Second Motion to Dismiss, the Court now makes the following findings of fact.

**A.       CSAME, FEDAME, and the Origination of the Loans**

1.       The AME Church was formed in Philadelphia, Pennsylvania in 1816.

2.       Under the name "the First African Methodist Episcopal Society in the City of Boston," CSAME was incorporated by act of the Massachusetts General Court on January 28, 1839.  Chapter 4 of the Acts of 1839.  In 1978, the "Society" amended its name to Charles Street African Methodist Episcopal Church of Boston.  CSAME has remained continuously incorporated in the Commonwealth of Massachusetts since its incorporation.

3.       At all times from its incorporation through the present, CSAME has been and remains a congregation, or local church, of the AME Church and in good standing as such.   It has no plans to sever its affiliation with the AME Church.

4.       At present, CSAME has approximately 1,400 members on its rolls, 1000 of them active. It employs a pastor and other religious and administrative employees and pays their salaries.  It conducts regular worship services, provides pastoral care and counseling, provides religious education, and engages in charitable activities of various sorts, much of it in the nature of activities, education, and support for children.  It raises money through congregational giving in remarkable sums to support its regular program and special projects and to support the larger AME Church.  It has expenses that it must and, for the most part, has paid.

5.       Since 1994, the pastor of CSAME has been Rev. Gregory Groover.  In accordance with AMEC polity, Rev. Groover became pastor by virtue of appointment by the bishop of CSAME's episcopal district, the appointments being always of a year's duration, subject to renewal.  Rev. Groover serves not only as pastor and preacher but also, in essence, as (in his own characterization) the CEO of the

management and operations of CSAME; he is the chair of all the governing boards at the church.  Since

1998, Rev. Opal Adams has been the associate pastor of CSAME.  Her duties have included actual

maintenance of the financial records of CSAME and payment of its debts from CSAME's accounts.

      6.      CSAME owns six parcels of real estate:

      a.      The "Church Building," located at 551 Warren Street , Roxbury, Massachusetts.

For purposes of the Plan, CSAME and OneUnited agree that this property has a value of

$1,300,000.  CSAME makes heavy, regular, and continuous use of the Church Building as its

place of worship and for its offices and meeting spaces.  The Church Building is crucial to the

mission and life of CSAME.  CSAME has given a first position mortgage on the Church

Building to OneUnited to secure the Church Loan and a junior mortgage to Tremont to

secure its loan.

      b.      The "Storefronts," located 553-565 Warren Street, Roxbury, adjacent to the

Church Building.  For purposes of the Plan, CSAME and OneUnited agree that this property

has a value of $400,000; the property is encumbered by a 2006 mortgage to OneUnited to

secure the Church Loan.  As the name implies, this single-story building was designed as two

retail storefronts.  For some time, CSAME used it as office space for "pastoral residents"

who have worked and studied with CSAME.  In the spring of 2010, however, the building

suffered catastrophic flooding in heavy rains, resulting in mold that has rendered the

property unusable for any purpose.  Remediation likely would require a teardown and

complete rebuilding—or a renovation just as expensive.  An appraisal in evidence notes that

the building requires "fairly significant renovations, including a new roof (significant water

damage and mold was noted), new flooring, new heating systems and a good overall

cleanup and updating (significant deferred maintenance)."  The appraisal estimated the cost

of needed renovations at $103,551, but this sum, and the itemized measures it would fund,

appear inadequate to fully address the mold.  CSAME, which was already financially

strapped by its obligations to OneUnited in conjunction with the RRC, has been unable to

address this need.  OneUnited would have the Court find the condition of this property

"shameful," but this is hyperbole, and there is no shame, negligence, or bad faith in

CSAME's failing to remediate what it had no means to remediate.  CSAME still has no plan or

means to renovate this property, and confirmation of the Plan would not change that fact.

CSAME has indicated that, in conjunction with the Plan, it would retain and use this property

to generate rental income, but this is plainly unrealistic:  the property cannot serve that

purpose without a substantial investment that CSAME concedes it has no means at present

to make.  CSAME has offered no justification for its decision to retain this property and not

to sell it, or turn it over to OneUnited, in partial satisfaction of the debt to OneUnited that it

secures.[4]  The Storefronts appear to be useless to CSAME and, insofar as they must be

insured at least for liability,[5] a net drain on CSAME's resources.

      c.        The "Milton Parsonage," located at 70 Summer Street, Milton, Massachusetts.

This property is subject to a 2006 mortgage to OneUnited that secures the Church Loan.

Acquired by CSAME in 1982, this property, a single-family home in a residential

neighborhood, served for some time as the residence of CSAME's pastor, but it has not been

used for that purpose for years—how many is not clear—and today is unused, unusable,

and in considerable disrepair.  Here, too, OneUnited would have the Court find the

condition of this property "shameful" and evidence of bad faith, but this too is unjustified:

there is no evidence that the condition of this property deteriorated through the fault of

CSAME, that the deterioration occurred after CSAME mortgaged it to OneUnited or after the

bankruptcy filing, that CSAME had the resources to renovate or rebuild the home, or that

---

[4] I do not find that there is no justification, only that the case has not been made.
[5] The structure likely has no value to protect, and land does not burn.

the commitment of resources for that purpose would have constituted a sound exercise of

CSAME's business judgment or been otherwise consistent with its purposes and mission.  In

the Plan, CSAME would turn this property over to OneUnited.  Before CSAME modified its

plan to provide for turnover of this property to OneUnited, at a time when the pending plan

contemplated that CSAME would retain the Milton Parsonage, CSAME and OneUnited

stipulated that "solely in connection with the confirmation proceedings of the First

Amended Plan," the value of the Milton Parsonage is $380,000.  Neither party intended that

the Stipulation would apply to the currently proposed treatment of this property.  In view of

the material difference in the treatment of this property between the plan then under

consideration and the current Plan, the parties' agreement as to the value of this property

does not apply to the present Plan.  The record also includes an "exterior only" appraisal of

the property as of February 20, 2012; using the sales comparison approach and an

assumption that the interior, not inspected, is in average condition, it fixes the fair market

value at $380,000.  On the strength of the appraisal and my own observation that interior is

in worse than average condition, I find that the value is less than $380,000; how much less I

cannot determine.

d.      The "Old Parsonage," located at 5-15 Elm Hill Avenue, Roxbury.  This property,

located across the street from the Church Building, is a house that serves not as a parsonage

but as office and meeting space for some of CSAME's various programs and ministries.  For

purposes of the Plan, CSAME and OneUnited agree that this property has a value of

$240,000.  It is encumbered by a 2006 mortgage to OneUnited that secures the Construction

Loan.

e.      The "Parking Lot," a parking lot located at 5-15 Elm Hill Avenue, Roxbury,

adjacent to the Old Parsonage.  For purposes of the Plan, CSAME and OneUnited agree that

this property has a value of $50,000.   It is encumbered by a 2006 mortgage to OneUnited

that secures the Construction Loan.

      f.      The "RRC Property," located at 567-575 Warren Street, Roxbury, adjacent to the

Storefronts.  This property is currently under construction; the construction has been stalled

since 2009 and remains incomplete.  For purposes of the Plan, CSAME and OneUnited agree

that this property, "as complete," would have a value of $2,600,000.  The parties have not

agreed on the current "as is" value.  The evidence includes an appraisal that fixes the "as is"

value at $2.3 million as of February 29, 2012.  I find that the "as is" value is no more than

this and, consistent with the appraisal, further find that this value is based on its use as "a

function hall (community center) or a religious type facility," which the appraiser opined was

the property's highest and best use.  The appraiser opined that the property, as complete,

would sell for no more than $2.4 million but arrived at a higher value on the basis of a

combined sales and cost approach.  Discounting for the cost of completion, which is at least

$260,000 and likely more, and accounting for the unlikelihood that a buyer would want the

property for its highest and best use, I find that a fair market sale of this property would

yield no more than $2 million, quite possibly much less.  I need not find a precise value.

    7.      Prior to 2006, CSAME conducted a number of community development activities and

programs through a separately incorporated Massachusetts nonprofit corporation that it formed.  The

corporation has been known since August 2005 as the Charles Street A.M.E. Roxbury Renaissance

Center, Inc. ("CSRRC, Inc."), and for five years before that as the Charles Street A.M.E. Life Development

Center, Inc., and before that as the Marcheta H. Taylor Life Enrichment Center, Inc.  The by-laws of this

corporation specify that the chairperson of its board of directors will always be the pastor of CSAME,

and that at least 51 percent of the membership of the board will always be CSAME members.  This

corporation was dissolved on June 18, 2012 for failure to file seven annual reports but, upon application

to revive it and cure of the deficiencies, revived on August 10, 2012.  Also, its § 501(c)(3) status has

lapsed and is in the process of being restored.  Its executive director from 2005 through the bankruptcy

filing in 2012 was Dennis Lloyd, who, during some of that period, was also the facilities manager for

CSAME.  The programs and activities of this entity have to date been conducted out of the Old

Parsonage.  They have included primarily an arts and music program for youths and an elder care

program, both of which continue, and a now discontinued program for at-risk youths.

8.    In 2006, following upon many years of planning, CSAME undertook to develop the RRC

Property into a community center to be known as the Roxbury Renaissance Center ("RRC").  Though the

RRC would be operated by CSRRC, Inc., its creation and the development of the building it will occupy

are charitable initiatives of CSAME.  CSAME anticipates that ownership of the RRC Property will remain

in CSAME and that CSRRC, Inc. will occupy the RRC Property under a lease from CSAME.  CSAME

envisions the RRC as a mixed use facility.  It would serve in part as space for charitable initiatives of

CSAME, including as a community center for its neighborhood, the Grove Hall section of Boston.  But

CSAME also contemplates that the RRC would produce revenue through rental of its space—especially

its ballroom for weddings and other functions, but also office space for nonprofit groups and perhaps for

small for-profit start-ups—by which it would pay for its maintenance and staff and yield a surplus,

payable to CSAME, as rent or some other contractual charge, to pay down the cost of its construction,

especially the Construction Loan.

9.    CSAME and CSRRC, Inc. have developed projections under which they anticipate that a

portion of the debt service on the restructured Construction Loan obligation would be funded from RRC

revenues.  These projections, in more than one iteration, are useful but rough, incomplete (they include

no line item for insurance), and necessarily somewhat speculative.  They forecast that the RRC would

have annual program expenses, excluding debt service, of $770,000 and revenues from office and event

rentals of only $240,000.[6]  These projected revenues include approximately $40,000 from rental of

space in the Storefronts, which revenues can't possibly be achieved, so projected revenues are in fact

only $200,000.  The shortfall of $570,000, 74 percent of the amount needed to break even, would be

covered by annual charitable giving to CSRRC, Inc. in the projected amount of $660,000, this sum being

over and above CSAME's own revenues from tithes and offerings.  Given these projections, the RRC

could at best yield $90,000 for payment of debt service.  This would require revenue from donations at a

level that CSRRC, Inc. might reach for a year or two but is unlikely to approach in most of the 20 years of

the restructured obligation on the Construction Loan.  CSAME makes the point that the expenses of

CSRRC, Inc. can be reduced to adjust for lower-than-budgeted revenues.  Even so, it is unrealistic to

expect the RRC to support debt service at all.  At best, it will help defray its own expenses.  Debt service

on the restructured loan would likely be borne entirely by CSAME, without help from the RRC or the

Storefronts.

    10.    CSAME's decision and initiative to enter into the Construction Loan and Church Loan

with OneUnited and to grant mortgages as security were the decision and initiative of CSAME.  The rules

of the AME Church required that the granting of these mortgages be approved by two ecclesiastical

authorities—the Quarterly Conference and the Annual Conference (about which more below)—and the

necessary permissions were granted, but the higher authorities did not direct that mortgages be

granted.  Their role was limited to oversight and permission; the initiative resided in the local church,

CSAME, not in any other authority of the AME Church at any level.

    11.    The AME Church is structured, in its own nomenclature, as "a connection" or

"connectional church."  That is, although its "local churches," such as CSAME, may be separately

incorporated, they are connected through a multi-tiered network of "conferences" of various regional

breadths and of "episcopal districts," each having such authority as is specified in the AME Church's

---

[6] These figures are approximate averages for the first five years of the plan.

Book of Discipline.  Local churches meet on their own, in Local Church Conferences presided over by the

local church's minister in charge.  For each local church, the pastor, ministers, and certain officers also

meet in special quarter-annual meetings knows as Quarterly Conferences, presided over by a "presiding

elder" for a given presiding-elder district (to be distinguished from an episcopal district).  Each Quarterly

Conference sends a representative to an annual District Conference for the presiding-elder district.  Also

annually, there is held a meeting of an Annual Conference, which is both an incorporated entity and a

meeting, for the oversight of the local churches within the presiding-elder districts within the Annual

Conference.  The Annual Conferences are themselves organized into Episcopal Districts, of which

(according to the 2008 *Book of Discipline*) there are twenty, each presided over by a bishop.  Finally, the

whole AME Church is overseen by a quadrennial General Conference, a legislative meeting of the

bishops and an equal number of ministerial and lay delegates, which constitutes "the supreme body of

the AME Church," and, between General Conferences, by a Council of Bishops, which is "the executive

branch of the connectional church."  CSAME belongs to the Boston-Hartford District of the New England

Annual Conference of the First Episcopal District, the latter being the entity referred to herein as

FEDAME.

12.     The AME Church relies on the connections among its congregations to accomplish its

mission and purpose and regards its various parts as interdependent.  It defines "connectional" as "[a]

structural organizational principle that all (national and international) AME church congregations are a

connected network of unique, compatible, interdependent relationships to accomplish the mission and

purpose of the church."  The term is more than neutrally descriptive and clearly has ecclesiological

significance for the denomination.

13.     The structure and regulations of the AME Church are set forth in *The Book of Discipline

of the African Methodist Episcopal Church*, the most-recently published (at least when this evidence was

presented) being that of 2008.  Subject to certain exceptions, the General Conference may make and

amend the rules and regulations of the AME Church that are set forth in the *Book of Discipline*.

14.    As a condition of making the Construction Loan, OneUnited insisted on receiving a

guaranty of the loan from FEDAME, and FEDAME, at the request of CSAME, did give OneUnited a

guaranty of the Construction Loan (the "Guaranty").  The Guaranty extends to all obligations of CSAME

under the Construction Loan.  It includes the following provisions:

a.   FEDAME "hereby unconditionally guarantees to the Bank [OneUnited] that:  (a) the
Borrower [CSAME] will duly and punctually pay or perform . . . all indebtedness,
obligations and liabilities of the Borrower to the Bank now or hereafter owing or
incurred (including without limitation costs and expenses incurred by the Bank in
attempting to collect or enforce any of the foregoing) which are chargeable to the
Borrower either by law or under the terms of the Bank's arrangements with the
Borrower accrued in each case to the date of payment hereunder arising under the
[Construction Loan promissory note] (the "Obligation") and (b) if there is a mortgage or
other agreement or instrument evidencing or executed and delivered in connection with
an Obligation, the Borrower will perform in all other respects strictly in accordance with
the terms thereof."  Guaranty, p. 1.

b.   "If for any reason the Borrower . . . is under no legal obligation to discharge any of the
Obligation undertaken or purported to be undertaken by it or on its behalf, or if any of
the monies included in the Obligation have become unrecoverable from the Borrower
by operation of law or a for any other reason, the Guaranty shall nevertheless be
binding on the Guarantor [FEDAME] to the same extent as if the Guarantor at all times
had been the principal debtors on all such Obligation."   Guaranty, p. 3.

c.   "The obligations of the undersigned hereunder [FEDAME] shall not be affected . . . by
any release, discharge, or invalidation, by operation of law or otherwise, of the
Liabilities[.] . . .  Interest and Costs of Collection shall continue to accrue and shall
continue to be deemed Liabilities guaranteed hereby notwithstanding any stay to the
enforcement thereof against the Borrower or disallowance of any claim therefor against
the Borrower."  Guaranty, p. 3.

d.   "The undersigned:  shall not exercise any rights against the Borrower, by way of
subrogation or otherwise shall not prove any claim in competition with the Bank in
respect of any payment hereunder or bankruptcy or insolvency proceeding of any
nature; shall not claim any set-off or counterclaim against the Borrower in respect of
any liability of the undersigned to the Borrower; and waives any benefit of, and any
right to participate in, any collateral which may secure the Liabilities. The payment of
any amounts due with respect to any indebtedness of the Borrower now or hereafter
held by the undersigned is hereby subordinated to the prior payment in full of the
Liabilities. The undersigned will not demand, sue for, or otherwise attempt to collect
any such indebtedness, and any amounts which are collected, enforced and received by

the undersigned shall be held by the undersigned as trustee for the Bank, and shall be paid over the Bank in account of the Liabilities without affecting in any manner the liability of the undersigned under the other provisions of the Guaranty."  Guaranty, p. 4.

15.       Before the Construction Loan closed, FEDAME supplied to OneUnited a financial statement for the fiscal year ended May 31, 2006.  The statement, which was prepared by an independent accountant, included the following note, known as "Note 1":  "There are 330 associated churches in the First Episcopal District.  The African Methodist Episcopal Church organization grants to the bishop of the First Episcopal District the authority to transfer funds at his discretion between organizations and member churches of the First Episcopal District and/or the district's central office. This authority also extends to any organization created or controlled by the district."  This same statement, or a close variant thereof—modified only by substituting "direction" for "discretion"— appeared in several financial statements of FEDAME for succeeding years.

16.       It is unclear whether, and to what extent, the bishop of FEDAME, or any bishop of the AME Church, has the authority represented in Note 1.  One witness testified that the authority so described exists by tradition.[7]  None of the four who were asked about it,[8] at least three of whom had considerable and long familiarity with the *Book of Discipline*, knew of authority for Note 1 in the *Book of Discipline*.  Rev. Gregory Groover, the pastor of CSAME, who also served as first vice-chairperson on the revisions committee of the 2008 and 2012 General Conferences, for revisions to rules and regulations that appear in the *Book of Discipline*, testified that Note 1 was inconsistent with his understanding, and that a bishop who attempted to invade the accounts of a local church would meet resistance in doing so. Another witness also testified that it was his understanding that a bishop's ability to transfer funds from a local church's accounts would be contingent on the local church's consent.

---

[7] Deposition of Rev. Vernard Leak, pp. 55-56.  This testimony raises the question of whether tradition, or long-standing practice, is a separate source of authority, alongside the *Book of Discipline*, in the AME Church.
[8] They are: (i) Dr. Clement Fugh, presently a bishop (but not of the FEDAME), who has been involved in the revision and compilation of the Doctrine and Discipline of the AME Church since 1980; (ii) Rev. Vernard Leak, administrator for bank relations for the First Episcopal District and a presiding elder; (iii) Clarence Fleming, chief financial officer for the First Episcopal District since 1998; and (iv) Rev. Gregory Groover, pastor of CSAME since 1994 and a pastor in AME churches since 1987.

17.     The FEDAME Financial Statement for fiscal year ended May 31, 2006, an unaudited,

consolidated financial statement for the entire First Episcopal District, indicated that the entire District

had cash of $23,588,192, of which $238,983 was in the District Office, $23,273,206 was in the

Conference Churches, and another $76,003 was in certain District Activities.  As is clear from its loan

underwriting memo for the Construction Loan, OneUnited relied on these figures, and on the ability of

the presiding Bishop to have recourse to the cash of the Conference Churches at his discretion, as

represented in Note 1, in deciding to make the Construction Loan.  There is no evidence that OneUnited,

in relying on this critical, unusual, and intra-ecclesial language, ever inquired of FEDAME about the limits

on and conditions under which the bishop would be exercising the discretion referred to in Note 1.

18.     OneUnited maintains that Note 1 was a correct statement of the authority of a bishop.

Nonetheless, OneUnited alleges that Note 1 and the financial documents containing it were produced,

or at least given to OneUnited, with a belief that they were false and with intent to deceive.  No

evidence for this proposition was cited in OneUnited's proposed findings of fact,[9] and, notwithstanding

OneUnited's considerable discovery into the issue, the proposition has not been established.

19.     OneUnited makes two related allegations [both in doc. #552, at p. 2] to support an

overall allegation of bad faith by CSAME and FEDAME.  The first is that someone—this allegation is in the

passive voice, so the subject is unclear—renounced financial statements of FEDAME on which

OneUnited relied.  This allegation does not specify the subject, the financial statements (much less the

specific content at issue), or the content and manner of the repudiation.  The second is that CSAME and

FEDAME have represented that, notwithstanding the Guaranty, FEDAME is in fact unable to satisfy the

---

[9] OneUnited requests a finding that FEDAME, "by its own account, presented enormously inflated financial
statements to a federally insured banking institution in aid of an application for millions of dollars in financing to
an otherwise unqualified borrower," but for this proposition it cites only a federal statute that is not evidence for
the proposition.  OneUnited Bank's Post-trial Brief [doc. #630], p. 27.  In addition, the proposed finding does not
allege knowledge (or at least belief) of falsity and intent to deceive.

guaranteed obligations of CSAME.  I am aware of no evidence as to either of these allegations, and OneUnited has proposed no findings as to either.

20.      CSAME has since at least January of 2000 been conducting an internal capital campaign, known as Vision to Victory ("V2V"), to help fund the construction of the RRC.  From January 2001 through April 2005, it raised $681,428.  From May 2005 through November 2009, it raised a further $858,250.00.  Thereafter, through December 2012, it raised at least another $308,000 and perhaps as much as $200,000 more (the overlapping of accounting periods makes a precise figure impossible).  Virtually all of this money has now been expended on the RRC construction project.

21.      The Church and Construction Loans closed in October 2006.  (Their terms and collateralization are set forth in the Procedural History and need not be repeated here.)  The RRC Loan, in the form of a construction line of credit, contemplated a term of 18 months, with a maximum of two 90-day maturity date extensions, to be exercised at the option of the Debtor.

**B.      Construction, Defaults, and Bankruptcy Filing**

22.      The construction work, for which CSAME had hired Thomas as general contractor, took longer and cost more than had been contemplated.  CSAME had to and did fund, from its V2V fund, unanticipated costs of preparing the building before the loan-funded portion of the project could commence.  This and the intervening winter delayed the project by many months.  OneUnited granted two contractual 90-day extensions and three additional discretionary extensions of the maturity date, for a total of five such extensions.  The last of these, dated September 1, 2009, was scheduled to expire on December 1, 2009.

23.      On November 4, 2009, as the December 1, 2009 expiration of the fifth extension approached, RRC Executive Director Dennis Lloyd notified OneUnited that the construction work would not be completed until late April, 2010.  OneUnited disallowed any further drawdown on the

Construction Loan; by this point OneUnited had advanced only $2.8 million of the $3.652 million

available under that loan.  The Construction Loan facility expired on December 1, 2009.

24.     When OneUnited and CSAME entered into the Construction Loan, both contemplated

that OneUnited would refinance the Loan with a new five-year loan at prime plus one percent and a 30-

year amortization.  By the fall of 2009, however, the credit crisis of 2008 had made it much more

difficult for CSAME to refinance with OneUnited or any other lender.  Also, the resulting downturn in the

economy caused a slowing in the V2V capital campaign needed to complete construction and otherwise

fund the project.

25.     Negotiations continued.  With no progress, OneUnited declared the Construction Loan

in default on April 19, 2010 but did not immediately undertake to enforce its rights against the collateral

or under the Guaranty.  Instead, it continued to work with CSAME to find an exit solution.  By letter

dated June 11, 2010, CSAME thanked OneUnited "for [its] extraordinary support and assistance . . .

stepping up to the plate when other lenders wouldn't even consider us."

26.     In the summer of 2010, the amicable relationship soured.  CSAME obtained the

assistance of third-party benefactors, whose buy-out offer to OneUnited on behalf of CSAME appears to

have elicited only resentment.  Negotiations devolved into threats to defame and *ad hominem* attacks in

both directions, many public, and differences became personal among the principals.  On September 2,

2010, OneUnited filed suit on the Construction Loan against CSAME, as borrower, and against the First

District, as guarantor, in the Suffolk County (Massachusetts) Superior Court (the "State Court Action").

CSAME and FEDAME responded with counterclaims.  The Superior Court dismissed the counterclaims,

but upon interlocutory appeal, the Appeals Court reinstated them.  The claims and counterclaims

remained pending when CSAME filed its bankruptcy petition.

27.     Over the life of the Church Loan, CSAME made all but two of the monthly payments of

interest (and even at least one of these was made but returned by OneUnited when it opted to proceed

with foreclosure), albeit in many instances late, and also paid 43 of 46 assessed late charges.  The

Church Loan matured on December 1, 2011, at which point the entire principal balance came due and

went unpaid.  On December 12, 2011, OneUnited issued a Notice of Default and Demand for Payment.

Two months later, having received no payment, OneUnited scheduled a foreclosure sale on the Church

Building and two other properties, which sale was stayed by CSAME's bankruptcy filing on March 20,

2012.

**C.    The Plan**

28.    The details of the Plan are set forth in the Procedural History and incorporated here by

reference.

29.    The Plan provides that the completion of construction of the RRC Building will be funded

by a $1.5 million donation to the Debtor by FEDAME.  The funds for the donation will be raised from

donors in the greater Boston area.  The fundraising effort is being led by Stephen Pagliuca, a managing

partner of Bain Capital.  An organization called the Friends of the First Episcopal District, of which Mr.

Pagliuca is an authorized agent, has committed to pledge $750,000 toward the $1.5 million donation.

Mr. Pagliuca remains committed to the pledge and raising the money for the donation.  OneUnited has

not disputed that, if the Plan is confirmed, the promised donation will be made; in any event, the Plan,

by its own terms, cannot become effective unless it is made.

30.    OneUnited has argued that it is a fiction to describe the above donation as being made

by FEDAME; in fact, OneUnited contends, it is coming from Boston-area donors, was not raised by

FEDAME, and is merely a device to help justify the Plan's release of the Guaranty.  The Court disagrees.

All of FEDAME's monies and assets originate in donations, so the donative nature of the fund is of no

moment.  Also, it is the joint intent of the originating donor and of FEDAME that the donation be

FEDAME's; the evidence shows that, but for this structuring of the donation, the donation would be

made at all.[10]  The testimony of Ryan Cotton is clear, and I find, that Mr. Pagliuca's intent in arranging

the donation is to help not only CSAME but also FEDAME and, by the donation, to resolve FEDAME's

liability on the Guaranty, to obtain a comprehensive resolution of claims arising from the Construction

Loan and Guaranty among CSAME, OneUnited, and FEDAME.  The donation is in fact, in the first

instance, a gift to FEDAME, and only then from FEDAME to CSAME.  Moreover, by virtue both of

FEDAME's Guaranty and the connectional nature of the AME Church, FEDAME has a strong interest in

resolution of CSAME's debt on the Construction Loan; and CSAME has a strong reciprocal interest in

protecting the positions of FEDAME and its member churches.  The present reorganization is in

significant part an effort by CSAME to make itself right with FEDAME.  It is simply untrue that the local

church's fund-raising initiative is not also undertaken for and on behalf of the episcopal district.

31.    Under the Plan, CSAME would assume the Thomas Contract for a cure cost of essentially

$300,000; Thomas would also receive a sizable unsecured claim but, by virtue of the treatment of Class

5, get nothing for it.  For this cure payment, Thomas would perform work remaining under the original

contract valued at $262,350.  In addition, Thomas would provide further services under an amendment

to the contract for which CSAME would pay an additional $1.2 million.  The total cost of Thomas's

further work is thus $1.5 million, which would be paid in full by the FEDAME donation, which is itself

earmarked for this purpose and would not be made except for this use under the Plan.  The agreement

with Thomas for assumption and amendment of the original contract is designed to complete the RRC

and render it functional.  The contract is likely to achieve that goal within budget and within a

reasonable time.  CSAME did not solicit other bids for this work and instead negotiated exclusively with

Thomas because Thomas is known to CSAME, loyal to and familiar with the project, a neighbor of

CSAME, and committed to the church's neighborhood.

---

[10] I do not find or suggest that if this plan is rejected, the donation would not be made in a different form.  That
would be speculation.  The point is only that the present donation does in fact have the structure it purports to
have.

D.      **Pastoral Residency Program**

32.     CSAME's mission and program has for many decades included the training of new

ministers.  Since 2003, this effort has taken the form of a program known as the Pastoral Residency

Program ("PRP").  The PRP permits seminary-educated but inexperienced ministers-in-training in the

AMEC to train, in cohorts of three, for a two-year period at CSAME under the tutelage of CSAME's

pastor, a program coordinator hired for this purpose, and (to lesser extents) CSAME's entire staff and

congregation.  As part of their training, the residents provide pastoral service to CSAME.  The program

pays the residents a stipend and health insurance, supplies them with a laptop, phone service, office

space, and supplies, funds their travel to denominational meetings, and pays the salary of a program

coordinator.

33.     The program has been funded mostly by three grants from the Lilly Endowment, Inc.

(the "Endowment"), each of four years' duration:  $795,489, funded in December 2002 for operation of

the PRP from December 1, 2002 through October 31, 2007;$850,000, funded in December 2006 for

operation of the PRP from December 1, 2007 through October 31, 2010; and $875,000, funded in

December 2010 for operation of the PRP from December 1, 2010 through August 31, 2015.  Each grant

was received subject to a grant agreement and the conditions specified therein, including:  (i) that the

grant be used solely for the PRP ("Under no circumstances may grant funds be expended , borrowed

(inter-fund), pledged or transferred for reasons unassociated with the stated purpose of this grant."), (ii)

that the grant be used in accordance with a budget appended to the agreement, with minor variations

permitted, provided prior written notice is given to the Endowment, and larger variations permitted

only on prior written approval, and (iii) that CSAME furnish the Endowment with annual written reports

on the progress of the PRP and the financial management of the grant.  The budget appended to the

2010 grant agreement contemplated that CSAME would itself contribute $275,888 to the PRP over the

life of the grant, but the grant agreement did not require this contribution.  CSAME has at all times

administered the PRP not as or through a separate entity but as part of CSAME's own program; the

PRP's income and expenses are CSAME's.  Financial management and oversight of the PRP has been in

the charge of Rev. Adams, but all disbursements of grant funds have required, and been made upon, the

direction of Rev. Groover.  Rev. Adams held the endowment funds in a segregated account, separate

from other CSAME funds.  None of the Endowment grants came with assurance of renewal, and, when it

made the 2010 grant, the Endowment informed CSAME that it would be the last.

34.      Upon application of CSAME, the Endowment also funded a two-year PRP grant in the

approximate amount of $416,000, known as the Boston Cluster Grant, to be administered by CSAME but

for the benefit of three other Boston-area congregations.  This grant covered a two-year period ending

in the summer of 2013.  When CSAME received this grant, Rev. Groover instructed Rev. Adams to hold

the funds in a separate account from the other Endowment funds, but, for reasons not in evidence, Rev.

Adams deposited the Boston Cluster Grant in the same account as CSAME's other Endowment grant

monies.

35.      Commencing in 2007 and in each year thereafter through 2012, Rev. Groover directed

Rev. Adams to pay Endowment monies in satisfaction of obligations of CSAME that were not related to

the PRP, and Rev. Adams, at Rev. Groover's direction (never on her own), transferred Endowment

monies as so directed.  These diversions occurred on numerous occasions and totaled $875,000,

including $51,000 from the Boston Cluster Grant and one transfer, of $23,000 for insurance, that

occurred after the bankruptcy filing, in April 2012.  Rev. Groover and Rev. Adams made each diversion

with knowledge that the funds in issue were restricted and, with one exception, that the diversions were

contrary to the terms of the grants.  The exception is that Rev. Groover was not aware that the monies

diverted from the Boston Cluster Grant were being diverted from *that* grant; he believed they were

being diverted from the third grant for CSAME's own PRP.  That is, he knew he was violating grant terms

but not that he was violating the terms of the Boston Cluster Grant—or a duty to the churches for whom

CSAME was administering the Boston Cluster Grant.  The diversions were made only to fund pressing

needs of CSAME, including interest payments to OneUnited on the Church Loan, payments for work by

Thomas that the Construction Loan would not fund, payments to OneUnited for extensions of the

Construction Loan, denominational assessments, and insurance coverage.  None of the monies were

appropriated for the personal benefit of Rev. Groover or Rev. Adams.  Rev. Groover has acknowledged

the wrongfulness of, and his responsibility and regret for, the diversions and the misrepresentations and

omissions they entailed.

36.    Rev. Groover thought of and referred to these diversions as "borrowing."  He

understood and conceded that they were made without notice to the Endowment and were not

consensual.  Nonetheless, he and Rev. Adams both always intended that the diverted funds would be

fully restored and that the PRP would suffer "no interruption or hiccup" on their account.  He cannot

always have been confident of achieving either goal, especially as total "borrowing" approached 80

percent of CSAME's annual budget.  Still, I find that the intent was real; restoration began in 2010, long

before the diversions were first disclosed.  As of June 28, 2013, by payment from CSAME's own

resources of expenses that would otherwise have been funded from the grants, some $288,000 of the

diverted total had been restored, including the one post-petition diversion.  I have no evidence that the

diversions have disrupted or affected the PRP, either for CSAME's residents or for those of the Boston

Cluster.

37.    The diversions were made without prior notice to or the consent of the Endowment.  In

annual reports that Rev. Adams made to the Endowment from 2007 through 2012, she did not report

the diversions, and Rev. Groover approved these reports.  In the applications they made for the 2010

grant and the Boston Cluster Grant, Rev. Groover and Rev. Adams did not disclose the diversions.  They

did not list the Endowment as a creditor in their bankruptcy schedules, as a consequence of which the

Endowment did not initially get notice of the bankruptcy case.  Nor did Rev. Groover otherwise disclose

the "borrowing" in the bankruptcy case, including in the Disclosure Statement.  Until the fall of 2012,

only Rev. Groover and Rev. Adams knew of the diversions.  Rev. Groover then disclosed the diversions to

his bishop and to one or more members of the CSAME committee charged with advising the pastor on

CSAME's finances.  The bishop did not require CSAME to take any immediate action with respect to the

diversions.  In early February 2013, Rev. Groover further disclosed the diversions in response to

questions posed to him in depositions in this case.  Finally, after the depositions, Rev. Groover, by phone

call and several letters, notified the Endowment of the diversions and accounted for its full scope.  He

also informed the Endowment that it was the intention of CSAME to restore the misappropriated funds

by continuing to fund the PRP through the term of the third grant and beyond.

38.    The Endowment, now aware of the diversions and of this bankruptcy case, has

expressed disappointment about the diversions and pleasure at the congregation's commitment to

replenish the restricted grant funds.  It has not asserted a claim in the bankruptcy case or an objection

to confirmation.  CSAME disclosed the diversions in the Supplemental Disclosure and also indicated

there that CSAME intends to continue to operate the PRP from its own resources at a level of

approximately $162,000 per year (but with no indication of duration).  The Boston Cluster Grant has

expired by its own terms.  By the budget that was approved with the third PRP grant, the PRP at CSAME

is scheduled to continue through the end of the third grant, in August 2015.  As Rev. Groover indicated

in his communications with the Endowment, it is CSAME's intent to finish restoring the diverted funds

by funding the PRP from CSAME's own resources[11] according to the grant budget through 2015 and then

at a reduced level—only one resident and no program coordinator—through 2017, at which point the

restoration would be complete.

39.    OneUnited has complained that Rev. Adams apparently accounted for the diverted

funds in the financial records and reports of CSAME as income.  Nowhere has OneUnited explained why

---

[11] The grant monies having recently run out, all future funding must come from CSAME, or not at all; and there is
no possibility of further misappropriation of grant funds.

it believes this was wrongful, as an accounting practice or otherwise.  The grants were income to

CSAME, albeit of restricted purpose.  OneUnited does not allege that Rev. Adams was counting them as

income twice, once when first received and again later when actually used.  There is no evidence that

they were counted as evidence when first received; better then to treat them as income when they are

used than not at all.  To be sure, the accounting at CSAME is no model, but counting the grant funds as

income was neither deceptive nor intended by Rev. Adams to deceive.  However, it is important to note

that this particular source of revenue will not be available after confirmation.

   40.  OneUnited further alleges that Rev. Adams acted with intent to deceive by failing to

distinguish the income from members' tithes and offerings from the Endowment income.  It appears

that Rev. Adams practice, beginning several years before the bankruptcy filing, was simply to list these

two kinds of income together under a single line item in CSAME's records and in its self-generated

financial reports.  The latter apparently made their way into the CSAME's disclosure statement.

OneUnited contends that was a deliberate deception that made CSAME's income from tithes and

offerings seem considerably larger than it really was.  This allegation is unsupported by the evidence.

The practice in question commenced years before the bankruptcy filing and well before even the

defaults on the OneUnited Loans.  They affected not just documents produced in this case but all of

CSAME's internal financial records, records on which CSAME itself relied, both for its own internal

accounting and for intra-denominational reports.  The evidence does not support a finding that this was

all done—starting in 2009—with intent to deceive in the disclosure statement in 2012.  It is even more

implausible in light of the fact that it was CSAME itself that pointed out inaccuracies in the disclosure

statement.  Bad accounting is sometimes just bad accounting.

   41.  The diversions were not CSAME's first use of restricted Endowment funds.

Notwithstanding that the Endowment's grant agreements expressly prohibited the pledging of these

funds for reasons unassociated with the grant, OneUnited prevailed upon CSAME to pledge $850,000 of

grant monies for 15 months to secure the Construction Loan, the funds to be held in an interest bearing

certificate of deposit at OneUnited. This pledge was a condition of the granting of the loan. The pledge

was subject to an agreement under which CSAME was permitted to withdraw "up to $150,000 for a

related program," the PRP. Rev. Groover's understanding when the loan was negotiated was that the

funds would not in fact be collateral for the loan. He testified: "There was an understanding, again by

the Bank and the Church, that this $850,000 totally had to be used exclusively for the program," the

PRP. The funds would simply be held on deposit at OneUnited. This agreement notwithstanding, in the

letter by which OneUnited informed CSAME that its application for the Construction Loan was accepted,

and which Rev. Groover signed on behalf of CSAME to accept the loan terms and conditions stated

therein, the deposit is characterized as "additional collateral," with no stated limitation on its use as

collateral except CSAME's right to withdraw up to $150,000. The deposit is also treated as collateral in

OneUnited's loan underwriting memorandum. In that memorandum, the $850,000 deposit is referred

to as a significant part of the "total collateral value"; and OneUnited further states:

> The Church does not have adequate cash flow to service this debt at the
> qualifying or start rate. This can be partly mitigated by a forecast of
> post-construction cash flows based on new revenues from the
> renovated facility. *It is further mitigated by an $850K reserve now
> deposited with [OneUnited], which more than covers one year's debt
> service at the qualifying rate.*

Loan Underwriting Memorandum of May 4, 2006, OneUnited Exhibit 43 (emphasis added). It therefore

appears that internally—but not in its mutual understanding with Rev. Groover regarding restrictions on

the use of the deposit—OneUnited was treating the funds as collateral in the full sense: they were not

an untouchable deposit but could be reached to cover debt service.

### E.    Feasibility and § 1129(b) Issues

42.     As of May 31, 2013, CSAME had unrestricted cash of only $5,400 and Endowment funds,

for the PRP, of $7,500. The latter is by now exhausted. The Plan would bring $1.5 million into CSAME's

coffers, but all of it would be dedicated to Thomas and completion of the RRC. None would be available

as working capital, of which CSAME has virtually none.  Without an appreciable level of savings, CSAME

will be unable to address contingencies—from emergency roof repairs to cash flow interruptions

occasioned by (among many other things) snow storms that cancel Sunday services.

43.     Debt service on the three obligations that the Plan would pay over time—the Church,

Tremont, and Construction Loans—would total approximately $316,000.[12]  This sum will need to be paid

entirely from CSAME's current income.  Going forward, this will include the tithes and offerings of

CSAME's members, including their giving to the V2V capital campaign and other special efforts, and, to a

much smaller extent, interest income.  It will no longer include Endowment grants.

44.     CSAME's expert, Timothy Dragelin, painstakingly reconstructed from CSAME's

accounting records the amount of CSAME's income from the donations of its members for the roughly

six years ending December 31, 2012.  In this reconstruction, he carefully identified and separated out

income from Endowment funds.  His results, which I find credible, are as follows:

| Income $000s | 12 mos end 3/31/08 | 12 mos end 3/31/09 | 12 mos end 3/31/10 | 12 mos end 3/31/11 | 12 mos end 3/31/12 | 12 mos end 12/31/12 |
|---|---|---|---|---|---|---|
| General Offering | 1,023 | 1,200 | 959 | 797 | 836 | 815 |
| Special Events | 2 | 66 | -- | 25 | 47 | 31 |
| Interest | 11 | 6 | 4 | 6 | 26 | 18 |
| V2V | 29 | 237 | 190 | 71 | 47 | 20 |
| Totals | 1065 | 1509 | 1143 | 899 | 956 | 884 |

45.     Over the 15 months between the commencement of this case and the completion of the

evidentiary hearing at the end of June 2013, CSAME has operated at an average deficit of approximately

$14,166 per month.[13]  This has been possible only because CSAME has until now been able to draw on

---

[12] The Plan provides for two possible treatments of the Construction Loan,  If, as CSAME would prefer, the
Construction Loan were paid at 5.75 percent interest without a guarantee, total debt service would be $330,000.
The Plan cannot be confirmed with that treatment, and therefore, per the Plan, the alternative treatment governs,
under which the Construction Loan would be paid at 5.25 percent, which, given the proposed 30-year
amortization, makes a difference of approximately ($14,000) in annual debt service.

[13] CSAME's monthly operating reports ("MORs") show average deficits of $20,000 per month over the postpetition
period, but Rev. Adams conceded she made errors in at least some of these, carrying forward incorrect numbers as
the beginning balance.  Timothy Dragelin testified that on the basis of his reconstruction of the 12-month period

grant monies to fund the PRP portion of its budget (approximately $16,500 per month) and on other savings. Going forward, that will not be possible, though CSAME plans to continue funding the PRP from its own resources through 2017.

46.    In view of its debt service obligations and present deficit, CSAME would need, in order just to break even, some combination of increased giving and cuts in its expenditures totaling $330,000, plus its current annual deficit, approximately $170,000, plus at least a small cushion for contingencies, say $50,000, for a total of at least $550,000. After August 2015, this burden will lessen by approximately $100,000 with the scaling back of the PRP, and by another $62,000 two years later if the PRP is then fully eliminated.

47.    CSAME has recently implemented a series of budget cuts. Staff positions have been eliminated, and the compensation of the remaining staff has been cut by ten percent, except Rev. Groover, whose reduction is twenty percent (notwithstanding that his compensation has not increased in twelve years). The savings reportedly total $175,000 per year. The resulting budget gap is $375,000 in the first two years of the plan, $275,000 in the next two, and approximately $215,000 thereafter.

48.    Can CSAME generate the necessary increase in congregational giving for these periods and durations? CSAME argues that it can, pointing to the years just before litigation with OneUnited began, in which it achieved giving at or near the necessary level. It contends that the deterioration of relations with OneUnited, and then the bankruptcy filing, affected members' willingness to give and caused CSAME to suspend its RRC capital campaign, believing that OneUnited might be permitted to seize donations. CSAME maintains that with confirmation of the Plan, confidence and willingness would be restored, and giving at the necessary levels would once again be achieved. OneUnited says this is pure speculation and wildly improbable.

---

ending December 31, 2012, there was a total deficit for the period of $170,000, or $14,166 per month. Mr. Dragelin's reconstruction is more reliable than the MORs.

49.     I find that confirmation of a Plan would likely enable giving to return to substantially higher levels than CSAME is presently achieving.  There is evidence that CSAME has achieved higher levels in the past, that giving was actively suppressed, and, as the conditions attached to the $1.5 million Plan donation demonstrate, that confirmation of a plan that resolves all issues would restore confidence and lead to higher giving.[14]  Still, I have three concerns.  First, in the first four years of the Plan, income will need to be $375,000 and then $275,000 higher than at present, but CSAME has matched or exceeded the higher level in only one year and the lower in only two (counting one year that was a near miss); it is less than clear that CSAME can achieve the necessary level immediately, to meet debt service in month 1 of the Plan, and sustain it for four years.   Second, after the first four years, giving would have to exceed present levels by only $215,000, but even that level has been achieved in only two years, with extraordinary effort and for a special purpose; it is less than clear that CSAME can reach and sustain that level for 16 consecutive years, especially where it would follow four years of even higher giving.  Third, these extraordinary exertions would enable CSAME just barely to make debt service and break even, with little ability—*for 20 years*—to respond to contingencies that will inevitably arise, much less to ease out of the austerity mode into which it has recently shifted.  In sum, even with a likely increase in giving, feasibility would be highly uncertain—too uncertain to satisfy 1129(a)(11).  CSAME would remain *at best* on the edge of insolvency for two decades—a congregation living for its debt.

50.     Each of the above concerns can be mitigated or allayed in part by development of cash reserves and demonstration that credit support from FEDAME (or another source) is a real, ready, and substantial supplement and backstop, both for short term cash flow issues and, in the event of default, for the whole of the obligations to OneUnited.  At present, cash reserves are nonexistent; and CSAME has made little effort to demonstrate FEDAME's creditworthiness and willingness, going forward, to supplement CSAME's efforts and perform when called upon.

---

[14] I do not rely on the opinion of CSAME's expert for this conclusion, though it is corroborative.

51.     CSAME has appointed a committee of its members to recommend new procedures and measures to strengthen CSAME's ability to perform on the Plan, to stabilize its finances going forward, to approve its accounting and funds management procedures, and to avoid the possibility of future secretive diversions of resources.  CSAME has adopted a raft of this committee's recommendations that will help with accountability, transparency, and fund-handling issues.  OneUnited argues that these do not go far enough.  I find that they at least go a long way and can be fine-tuned to address remaining concerns.  Work is ongoing on the other issues.  To date, however, I have no evidence of recommendations from this committee, or other initiatives from CSAME, regarding measures that might be taken to avoid cash flow issues that have plagued CSAME, especially routine and costly lateness of payments.  A working capital reserve would be a large help here, but one that CSAME does not appear to have used its Chapter 11 respite from debt service to address.  Also, as the present Plan indicates, CSAME has not made a priority of limiting its debt service obligations to manageable levels.

**RULINGS OF LAW CONCERNING CONFIRMATION**

For reasons set forth below, the Court concludes that confirmation of the currently proposed plan must be denied.  This conclusion could rest on a single blocking determination, such as the conclusion that the proposed release of FEDAME's guaranty is not justified, which by itself would require denial of confirmation.  However, CSAME has indicated its intent to propose another plan (should this one be denied confirmation), and it is only fair, after their considerable expenditure of time and effort on the present plan, that the parties know where the Court stands on the various issues, especially those that may resurface in some form.  Accordingly, the Court will address most of the issues in contention, albeit not in every instance with the detail that one might bring to that issue were it alone dispositive.

Given the vital mission of CSAME—vital to its members and its community—the debtor must be afforded considerable latitude in achieving financial stability.  All constituents in this case were well

aware of the core mission of CSAME; indeed they were motivated to deal with CSAME because of that

mission and no doubt derived a benefit from its vitality.  The Court will indulge all reasonable efforts to

ensure reorganization.

### a.  Jurisdiction

The matter before the Court is the confirmation of a chapter 11 plan.  It arises under the

Bankruptcy Code and in a bankruptcy case and therefore falls within the jurisdiction given the district

court in 28 U.S.C. § 1334(b) and, by a standing order of reference (codified in the district court's local

rules at L.R. 201, D. Mass.), referred to the bankruptcy court pursuant to 28 U.S.C. § 157(a).  It is a core

proceeding within the meaning of 28 U.S.C. § 157(b)(1).  28 U.S.C. § 157(b)(2)(L) (core proceedings

include confirmations of plans).  The bankruptcy court accordingly has authority to enter final judgment.

### b.  Standard and Burden

Section 1129 of the Bankruptcy Code governs confirmation of a chapter 11 plan and sets forth

the requirements for confirmation.  11 U.S.C. § 1129.   Where, as here, an impaired class has voted to

reject a plan, the plan may be confirmed only if it (a) satisfies every applicable provision of § 1129(a)

other than subsection (a)(8) (requiring, as to each class, that it either have accepted the plan or be

unimpaired) and (b) does not discriminate unfairly and is "fair and equitable" with respect to the

dissenting classes' impaired claims.  11 U.S.C. §1129(b)(1); *RadLAX Gateway Hotel, LLC v. Amalgamated*

*Bank*, ___ U.S. ___, 132 S. Ct. 2065, 2069 (2012); *Beal Bank, S.S.B. v. Waters Edge Ltd. P'ship*, 248 B.R.

668, 678 (D. Mass. 2000).  The plan proponent bears the burden of proof.  *In re SW Boston Hotel*

*Venture, LLC*, 460 B.R. 38, 51 (Bankr. D. Mass. 2011).  The bankruptcy court has an independent

obligation to ensure that the plan satisfies the requirements.  *Id*.  The standard of proof is the

preponderance of the evidence.  *Heartland Fed. Says. & Loan Assoc'n v. Brisco Enters., Ltd. II (In re*

*Briscoe Enters. Ltd. II)*, 994 F.2d 1160, 1163-65 (5th Cir. 1993).

### c.  Section 1129(a)(1): Whether the Plan Complies with the Bankruptcy Code

Section 1129(a)(1) of the Bankruptcy Code requires that "a plan comply with the applicable

provisions of this title." 11 U.S.C. § 1129(a)(1).  Courts have interpreted this provision as requiring that a

plan comply with the requirements of §§ 1122 (governing classification of claims) and 1123 (governing

the contents of a plan), as well as other Code provisions.  OneUnited's objections implicate six of these:

§ 1122(a) (classification of Tremont and Lilly); § 1123(a)(5) (the release; lack of means to fund the Plan);

§ 1125(b) (adequacy of disclosure); § 109(d) (eligibility); § 510(c)(1) (equitable subordination); and § 365

(assumption of Thomas Construction Contract).

### 1.  Section 1122(a):  Classification of Tremont and Lilly

### (A)  Classification of Tremont Claim

OneUnited argues that the Tremont claim is in fact wholly unsecured (because postpetition

growth in the Church Claim has fully consumed the equity in the property securing it, leaving no value to

fund Tremont's junior mortgage), and therefore that § 1122(a), in combination with § 1123(a) and the

law construing these provisions in this circuit, requires that Tremont's claim be classified with the

general unsecured creditors in Class 5, not separately in Class 3 and treated as fully secured.  For the

following reasons, the court disagrees.  In doing so, the Court assumes for the sake of argument

OneUnited's Church Claim fully consumes the equity in the property securing it, such that, under §

506(a), Tremont's claim is wholly unsecured and substantially similar to the claims in Class 5.[15]

First, § 1122(a) states that, subject to an exception not applicable here, "a plan may place a

claim or an interest in a particular class only if such claim or interest is substantially similar to the other

claims or interests of such class."  11 U.S.C. § 1122(a).  It thus limits the circumstances in which claims

---

[15] See 11 U.S.C. § 506(a)(1) ("An allowed claim of a creditor secured by a lien on property in which the estate has
an interest . . . is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such
property . . . and is an unsecured claim to the extent that the value of such creditor's interest . . . is less than the
amount of such allowed claim").

may be joined together in a single class.  It does not require that substantially similar claims be joined together in the same class.

Second, in relevant part, § 1123(a) states that "a plan shall . . . provide the same treatment for each claim or interest of a particular class, *unless the holder of a particular claim or interest agrees to a less favorable treatment* of such particular claim or interest."  11 U.S.C. § 1123(a)(4) (emphasis added). Here, the creditors whose ox would be gored by the classification of which OneUnited complains, the general unsecured creditors in Class 5 (in which OneUnited has no claim), have assented to the treatment in question by voting, unanimously, to accept the Plan; and no creditor in that class has objected to the Plan.  It follows that even if CSAME were required to join Tremont and the general unsecured creditors in a single class, CSAME would not be precluded from treating them differently, in the manner that it has.

Third, the cited circuit-level authority states that "[t]he general rule regarding classification is that all creditors of equal rank with claims against the same property should be placed in the same class," and that "[s]eparate classifications for unsecured creditors are only justified where the legal character of their claims is such as to accord them a status different from the other unsecured creditors." *Granada Wines, Inc. v. New England Teamsters and Trucking Industry Pension Fund*, 748 F.2d 42, 46 (1st Cir. 1984) (internal quotations omitted).  On the basis of the rules thus stated, *Granada Wines* sustained the objection to confirmation of a plan by a creditor, a pension fund, whose claim would have been paid half the dividend that the other creditors in its class were to be paid.  The Court of Appeals for the First Circuit held that the debtor did not and could not have separately classified the pension fund claim from those of other creditors; implicitly, it also held that the plan could not treat the pension fund differently from other creditors in the same class.  In doing so, however, it did not address § 1123(a)(4) or § 1122(a) and was not faced with the disparate treatment of an *assenting* class. Moreover, insofar as the Court of Appeals appeared to be applying any provision of the Bankruptcy

Code, it was § 1129(b)(2)(B)(ii), which, the Court noted, applies and is necessary only with respect to the treatment of classes that have *not accepted* the plan. *Granada Wines*, 748 F.2d at 46 ("Section 1129(b)(2)(B)(ii) of the Bankruptcy Code provides for a method of confirming a reorganization plan *over the objection of an impaired class of creditors*" (emphasis added)). *Granada Wines* differs from the present case in that the affected creditor in that case did not assent to its disparate, lesser treatment. Here, the affected creditors assent, a difference that, in view of § 1123(a)(4), makes a difference. *Granada Wines* therefore does not govern the present facts.

Fourth, the alleged impropriety in classification and treatment of Tremont's claim does not affect OneUnited or its treatment. OneUnited lacks standing to raise it.

I add that the same objection as OneUnited raises here on behalf of the Class 5 unsecured creditors could be made about the Plan's treatment of the Construction Loan: it treats the claim as secured to the extent of $3,815,795.70, but the value of the property securing that claim is much less, such that the Plan effectively prefers OneUnited's unsecured debt over that of the Class 5 claimants. Yet OneUnited does not raise this objection. More importantly, neither have the Class 5 claimants.

### (B)  Nonclassification of Alleged Lilly Endowment Claim

OneUnited argues that the Lilly Endowment has an unsecured claim for restoration of misapplied restricted-use funds and that, in violation of §§ 1122 and 1123(a), the Plan (i) does not classify the claim of the Lilly Endowment at all and (ii) affords the Endowment disparate treatment by promising full payment of its unsecured claim while, absent equitable subordination, other unsecured creditors will receive nothing. Although OneUnited says that "the Plan promises" full treatment of the Endowment's claim, the Plan actually says nothing about any claim the Endowment may have. OneUnited's point, as I understand it, is that *CSAME* has promised to make the Endowment whole on an unsecured claim that should properly have been treated the same as the general unsecured creditors in Class 5, a violation of the equal treatment requirement in § 1123(a)(4), and that this promise was made

39

outside the Plan and without disclosure to the Class 5 creditors.  CSAME responds that (i) OneUnited

lacks standing to make this objection, (ii) the Lilly Endowment is aware of the case and the diversion of

the restricted-use funds and has not filed a claim, (iii) the misuse of restricted funds does not give rise to

a claim, (iv) CSAME does not plan to pay any monies to the Endowment, only to continue the PRP, (v)

the continuation of the PRP involves no transfer of value to the Endowment, and (vi) CSAME is

continuing the PRP as part of its mission, not as payment of a claim.

I do not understand OneUnited to be arguing that the Plan's classification of claims does not

include whatever unsecured claim the Endowment may have.  If the Endowment has an unsecured

claim, that claim is part of Class 5.  Nothing in the Plan's definition of the membership of Class 5 would

exclude the Endowment's nonpriority unsecured claim (if any) from Class 5; and it is not necessary for

the Plan to identify by name each member of such a class—most plans do not, and this one does not

specifically identify any member of Class 5 (except Thomas Construction, and then only because that is

part of the agreement for assumption of its contract).

Nor do I understand OneUnited to be complaining of unfairness or nondisclosure to the

Endowment.  Rather, the gist of this objection is that CSAME has, by means outside the Plan and

without disclosure to other Class 5 claimants, promised to make the Endowment whole by continuing to

fund the PRP at a particular level, and thereby has unfairly preferred the Endowment over similarly-

situated class 5 claimants, without fair disclosure to them.

The Court agrees that OneUnited lacks standing to make this objection—it is not a member of

Class 5.  The Court nonetheless has an independent duty to determine that the requirements of

confirmation are satisfied but finds no cause here for concern.  The Plan itself is the governing

document.  It makes no specific provision for the Endownment.  The Endownment is aware of the case

and of the Plan and has not filed a proof of claim; but should it do so, that claim would be paid to the

extent specified in the treatment of Class 5 (that is, no dividend) and would otherwise be discharged.  In

the Supplemental Disclosure, CSAME made clear its intent to continue funding the PRP at a specific

level, which funding would effectively restore to the PRP what was diverted, but were the Plan

confirmed, CSAME would have no obligation to the Endowment, on account of any claim it may have, to

follow through on this intent.  In any event, a debtor always retains the prerogative of honoring any

discharged obligation.  11 U.S.C. § 524(f).  And CSAME is being reorganized to carry on its mission and

programs; this is no secret from any creditor.  One long-standing part of that program is the PRP.

CSAME would carry on this program regardless of any obligation to the Endowment.  For these reasons,

I conclude that disclosure to the Class 5 creditors was not inadequate concerning CSAME's intention to

fund the PRP.

### 2.  Section 1123(a)(5):  Means to Effectuate the Plan

Section 1123(a)(5) states that "[n]otwithstanding any otherwise applicable nonbankruptcy law,

a plan shall . . . provide adequate means for the plan's implementation[.]"  11 U.S.C. § 1123(a)(5).

OneUnited contends that the means of implementation are inadequate in three respects.

### (A)  Income from RRC and Storefronts

OneUnited argues that the Plan relies on income from the RRC and from rental of the

Storefronts, but (i) the Plan provides no means to restore the Storefronts to rentable condition, (ii) the

RRC cannot generate income while incomplete, and (iii) the RRC would be run by an entity that CSAME

does not control.  For reasons articulated in the findings above, the Court agrees that income from the

Storefronts and the RRC cannot be counted on to fund the Plan.  However, the Plan provides other

means for its implementation, especially membership giving, the adequacy of which the Court will

address in its feasibility analysis under § 1129(a)(11).

### (B) The Release of Insiders

For the first time in the brief it filed after the evidentiary hearing on confirmation and even after

CSAME had filed its post-trial brief, OneUnited objected to confirmation on the basis that "sections

9.3(a) and 9.4 of the Plan"—respectively, a release of the Chapter 11 Parties (a defined term) and an

exculpation and limitation of liability for Chapter 11 Parties—"propose to release claims [CSAME] has or

may have against non-debtor insiders (including First District and Rev. Groover) despite the fact such

claims might arise from gross misconduct and fraud."  In the circumstances of this case, OneUnited

maintains, this release would be "contrary to substantive bankruptcy law."  By virtue of its timing, this

objection is deemed waived.  I note, moreover, that the briefing of this objection is almost entirely

undeveloped, that § 9.4 contains an express exception for gross negligence, willful misconduct, or bad

faith, and that Rev. Groover does not appear to be a Chapter 11 Party.

### (C) The Release of FEDAME's Guaranty

In opposition to the Plan's release of FEDAME's liability to OneUnited on the Guaranty of the

Construction Loan, One United contends that the release is an impermissible means of implementation,

arguing that:  (i) the bankruptcy court lacks subject matter jurisdiction to approve a plan containing a

third-party release; (ii) the bankruptcy court, a non-Article III tribunal, lacks constitutional authority to

adjudicate a plan containing a third-party release; (iii) Bankruptcy Code § 524(e) bars third-party

releases; (iv) a third-party release cannot be approved where the affected party does not consent; (v)

equity bars the release because FEDAME fraudulently induced OneUnited to rely on the Guaranty and

approve the Construction Loan through financial statements it knew to be false; and (vi) even under the

"*Master Mortgage* factors," the oft-cited factors articulated in *In re Master Mortgage Investment Funds,*

*Inc.*, 168 B.R. 930, 934-35 (Bankr. W.D. Mo. 1994) that CSAME urges the Court to adopt, the release fails

because (a) the affected party opposes it, (b) the Plan does not pay the released claim in full, (c) the

release is unnecessary, (d) FEDAME is not contributing substantial assets to the reorganization, and (e)

there is no indemnity relationship or identity of interest between the debtor and the party being

released.

### (i) Subject Matter Jurisdiction

OneUnited argues that the Guaranty is unrelated to this bankruptcy case, and its release in the

plan is a two-party dispute to which neither the debtor nor its estate is a party; therefore, OneUnited

would have the Court conclude, the proposed release is beyond the outer, "related-to" reaches of

bankruptcy jurisdiction.  The Court disagrees.  Bankruptcy jurisdiction, conferred in the first instance in §

1334(b) of title 28 (and then referred to the bankruptcy courts under §28 U.S.C. § 157(a)), includes "all

civil proceedings arising under title 11" and extends, in its outermost reaches, to all civil proceedings

"related to cases under title 11" ("related-to jurisdiction").  28 U.S.C. § 1334(b).  The matter before the

Court is a plan of reorganization, the confirmation of which arises under title 11, the Bankruptcy Code.

It is what chapter 11 is all about, see 11 U.S.C. §§ 1121-1144, the quintessential bankruptcy matter.  It is

not the mere adjudication of a single claim by a creditor against a third-party guarantor but a unitary

omnibus civil proceeding for the reorganization or adjustment of all obligations of the debtor and

disposition of all the debtor's assets.  It may or may not be appropriate for a court exercising bankruptcy

jurisdiction to confirm a plan containing a third-party release—and, if it is appropriate, the manner and

degree of relation of the released claim to the case are certainly factors in the analysis—but the court

undoubtedly has jurisdiction to adjudicate the plan, even without recourse to its related-to jurisdiction.

Accordingly, for example, the Court of Appeals for the First Circuit held that the third-party release in a

confirmed plan had preclusive effect notwithstanding that the propriety of third-party releases was

unsettled in the circuit.  *Monarch Life Ins. Co. v. Ropes & Gray*, 65 F.3d 973, 983-84 (1st Cir. 1995).  In

any event, the Court is well satisfied, for reasons articulated below, that the Guaranty and release are

related to this case.  The matter is easily within the Court's statutory subject matter jurisdiction.

### (ii) Constitutional Authority of the Bankruptcy Court

Citing *Stern v. Marshall*, ___ U.S. ___, 131 S.Ct. 2594 (2011), OneUnited argues that approval of

the release is tantamount to adjudication of the guaranty, which, as a two-party dispute that arises

under state law between non-debtor parties, cannot constitutionally be adjudicated by a non-Article III

judge, even if that controversy is part of a statutorily defined "core proceeding" in 28 U.S.C. § 157(b).

Again, the Court disagrees.  The matter before the Court is not a suit on the Guaranty; the merits of the

Guaranty are not in controversy.  To reiterate, the matter before the Court is the confirmation of a plan,

a unitary omnibus civil proceeding for the reorganization of all obligations of the debtor and disposition

of all its assets.  Confirmation of a plan is not an adjudication of the various disputes it touches upon—

the Guaranty being here but one of many; it is a total reorganization of the debtor's affairs in a manner

available only in bankruptcy.  The release may be proposed and approved only as part of a plan and only

(if at all) pursuant to powers of adjustment afforded by the Bankruptcy Code, such as in sections

1123(a)(5) and 105(a).  Accordingly, the confirmation of a plan—including any third-party release it may

propose—is a matter of "public rights" that, under *Stern*, Congress may constitutionally assign to a non-

Article III adjudicator.  *Stern*, 131 S.Ct. at 2618 (the question is "whether the action at issue stems from

the bankruptcy itself" and thus falls within one of the limited circumstances covered by the public rights

exception).  There is no constitutional infirmity in Congress's having provided, in 28 U.S.C. § 157(b)(1)

and (b)(2)(L), that confirmation of a plan, including one of the variety here presented, is a proceeding

that a bankruptcy judge may hear, determine, and enter appropriate orders and judgment on.

### (iii) Section 524(e) and *Master Mortgage*

The Plan proposes a third-party release, a release not of CSAME's rights, rights it undoubtedly

controls, but rights belonging to OneUnited:  specifically, OneUnited's rights under the Guaranty against

FEDAME.  The Bankruptcy Code does not expressly authorize third-party releases but neither does it

expressly prohibit them.  Section 524(e) states that "a discharge of a debt of the debtor does not affect

the liability of any other entity on . . . such debt," 11 U.S.C. § 524(e), but it does not preclude the

bankruptcy court from limiting the liability of co-obligors in appropriate circumstances.  11 U.S.C. §

524(e).   In § 1123(a)(5), the Bankruptcy Code grants a debtor extraordinary—albeit not unlimited or

clearly delimited—latitude to propose means for implementation of a plan, means that may preempt

otherwise applicable nonbankruptcy law.  See *Irving Tanning Co. v. Maine Superintendent of Ins. et al.*

*(In re Irving Tanning Co.)*, 2013 WL 4400254 *14-18 (1st Cir. BAP 2013) and cases cited.   And in § 105(a),

the Bankruptcy Code grants to the court authority to issue "any order, process, or judgment that is

necessary or appropriate to carry out the provisions of this title."   Against this statutory background, the

Court cannot conclude, *a priori*, that no third-party release, however well-tailored and justified, may

ever be permitted in a plan of reorganization.

The state of the law on third-party releases, unsettled in the First Circuit, was concisely

summarized by Judge Hoffman of this district in *In re Quincy Medical Center, Inc.*, 2011 WL 5592907

(Bankr. D. Mass. 2011).  I adopt his summary by reference and agree with him, with the circuit-level

majority, and with Judge Hillman of this district that a chapter 11 plan may, in appropriate

circumstances, include a third-party release, and that the *Master Mortgage* factors are useful

considerations in assessing the propriety of a proposed release.  *Id*. at *2.   "These factors are neither

exclusive nor conjunctive requirements." *In re Washington Mutual, Inc.*, 442 B.R. 314, 346 (Bankr. D.

Del. 2011).  They are a useful starting point.

The first consideration is whether there is an identity of interest between the debtor and the

third party, FEDAME, usually an indemnity relationship, such that a suit against the non-debtor is, in

essence, a suit against the debtor or will deplete assets of the estate.  CSAME argues that the identity of

interests is present here because any payment by FEDAME on the Guaranty gives rise to an equal claim

by FEDAME against CSAME for indemnification or contribution.  OneUnited argues that there is no such

relationship here because (i) in the Guaranty, FEDAME waived any right of indemnification or

contribution it may otherwise have had and (ii) FEDAME's claim remains contingent—because FEDAME

has not yet made a payment to OneUnited on the Guaranty—and, 11 U.S.C. § 502(e)(1)(B) requires that

a contingent claim be denied.  FEDAME, in responding to OneUnited's objection to its claim, answered

that the Guaranty contains no waiver of rights, only, at best, a covenant to forbear from suing CSAME or

from sharing in a distribution of OneUnited's collateral.

The Court concludes that there is an identity of interest between CSAME and FEDAME.[16]  The

present contingency of FEDAME's claim is of no moment: a claim disallowed for contingency under §

502(e)(1)(B) can be reconsidered when it becomes fixed, see 11 U.S.C. § 502(j) ("[a] claim that has been .

. . disallowed may be reconsidered for cause"), and, upon reconsideration, would be determined and

allowed or disallowed "the same as if such claim had become fixed before the filing of the petition."  11

U.S.C. § 502(e)(2).  The Court also agrees with FEDAME that the Guaranty does not waive all rights of

indemnification and contribution against CSAME; in essence, it merely obligated FEDAME not to

compete with OneUnited for recovery against CSAME and its assets.  But even if this were not the case,

two further reasons establish identity of interest.  First, even without a legally enforceable obligation to

repay, CSAME would still be bound by its "connectional," intra-ecclesial relationship to FEDAME to make

FEDAME whole for losses it sustains on CSAME's account.  Second, both CSAME and FEDAME, obligated

on the same debt, have an interest in paying the debt, not paying it more than once, and not wasting

resources on developing one means of payment (such as a plan in this case) that OneUnited might

render moot by enforcing and obtaining payment on the Guaranty.

The second *Master Mortgage* factor is whether the non-debtor, FEDAME, has contributed

substantial assets to the reorganization.  The short answer is: yes, but not in a way that matters much.

In the findings of fact, I found that it is not a fiction to treat the promised contribution of $1.5 million as

---

[16] For these same reasons I conclude that the Guaranty is "related to" the bankruptcy case within the meaning of
28 U.S.C. § 1334(b).

FEDAME's.[17] I further conclude that the contribution is substantial, probably in the ballpark of the sum

that FEDAME would be obligated to pay on the Guaranty were OneUnited to liquidate its collateral

today and then to seek the balance from FEDAME.  The problem is that the plan contribution would

serve a purpose that, though legitimate, is not, directly or even indirectly, the restructuring of CSAME's

obligations to OneUnited.  The contribution would be entirely devoted to assumption of the Thomas

Construction Contract ($300,000) and the funding of an amendment to that contract that would enable

CSAME to complete the RRC construction project ($1,200,000), the cure being a cost of obtaining the

contract amendment.  None of this money would pay down the debt to OneUnited.  To be sure, the

investment of $1.5 million would, if all went according to plan, increase the value of the RRC Property

and thereby substantially enhance the value of OneUnited's collateral; this is a benefit, but, as the Plan

would not liquidate the completed property to pay OneUnited, not a significant one.  If the Plan were

confirmed and OneUnited got to the point of foreclosing on the RRC Property, the Plan would have

failed.  Moreover, in a foreclosure scenario, the mortgagee usually realizes considerably less than fair

market value, so much of the gain in value from completion would be lost.  The investment might also

bring the RRC to the point of being able to produce income for CSAME, but the RRC would have its own

expenses, and the likelihood of significant net income is too speculative to count on here.  In sum,

completion of the RRC Property serves pastoral purposes of CSAME and FEDAME; for the most part, it

does not inure to the benefit of OneUnited.

The third *Master Mortgage* factor is whether the injunction is essential to reorganization, such

that, without it, there would be little likelihood of success.  For the same reasons as just articulated, the

Court finds that the contribution is essential to one of the Plan's purposes, completion of the RRC

Property, a pastoral initiative of CSAME, but not to its more important purpose (important in

bankruptcy, if not in the larger scheme of things), repayment of debt.  It repays only a portion of the

---

[17] I do not mean to suggest that a rough guesstimated equivalence would suffice.

Thomas Construction unsecured debt but does not benefit OneUnited or unsecured creditors (other

than Thomas).  And the cure payment to Thomas Construction is being made only to facilitate the

completion of the RRC.  If anything, the release detracts from the likelihood of the Plan's success by

depriving it of a critical measure of credit support.  At least to the extent of the New Guaranty, the

release is also not necessary in the further sense that FEDAME is evidently willing to remain a guarantor

to that significant extent.  The Court must further ask whether, if a modification of the Guaranty is

needed to produce a contribution that makes a difference in the Plan's treatment of the Construction

Loan debt, it would not suffice for that modification to be more limited, such as adjustments to

covenants to permit the guarantor to cure defaults before OneUnited could make demand on the entire

obligation.  The record provides no answer.

The fourth *Master Mortgage* factor is whether a substantial majority of the creditors, and

especially the affected classes, agree to the release and have overwhelmingly voted to accept the

proposed plan treatment.  *Master Mortgage*, 168 B.R. at 935.  The consent of the affected creditors can

render irrelevant many other concerns.  Here, the Class 3 and 5 claimants support the Plan, but

OneUnited, holder of the vast majority of the debt and the sole affected creditor, opposes the release

and the Plan.  Among those courts that subscribe to the *Master Mortgage* approach to releases, some,

including Judge Hoffman, take the position that "only consensual releases are permissible."  *In re Quincy*

*Medical Center, Inc.*, 2011 WL 5592907 at *4 and cases cited.  I do not hold that no nonconsensual

release, however narrowly tailored and otherwise justified, can ever be approved.  Certainly, however,

no nonconsensual release can be approved where the plan does not replace what it releases with

something of indubitably equivalent value to the affected creditor.

This raises the fifth *Master Mortgage* consideration:  whether the plan provides a mechanism

for the payment of all, or substantially all, of the claims of the class or classes affected by the injunction.

Only Class 4, the class of OneUnited's Construction Loan Claim, is affected by the release.  CSAME

maintains that the Plan proposes to pay OneUnited "all obligations [CSAME] legally owes OneUnited in full, granting the Bank new notes in the amount of its outstanding obligations[.]"  This is true in a sense, but not in the sense needed to justify the release.  The Plan proposes to pay the Construction Loan only to the extent of the amount of the debt on the petition date.  The Plan treats that sum as entirely secured, but because the value of the collateral has never exceeded that sum, by operation of 11 U.S.C. §§ 506(a) and 502(b)(2), any claim that OneUnited may have for postpetition interest, fees, and other charges is disallowed.  Its claim is frozen at the amount owing on the petition date.  On the Guaranty, however, FEDAME's liability extends to all of what CSAME owes on the Construction Loan, regardless of the Bankruptcy Code's limitations on the recoverability of those sums against CSAME.  The Plan would pay postconfirmation interest, but at a lower rate than the contract rate, and the interest would run only from the effective date of confirmation, not the petition date.  In short, the Plan does not propose to pay the full debt on which FEDAME is obligated.  In addition, because the Construction Loan is undersecured, and feasibility in even the best of circumstances is never assured, the release would deprive OneUnited of a critical measure of credit support.  The New Guaranty would restore some of that support, but only on the new obligation, the New OneUnited RRC Note, less $1.5 million.  For these reasons, the Plan does not replace what it releases with something of equivalent value.

The parties would have the Court consider two further factors.  First, CSAME asks the Court to consider that the Guaranty is subject to potentially serious counterclaims—serious because an appellate court has said that the counterclaims do not fail to state a claim on which relief can be granted—and therefore is of doubtful value.  I give no weight to this argument.  The merits of the Guaranty and counterclaims are in litigation in another forum, not here.  For purposes of evaluating the merits of the release, I assume without finding or ruling that the Guaranty is enforceable and that FEDAME is solvent and can honor it—whether by recourse to the authority referenced in Note 1 or otherwise.

Second, OneUnited argues that the release, if otherwise meritorious, should nonetheless be disallowed in equity for unclean hands because, OneUnited alleges, FEDAME fraudulently induced OneUnited to make the Construction Loan by inserting Note 1 into financial statements that it gave OneUnited.  Note 1 is a representation that the AMEC "grants to the bishop of the First Episcopal District the authority to transfer funds at his discretion between organizations and member churches of the First Episcopal District and/or the district's central office."  Several individuals with knowledge of AMEC polity testified that Note 1 was inconsistent with their understandings or that they were unaware of authority for it; one testified that authority for the proposition exists by tradition.  The burden of alleging and proving fraud here falls on OneUnited but has not been carried.  Fraud would require a false statement, but OneUnited maintains that Note 1 is true, so whatever is alleged here, it is not fraud.  In any event, OneUnited has not established that Note 1 and the financial documents containing it were produced, or given to OneUnited, with intent to deceive (the apparent theory being that an intended deception was bungled in the execution by the inadvertent truth of the intended falsehood).  Accordingly, I give this argument no weight.

The Court is left with a release that is not essential to the debt repayment objectives of the Plan, that does not have the assent of the affected creditor, and that does not treat that creditor so well that the release is of virtually no concern.  On these considerations, the release is an impermissible means of implementation.

### 3.  Section 1123(b)(2):  Assumption of Thomas Construction Contract

Section 1123(b)(2) of the Bankruptcy Code states that subject to § 365, a plan may provide for the assumption of an executory contract.  OneUnited contends that the Plan's proposed assumption of the Thomas Construction contract for a $300,000 cure payment, as part of an agreement in which Thomas Construction would also be hired at a cost of an additional $1.2 million to complete the RRC construction project and would get a general unsecured claim of $763,000, should be disallowed under

§ 365 as an abuse of the CSAME's business judgment.  In light of the denial of equitable subordination,

the $763,000 unsecured claim in this agreement would receive no dividend, and it is unclear whether, in

light of that development, OneUnited would still make this argument.  In any event, I find no fault in

CSAME's business judgment here.

When considering a debtor's request to assume an executory contract under § 365, "the only

issue properly before a court is whether the assumption or rejection of the subject contract is based

upon a debtor's business judgment." *Eagle Ins. Co. v. BankVest Capital Corp. (In re BankVest Capital

Corp.)*, 290 B.R. 443, 447 (B.A.P. 1st Cir. 2003).  The business judgment standard "merely requires a

showing" that assumption of the executory contract will benefit the estate.  *In re MF Global Holdings,

Ltd.*, 466 B.R. 239, 242 (Bankr. S.D.N.Y. 2012).  Once a debtor articulates a valid business justification,

"[t]he business judgment rule 'is a presumption that in making a business decision the directors of a

corporation acted on an informed basis, in good faith and in the honest belief that the action taken was

in the best interests of the company.'" *Official Comm. of Subordinated Bondholders v. Integrated Res.,

Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom*, 488

A.2d 858, 872 (Del. 1985)).

Assumption of the contract is well-justified.  Thomas Construction is known to and a neighbor of

CSAME, is familiar with the project, and has demonstrated commitment to the project and to CSAME, all

of which reduces the risk that Thomas Construction would abandon the project or seek to alter terms at

a key construction juncture.  The assumption agreement, a compromise, was negotiated at arm's length.

By accepting most of its cure in the form of an unsecured claim, which without equitable subordination

is entitled to no distribution, it has effectively agreed to accept a cure payment, $300,000, that is close

in value to the work remaining on the original contract, which OneUnited itself fairly estimates to be

worth $262,350.  The premium being paid, if there is one at all—OneUnited has adduced no evidence

that the work might be contracted to another builder for less—is more than justified by the fact that any

other contractor would be unknown and unfamiliar with the project, and would have to add cost for

coming up to speed. Thomas Construction will likely complete the RRC in a reasonable time.

Significantly, all funds to pay Thomas Construction are coming from outside sources and earmarked for

such payment; the assumption therefore does not affect other creditors or the estate except by

enhancing the value of the RRC.

### 4.  Section 1123(b)(6):  Equitable Subordination under § 510(c)(1)

The Plan proposes, in the first instance, to subordinate OneUnited's claims to the claims in

Classes 3 and 5.  The Court has addressed the issue of equitable subordination in a separate

memorandum of decision issued today (the findings and rulings in which I incorporate by reference)

and, for the reasons stated therein, has denied subordination.  The Plan provides for alternative

treatments of the affected classes, and therefore denial of subordination does not itself require denial

of confirmation.

### d.  Section 1129(a)(2):  Whether the Plan Proponent Complies with the Bankruptcy Code

Section 1129(a)(2) is a requirement that the proponent of the plan comply with the applicable

provisions of the Bankruptcy Code.  OneUnited would find fault here in two respects.

### 1.  Adequacy of Disclosure under § 1125(b)

Section 1125(b) requires that the solicitation of votes occur with the benefit of a written

disclosure statement approved as containing adequate information.  As required, the Court did approve

both the Disclosure Statement and later the Supplemental Disclosure as containing adequate

information before the solicitations occurred.  Section 1129(a)(2) permits the court to revisit the

adequacy of disclosure in light of what is known at confirmation.  OneUnited argues that the

requirement of adequate information was not satisfied because (i) the Disclosure Statement's

presentation of historic financial data was erroneous, (ii) other financial reports from an outside

accountant were not included in the Disclosure Statement, (iii) CSAME's accounting erroneously counted the Lilly Endowment monies as income, (iv) the diversion of restricted Lilly Endowment funds was not initially disclosed, and (v) CSAME's schedules did not list the Endowment as a creditor or the Endowment's funds among its cash assets.  All of this, OneUnited concludes, amounted to a purposeful withholding of accurate financial information from creditors, including OneUnited, and the presentation of misleading information to the unsecured creditors.

The question presented here is not good or bad faith—the Code treats that issue separately in § 1129(a)(3)—but whether the solicitation and voting occurred with adequate information.  The Court continues to find that they did.  OneUnited, having twice voted to reject the Plan, was not misled into acceptance.  The Class 5 unsecured creditors, who did vote to accept, clearly did not do so for the dividend they would receive without equitable subordination, which is nothing.  If they were self-interested al all, they must have accepted because the Plan proposed equitable subordination that, if permitted, would pay their claims from the first dollars that would otherwise go to OneUnited, their only hope of recovery; none of the alleged inaccuracies in disclosure would affect that dynamic. Tremont, which has had legal representation throughout and was supplied the Supplemental Disclosure and permitted to change its vote, is aware of all the alleged inadequacies of disclosure that OneUnited cites—the Supplemental Disclosure expressly put Tremont on notice of those issues—and elected *not* to change its vote; it supports confirmation.  Under a different heading, OneUnited raised and the Court has addressed other disclosure issues raised by CSAME's intent to carry on the PRP.  The Court is satisfied that disclosure has been adequate.

## 2.  Eligibility to be a Debtor under § 109(d)

OneUnited objects to confirmation on the basis that the CSAME, the Plan proponent, is ineligible to be a debtor under § 109(d) of the Bankruptcy Code:  that is, not eligible for bankruptcy relief at all. By order of September 11, 2012, and on the basis of findings and rulings articulated with the order [doc.

#359], the Court denied dismissal and ruled that CSAME was eligible.  That order has been affirmed on

appeal but remains subject to possible further appeal.  The Court need not address the issue anew but

incorporates by reference its earlier findings and rulings.

### e.  Section 1129(a)(3):  Whether the Plan has been Proposed in Good Faith

Section 1129(a)(3) requires that CSAME have proposed the Plan "in good faith and not by any

means forbidden by law." 11 U.S.C. § 1129(a)(3).  This is "generally interpreted to mean that there exists

a reasonable likelihood that the plan will achieve a result consistent with the objectives and purposes of

the Bankruptcy Code."  *In re Weber*, 209 B.R. 793, 797 (Bankr. D. Mass. 1997).  OneUnited contends

that, for lack of honesty of purpose and nondisclosure and misrepresentations of material facts, the Plan

has been proposed in bad faith.  It would base this conclusion on the following allegations:  (i) foremost,

the plan seeks an unjustified third-party release of FEDAME and thus favors an insider; (ii) it does so by

falsely characterizing as FEDAME's a donation originating in another entity; (iii) CSAME included false

historical financial information in its Disclosure Statement; (iv) Revs. Groover and Adams secretly

diverted restricted-use funds; and (v) they failed to disclose the diversions in CSAME's schedules and

Disclosure Statement.

This objection is now moot:  the Court ruled above that the release is impermissible, which

requires denial of confirmation; and any succeeding plan will be another plan, with its own separate

manner of proposal, subject to its own good faith analysis.  Because the good faith requirement figured

so large in OneUnited's efforts, however, I note for the record the following.  It was not bad faith to file

a plan featuring a third party release, especially where the scope of the release has considerably

narrowed over time, and a plan is always in bankruptcy as much a tentative negotiating position as a

litigation position.  CSAME was either entitled to the release or not—and if not, confirmation would be

denied on that basis, not for requesting it—but testing the waters was not bad faith.  The provenance of

the FEDAME donation is also of no moment; the parties can argue about whether it should properly be

credited to FEDAME, but the origins of the funds have always been clear and fully and fairly disclosed.

The financial errors in the Disclosure Statement were pointed out by CSAME itself, which is highly

inconsistent with an intent to deceive; the implication that the errors had their origins in bad faith is not

proven.  And the diversions of restricted-use funds were not part of the proposal of the Plan, the focus

of § 1129(a)(3).  The nondisclosure and misrepresentations concerning the diversions are germane, but

they do not taint or derail the whole effort, which in substance represents a fair and serious effort by a

1400 member congregation, not Rev. Groover or Rev. Adams, to address CSAME's obligations to

OneUnited and the universe of its solvency issues.  Certainly the Plan promises to OneUnited a far better

recovery than it can hope for in a liquidation or dismissal scenario (especially if, as OneUnited contends,

the Guaranty is worthless), all by the membership's putting itself under considerable debt service strain

that it has no obligation to undertake.  This is not bad faith.

### f.  Section 1129(a)(5):  Continuance in Office of Officers

Sections 1129(a)(5)(A)(i) and (ii) require that the Plan proponent disclose the "identity and

affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer or

voting trustee of the debtor," and requires a finding that "the appointment to, or continuance in, such

office of such individual, is consistent with the interests of creditors and equity security holders and with

public policy." 11 U.S.C. § 1129(a)(5)(A)(i), (ii).  OneUnited argues that the Court cannot find that the

continuance in office of Rev. Groover and Rev. Adams is consistent with the interests of creditors and

with public policy.  Specifically, under the Plan, Rev. Groover would be tasked with receiving $1.5 million

for completion of the RRC, but Rev. Groover, and Rev. Adams at his direction, diverted restricted funds

from their intended use and concealed the diversion.  I do not understand OneUnited to suggest that

the Court, or public policy, has a legitimate interest in telling the bishop of the FEDAME how to staff the

pastorate of CSAME.  The concern is limited to oversight of the disposition of funds dedicated to a

specific use.  OneUnited contends that the Recommended Policies and Procedures that CSAME has put

in place do not go far enough in this respect, as they fail to address the principal means by which monies were diverted:  electronic bank account transfers.  The Court agrees that, if a future plan involves restricted use funds and does not place them in the charge of a plan fiduciary or other functionary, the policies and procedures will at least need further amendment.

### g.  Section 1129(a)(7):  Best Interests of Creditors

Section 1129(a)(7), known as the "best interest of creditors test," provides (in relevant part):

With respect to each impaired class of claims or interests—

(A) each holder of a claim or interest of such class

(i) has accepted the plan; or

(ii) will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date.

11 U.S.C. § 1129(a)(7)(A).  OneUnited argues that this requirement is unsatisfied for two sets of reasons.  The first concerns the interests of the impaired claims in classes 3 and 5 and of CSAME, all of whom OneUnited argues would fare better, or no worse, in a chapter 7 liquidation.  This argument is irrelevant:  § 1129(a)(7) is satisfied as to Classes 3 and 5 by their acceptance of the plan, see § 1129(a)(7)(i), and it does not inquire at all into the interests of the debtor.  After completion of the evidentiary hearing, OneUnited raised for the first time a second set of concerns, arguing that OneUnited itself would do better in a chapter 7 liquidation because the Plan deprives it of the value of the Guaranty, an asset it would retain in chapter 7.  CSAME responds that this argument is untimely and that, in any event, the retention of outside assets, assets that don't belong to the estate, should not be considered in the § 1129(a)(7) calculus.  In view of the rulings above on the proposed release of the Guaranty, this argument is now moot.  OneUnited does not deny, and I readily conclude, that, if the Guaranty is not part of the calculus, the best interest test is satisfied as to both claims of OneUnited.

### h.  Section 1129(a)(8):  Acceptance by All Impaired Classes

Section 1129(a)(8) requires that each impaired class of claims or interests accept the Plan.  Here, two impaired classes have voted to reject.  The Plan may therefore be confirmed only by satisfaction of the requirements of § 1129(b) as to each impaired class that has not accepted the Plan, the classes of OneUnited's claims.

### i.  Section 1129(a)(9):  Payment in Full of Allowed Priority Claims

Section 1129(a)(9) sets forth requirements for the payment through a plan of priority claims.  No administrative or other priority claim has been filed or asserted in the case, and CSAME's professionals' services have been provided pro bono.  Therefore this requirement is not applicable.  OneUnited nonetheless objects, arguing that CSAME's cash on hand is insufficient to pay any administrative claims that may arise.  OneUnited cites no existing claims but indicates that it will file such a claim itself, for substantial contribution to the case.  It did not file such a claim before completion of the evidentiary hearing, and it did not establish (or even allege) during the hearing that it has a meritorious claim.  The objection under subsection (a)(9) is therefore overruled.

### j.  Section 1129(a)(10):  Acceptance by at Least One Impaired Class

If any class of claims is impaired, § 1129(a)(10) requires that the plan have been accepted by at least one impaired class, determined without including any acceptance of the plan by an insider.  11 U.S.C. § 1129(a)(10).  CSAME contends that this requirement is satisfied, citing the undisputed acceptance of the Plan by Classes 3 and 5, both impaired (and the acceptance of Class 5 having being determined without the vote of FEDAME).[18]  OneUnited argues that § 1129(a)(10) is not satisfied because Tremont's claim is not properly classified in Class 3.  Tremont is wholly unsecured, OneUnited

---

[18] In view of the Plan's acceptance by Class 3, I need not decide whether, by virtue of the denial of subordination and the resulting treatment of Class 5—it would get nothing—Class 5 must be deemed, by operation of 11 U.S.C. § 1126(g), to have rejected the Plan, despite its vote of acceptance.  OneUnited does not dispute that the Plan has been accepted by Class 5.

maintains, and "[w]hen Tremont's claim is properly re-classified as along with other unsecured claims, there is no accepting impaired class because OneUnited has not accepted the Plan and its deficiency claim controls the unsecured class."  This argument is not wholly intelligible:  by virtue of the treatment of its two claims as secured to at least their extent on the petition date, OneUnited has no deficiency claim.  In any event, this is not properly an objection to satisfaction of § 1129(a)(10) but to both the classification and treatment of Tremont.  I have dealt with and rejected that objection elsewhere.  Given the class structure of the Plan, § 1129(a)(10) is satisfied.

### k.  Section 1129(a)(11):  Feasibility

Section 1129(a)(11) requires a showing that

> [c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

11 U.S.C. § 1129(a)(11).  This "feasibility test" requires the court to make an independent determination as to whether the Plan is workable and has a reasonable likelihood of success. See *In re SW Boston Hotel Venture, LLC*, 460 B.R. 38, 58 (Bankr. D. Mass. 2011).  A plan proponent need only demonstrate that there exists a reasonable prospect of success and a reasonable assurance that proponents can comply with the plan.  *Berkeley Fed. Bank & Trust v. Sea Garden Motel & Apartments (In re Sea Garden Motel & Apartments)*, 195 B.R. 294, 304-05 (D. N.J. 1996).  "A plan proponent need not guarantee the success of the plan, but rather must introduce evidence that its plan is realistic."  *SW Boston Hotel*, 460 B.R. at 58.  A court scrutinizing a plan should consider "(1) the adequacy of the capital structure; (2) the earning power of the business; (3) economic conditions; and (4) the ability of management."  *In re Agawam Creative Mktg. Assocs., Inc.*, 63 B.R. 612, 619-20 (Bankr. D. Mass. 1986).

In view of the Plan's high level of debt service, the extraordinary demands this would make on congregational giving for twenty years, CSAME's lack of working capital reserves, and the lack of

evidence that FEDAME, as giver of the New Guaranty, is both credit worthy and willing to supplement

CSAME's efforts and perform when called upon, I cannot find that this Plan satisfies § 1129(a)(11).

### l.   Section 1129(b):  Fair and Equitable to Rejecting Classes

Where a plan proponent has satisfied all the applicable requirements of § 1129(a) except only

the requirement in paragraph (8) that each impaired class of claims or interests accept the plan, "the

court . . . shall confirm the plan . . . if the plan does not discriminate unfairly, and is fair and equitable,

with respect to each class of claims or interests that is impaired under, and has not accepted, the plan."

11 U.S.C. § 1129(b)(1).  Certain requirements of fair and equitable treatment for secured claims are set

forth in § 1129(b)(2)(A).  OneUnited argues that the treatment of its claims is less than fair and equitable

in five ways; and it argues that the treatment of Class 5 unsecured creditors falls short in another.

### 1.   The 20-year Term

OneUnited takes issue with the 20-year term of the two promissory notes it would receive in the

Plan, arguing that notes of longer than ten years for "loans" of this kind are "wholly detached from

market realities and fall far short of the indubitable equivalent treatment" that § 1129(b)(2)(A) requires.

I conclude that the 20-year term is not in itself inadequate.  The touchstone in § 1129(b)(2)(A) is

whether the proposed treatment provides to OneUnited the indubitable equivalent of the value of its

secured claim.  A plan's treatment of a secured claim is not a loan, and "conformity to market realities"

does not appear in the statutory language.  I will consider the term and rate of amortization, especially

the risks these entail, in determining whether the overall treatment of OneUnited's secured claims

satisfy the indubitable equivalent standard and are otherwise fair and equitable.  Provided they do,

however, the 20-year term, standing alone, is no problem.  This is especially so where the actual value of

OneUnited's collateral is far less than the present value of what the Plan is proposing to give OneUnited

for its secured claim.

### 2.  Sufficiency of Covenants in Restructured Notes and Mortgages

OneUnited objects to the almost complete lack of covenants in the promissory notes and mortgages it would be given under the Plan.  The parties are in agreement about the state of the law on this question.  The Bankruptcy Code requires no particular set of covenants in restructured loans. The issue is whether the terms are fair and equitable, considering all the circumstances.  The Court must consider "(1) whether the proposed terms and covenants unduly harm the secured creditor with respect to its collateral position; and (2) whether the inclusion of terms and conditions from the pre-bankruptcy loan documents would unduly impair the debtor's ability to reorganize."  *In re Am. Trailer & Storage, Inc.*, 419 B.R. 412, 441 (Bankr. W.D. Mo. 2009).  CSAME emphasizes the second prong, arguing that it would now be reasonable to expect that at the first technical breach of even the most minor covenant, OneUnited would not act as a normal lender, but would accelerate and thus cause the Plan to fail; and CSAME further points out that before the deterioration in relations between the parties, OneUnited showed little concern for the covenants.  OneUnited emphasizes the first prong, arguing that the standard covenants are so wholly lacking that its collateral position is severely compromised, especially because most relevant covenants would not here be satisfied.

The Court agrees with CSAME that, in view of OneUnited's conduct in this case and since its declaration of default, it should be expected that OneUnited would use standard covenants for maximum leverage, beyond their intended purpose.  The Court would insist that collateral be insured (with due regard for the fact that three of the six properties have virtually no value beyond that of their land) and that nonpayment be an event of default after a suitable grace period.  Beyond that, the Court will consider other covenants provided they are fashioned in a manner acceptable to CSAME or to otherwise allay CSAME's valid concern.

### 3.  Sufficiency of Interest Rates

OneUnited objects to the interest rates of the promissory notes and mortgages it would be given under the Plan:  for the Church Loan, 5.75 percent; for the Construction Loan, 5.75 percent, unless the Plan cannot be confirmed with that rate, in which event OneUnited would be given the New Guaranty and the interest rate would be reduced to 5.25 percent.  As a preliminary matter, I find that the feasibility of the proposed repayment of the Construction Loan at 5.75 percent is far too risky to confirm without benefit of third-party credit support.  With respect to the Construction Loan, I therefore would evaluate the proposal to pay interest at 5.25 percent with the New Guaranty.

I need not settle on a number here; the next Plan will be different, and the details matter.  I offer the following observations to assist in further plan formulation.  CSAME's expert defended the proposed rates, and OneUnited's expert opined that the appropriate rates would be at least 15.5 percent for the Church Loan and 18 percent for the Construction Loan.  OneUnited's expert was less than convincing in a number of respects, among them arithmetic errors and his opinion that a 20-year term should have the same effect on the rate as a 30-year.  Also, for each risk factor that should affect the rate calculus—among others, the inadequacy of collateral, the insufficiency of current income to cover debt service, the bare margin that even augmented income would supply, the terms of the replacement notes, the lack of cash reserves, and the history of cash flow and financial management issues—he increased the rate by an amount of his choosing, but he offered no reasons for the amounts he chose, a problem of calibration, precisely what his testimony was most meant to address.  He also assumed that FEDAME's New Guaranty would have no mitigating effect on the risk of nonpayment, something that has not been established; his failure to address the curative effects of credit support is a major omission that would affect much else in his analysis.  With respect to calibration, CSAME's expert was more persuasive, but he too made assumptions about the guarantor:  that its creditworthiness was established by the fact that OneUnited relied on it in making the Construction Loan.  I do not regard the

creditworthiness of FEDAME as so established, both because OneUnited's opinion in the matter has

changed since it made the loan—to what is not clear, perhaps not even to OneUnited, but it has

changed—and because CSAME has simply not addressed the issue.  In view of the strain that the Plan's

debt service would place on CSAME, much rests on this issue that neither side has seen fit to address,

and also on CSAME's ability to obtain a sizable working capital reserve.

### 4.  Credit for Turnover of Milton Property

In the Plan's treatment of OneUnited's Class 2 Claim, regarding the Church Loan, CSAME

proposes to turnover to OneUnited the Milton Parsonage, one of three properties that secures that

loan, and, more to the point, to receive a credit therefor against the claim it secures of $380,000.

OneUnited objects to the amount of the credit, arguing that valuation on which CSAME relies was

established by a stipulation that was not intended to apply to the present iteration of the plan, the first

to propose turnover, not retention, of the Milton Parsonage.  The Court agrees that the stipulation

cannot be used for this purpose, retention and turnover being materially different for purposes of

valuation.  The burden is on CSAME to establish that the amount of the credit is fair and equitable.  On

the basis of the appraisal in evidence and the fact that the interior of the property is in worse condition

than the appraiser assumed, I have found that the value is appreciably less than $380,000.  Moreover,

the net value of the property to OneUnited, after deduction of the costs of resale, would be lower still.

The amount of the credit is therefore not fair and equitable under § 1129(b)(2)(A)(iii) (a plan is fair and

equitable to a class of secured claims if it provides for the realization by the claim holders of the

indubitable equivalent of such claims).  This ground of objection must be sustained.

### 5.  Right of Appeal

In its § 8.7, the Plan dictates that it will be deemed "substantially consummated" as of the Plan's

effective date; and, under the Plan's definition of Effective Date, the Plan could conceivably become

effective on the date of confirmation.  Substantial consummation can render an appeal moot.

OneUnited objects, arguing that the occurrence of substantial confirmation on the effective date could

unfairly deprive OneUnited of its right of appeal.  This raises questions of whether a plan can artificially

accelerate the date of substantial consummation and, conversely, whether for the sake of a creditor

wanting to appeal, substantial consummation can be deemed to occur later than it actually does occur.

For simplicity, and to preserve intact the right of appeal, if the Court were to confirm a future plan

iteration containing this same language, the Court would simply add to the confirmation order a proviso

that the Effective Date shall in no event occur until after expiration of 14 days from the date of

confirmation.

### 6.  Absolute Priority Rule

In its earliest objection to confirmation [doc. #261], OneUnited objected on the basis that Plan

violates the absolute priority rule, § 1129(b)(2)(B)(ii), one of the conditions of a plan's being fair and

equitable with respect to a class of unsecured creditors.  OneUnited did not reiterate this objection in

later statements of its position and thus appears to have abandoned it.  In any event, the absolute

priority rule is irrelevant because the class of unsecured creditors has accepted the plan.  Section

1129(b)(1) requires a showing that a plan is fair and equitable only "with respect to each class of claims

or interests that is impaired under, *and has not accepted*, the plan."  11 U.S.C. § 1129(b)(1) (emphasis

added).

### m.  Conclusion as to Confirmation

Having sustained OneUnited's objections concerning release of the Guaranty, inadequacy of

covenants, and valuation of the Milton Parsonage, the Court will enter a separate order denying

confirmation of the Seventh Modified First Amended Plan of Reorganization.

**RULINGS OF LAW CONCERNING MOTION TO DISMISS**

    a.    **Section 1112(b)(1) and Cause for Dismissal**

OneUnited has moved under 1112(b)(1) of the Bankruptcy Code to dismiss this chapter 11 case

for cause.  Section 1112(b)(1) states:

> Except as provided in paragraph (2) and subsection (c), on request of a
> party in interest, and after notice and a hearing, the court shall convert
> a case under this chapter to a case under chapter 7 or dismiss a case
> under this chapter, whichever is in the best interests of creditors and
> the estate, for cause unless the court determines that the appointment
> under section 1104(a) of a trustee or an examiner is in the best interests
> of creditors and the estate.

11 U.S.C. § 1112(b)(1).  The parties and the Court agree that conversion to chapter 7 is not a viable or

useful option here, and therefore this motion is about dismissal only.  Subsection 1112(b)(4) sets forth a

non-exhaustive list of examples of "cause" within the meaning of § 1112(b)(1).  These include

"substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood

of rehabilitation," § 1112(b)(4)(A); "gross mismanagement of the estate," § 1112(b)(4)(B); "failure to

maintain appropriate insurance that poses a risk to the estate," § 1112(b)(4)(C); and "unexcused failure

to satisfy timely any filing or reporting requirement established by this title or by any rule applicable to a

case under this chapter," § 1112(b)(4)(F).  OneUnited relies on each of these and others not

enumerated.  "One ground, however, is sufficient, standing alone, to establish cause under the statute."

*In re Colón-Martinez*, 472 B.R. 137, 144 (B.A.P. 1st Cir. 2012) (internal quotations and citations omitted).

The burden of proving cause is on the party moving to convert, and the standard is a preponderance of

the evidence.  *In re Cranney*, 2013 WL 2383594 *2 (Bankr. D. Mass. 2013).  Once cause is established,

the court "shall" convert or dismiss unless doing so is excused by subsection (b)(1) or (b)(2).  11 U.S.C. §

1112(b)(1) &(2).  The first step, however, is to determine the existence of cause.

1.    **Section 1112(b)(4)(A)**

OneUnited first contends that cause exists under § 1112(b)(4)(A).  This subsection requires proof

of "substantial or continuing loss to or diminution of the estate and the absence of a reasonable

likelihood of rehabilitation."  11 U.S.C. § 1112(b)(4)(A).  Both prongs must be satisfied.

A.    **Absence of Reasonable Likelihood of Rehabilitation**

OneUnited has not established an absence of a reasonable likelihood of rehabilitation.  CSAME is

being denied confirmation of its present ambitious plan—primarily for its third-party release and debt

burden—but many alternatives are conceivable.  CSAME has benefactors interested in helping it to

succeed.  CSAME can adjust its ambitions regarding the RRC and the amount of debt service it takes on

in a plan.  CSAME can increase its level of donations.  It can liquidate properties in partial satisfaction of

secured debt.  It may be able to cram down remaining secured debt.  It may even hit upon a proposal

that OneUnited would accept, which in theory should be achievable.  The possibilities are numerous,

CSAME has able counsel, and, contrary to OneUnited's urgings, there exists no *a priori* reason why none

of these possibilities can be confirmed.

B.    **Substantial or Continuing Loss to or Diminution of the Estate**

In view of the above ruling on the rehabilitation prong of § 1112(b)(4)(A), there can be no

"cause" within the meaning of that subsection.  Nonetheless, under the banner of the other prong,

OneUnited alleges not just loss and diminution but administrative insolvency, and therefore I proceed to

address these allegations.  OneUnited makes four allegations[19] to support a finding of "substantial or

continuing loss to or diminution of the estate."

Three may be quickly rejected.  First, OneUnited alleges that CSAME has suffered the

Storefronts and the Milton Parsonage to exist in a continuing state of disrepair.  This is not cause for

---

[19] The Motion to Dismiss included a fifth allegation, regarding unaccounted uses of grant funds; but OneUnited
asked for no finding on that allegation in its post-trial brief and appears to have abandoned the allegation.

dismissal because there is no evidence that the properties have deteriorated in value or condition since the filing of the bankruptcy petition.  Second, OneUnited alleges that CSAME lacks equity in any of its real property.  This is a nonstarter.  A debtor's lack of equity in its property is not loss to or diminution of the estate.  I do not understand OneUnited to allege that the CSAME has less equity today than it did on the petition date; if it does so allege, the allegation is not proven.[20]  Third, OneUnited complains that CSAME has "eliminated the collateral value" available to Tremont on its second-position mortgage on the Church Building.  This argument fails on the law.  Where property is fully encumbered, then by operation of § 506(a) and (b), the postpetition passage of time causes a senior lien to grow and consume the equity that would otherwise inure to junior liens on the same property.  The resulting loss or diminution is to the junior lienholder, not the estate.

The fourth allegation is that "[a]n analysis of the Monthly Operating Reports ["MORs"] filed by CSAME with the Office of the U.S. Trustee (March 2012 through January 2013) reveals a substantial post-Petition operating loss."  OneUnited did not supply the analysis in its motion to dismiss or in its separate memorandum.  After trial it now argues that the MORs show a negative post-petition cash flow of $300,877.40, an average loss of $20,058.49 per month.  CSAME responds that these "losses" are nothing but the expenditure of restricted grant funds for grant purposes, which is not properly characterized as a loss, and CSAME's non-restricted accounts have shown a slight increase.

I need not decide the proper characterization of the use of grant funds.  CSAME has used up, and not been replenishing, its cash; and this has occurred notwithstanding a suspension of debt service. The average monthly deficit is substantial, at least $14,166 (Mr. Dragelin's reconstructed figure) if not $20,056 (if the MORs are taken at face value).  CSAME's remaining cash is near to nothing.  After the

---

[20] The parties' stipulation as to values applies only to the Plan, not the Motion to Dismiss, and in any event does not address liquidation values.  The three properties that secure the Construction Loan have always concededly had less value than the amount of the loan they secure.  It is not established that the other three properties had sufficient liquidation value on the petition date to cover the combined amounts of the Church Loan and Tremont Loan on that date.

evidentiary hearing, OneUnited requested a further finding that administrative expenses now render the

estate administratively insolvent, citing two potential claims that have neither been filed nor tested.  On

both substantive and due process grounds, I do not so find.  Nonetheless, CSAME can now avoid

administrative insolvency only by some combination of spending cuts and increases in donations.  It has

recognized the need for spending cuts and begun to implement them.   For these reasons, I find cause

for concern but not administrative insolvency of any degree and not cause for dismissal.

### 2.        § 1112(b)(4)(B):  Gross Mismanagement of the Estate

Under § 1112(b)(4)(B), cause includes "gross mismanagement of the estate."  OneUnited argues

that CSAME has grossly mismanaged the bankruptcy estate by failing to restore or maintain the

Storefronts and the Milton Parsonage, by concealing the prepetition diversion of Endowment funds, and

by failing to raise more money in congregational giving than it has during the post-petition period.  None

of this is mismanagement of the estate, which is concerned with the handling of estate assets.  In

support of its position, OneUnited offered no evidence whatsoever that restoration of either the

Storefronts or the Milton Parsonage was in the best interest of the estate.  The concealment of

Endowment diversions, though wrongful, involved no management of estate assets.  And the potential

contributions of CSAME's members are not property of CSAME or its estate.

### 3.        § 1112(b)(4)(C):  Failure to Maintain Insurance

Section 1112(b)(4)(C) states that cause includes "failure to maintain appropriate insurance that

poses a risk to the estate or to the public."  11 U.S.C. § 1112(b)(4)(C).   OneUnited seeks relief on this

basis in its post-trial arguments, but it did not articulate this basis for relief before the evidentiary

hearing, either in its motion or in the memorandum later filed in support of it.  The facts that constitute

the basis for dismissal under this subsection were the subject of a late interruption in the evidentiary

hearing, but they were not the subject of the evidentiary hearing itself.  OneUnited might have moved

to amend its motion and to reopen the evidence, to add this subsection and the underlying facts as a

basis, but it did not do so.  Not surprisingly, CSAME did not address this issue in its otherwise

comprehensive post-trial brief on the motion to dismiss.  For lack of due process, then, this subsection

may not be the basis for a finding of cause.

Even substantively, cause has not been demonstrated.  OneUnited relies on a statement by

CSAME's counsel to the effect that three of five properties were uninsured for some unspecified time;

the properties in question were not identified except as unoccupied.  CSAME, however, owns *six*

properties, including *four* that are unoccupied.  OneUnited itself asked for clarification as to which of the

properties were uninsured, but no answer was supplied on the record.  Of the four unoccupied

properties, three—the Milton Parsonage, the Storefronts, and the Parking Lot—have no demonstrated

value above the value of the land they occupy, which, being land, is not at risk.  Therefore, even if there

was a lapse in "appropriate insurance" of some appreciable length, the case has not been made that the

estate was put at risk.  "Cause" in this subsection requires proof not just of a failure to maintain

appropriate insurance but also that the estate was thereby put at risk. [21]  11 U.S.C. § 1112(b)(4)(C).

### 4.    § 1112(b)(4)(D):  Unauthorized Use of Cash Collateral

Under § 1112(b)(4)(D), cause includes the unauthorized use of cash collateral substantially

harmful to one or more creditors.  11 U.S.C. § 1112(b)(4)(D).  In its motion to dismiss, OneUnited

"preserved the argument" that cause for dismissal includes CSAME's use of "cash collateral" belonging

to the Endowment, but OneUnited acknowledged uncertainty about whether the funds in question

were in fact cash collateral, and therefore stopped short of actually "making" this argument.  OneUnited

now makes no mention of this theory in its post-trial brief; the argument is deemed waived.

---

[21] OneUnited does not invoke the portion of subsection (b)(4)(C)  concerning risk "to the public," only the portion concerning risk "to the estate."

**5.    § 1112(b)(4)(F):  Failure to Satisfy Reporting Requirement**

Under § 1112(b)(4)(F), cause includes "unexcused failure to satisfy timely any filing or reporting requirement established by this title or by any rule applicable to a case under this chapter."  The movant must specify a filing or reporting requirement and prove a failure to satisfy it.  In its post-trial brief, OneUnited's entire argument under this subsection is founded on an alleged failure of CSAME to satisfy investigation and reporting requirements that OneUnited contends were imposed upon CSAME, as debtor in possession, by § 1106(a)(3) and (4) (defining duties of a trustee) via § 1107(a) (specifying the duties of a trustee that a debtor in possession shall perform).   But the duties imposed on a trustee by § 1106(a)(3) and (4) are expressly excepted from those that § 1107(a) imposes on a debtor in possession.  11 U.S.C. § 1107(a) ("a debtor in possession . . . shall perform all the functions and duties, except the duties specified in section 1106(a)(2), (3), and (4), of a trustee serving in a case under this title").  The requirement in question did not apply to CSAME.

In its Motion to Dismiss, OneUnited also complains that CSAME failed to list the Endowment on its schedule of creditors holding nonpriority unsecured claims ("Schedule F") and on the list of the twenty largest unsecured creditors.  CSAME does not dispute this allegation but contends that, where CSAME did file its schedules and list of unsecured creditors, and where it has undertaken remedial measures with respect to the omitted creditor, its omission of the Endowment from the schedule and list is not cause for dismissal.

While I do not find these factors wholly irrelevant to § 1112(b), their relevance to a determination of cause under subsection (b)(4)(F) is limited to whether the failure in question was, as that subsection requires, "unexcused."   11 U.S.C. § 1112(b)(4)(F).  Not every minor omission or inaccuracy in complex and voluminous schedules is cause for dismissal.  However, this failure was the omission of a creditor that CSAME does not contend was inadvertent.  Even if there had been no diversion here, the Endowment would have had a claim—because CSAME had not yet fully performed

under the latest grant agreement.  The Endowment was entitled to notice of the case.  The failure to

schedule the debt to the Endowment frustrated the notice purpose and served to disenfranchise the

Endowment.  The diversion and the affirmative measures by which they were hidden from the

Endowment:  these only make matters worse.  So the failure here was not insignificant or "excused."

The omission of the endowment from Schedule F and from the list of the twenty largest unsecured

creditors is cause under § 1112(b)(4)(F).

Under the heading of § 1112(b)(4)(F), OneUnited also lists other alleged misrepresentations and

omissions that are not tied to specific filing or reporting requirements.  I need not address these.  Cause

under this subsection is limited to failure to satisfy a specific filing or reporting requirement.

### 6.    Bad Faith and Other Cause

The list of items constituting cause in § 1112(b)(4) is not exclusive.  OneUnited urges the Court

to find cause in a raft of alleged misrepresentations and material omissions.  I find no intent to deceive

in any of these.  Having addressed them in the findings of fact, I need not rehearse them again here.

They are not bad faith and not "cause" under § 1112(b). For the same reasons as I found that the Plan

was proposed in good faith, I would find that CSAME has acted in good faith.

### 7.    Conclusion Regarding "Cause"

I find far less cause for dismissal than OneUnited alleges, but one ground is sufficient.  Cause

exists under § 1112(b)(4)(F) for omission of the Endowment from Schedule F and from the list of the

twenty largest unsecured creditors.

### b.    Exceptions

Once cause is established, conversion or dismissal may be avoided only by showing that the case

falls into one of the exceptions set forth in § 1112(b)(1) and (2).  Subsection (b)(1) specifies that

conversion or dismissal is not mandatory if "the court determines that the appointment under section

1104(a) of a trustee or an examiner is in the best interests of creditors and the estate." 11 U.S.C. §

1112(b)(1).  As each party for its own reasons agrees, the appointment of a trustee would be neither

useful nor appropriate here.  Section 1104(c) states that the court may appoint an examiner at any time

before the confirmation of a plan "to conduct such an investigation of the debtor as is appropriate . . . if

such appointment is in the interests of creditors, any equity security holders, and other interests of the

estate." 11 U.S.C. § 1104(c).[22]

CSAME's position is that there is no cause to appoint an examiner, but also that if the Court

finds such cause, then the appointment of an examiner, with duties appropriately limited to protect the

religious liberty interests of CSAME, is preferable to dismissal of the case, the former being more in the

interests of creditors and the estate.  OneUnited does not dispute that there is cause to appoint an

examiner but argues that dismissal of the case better serves the interests of creditors and the estate

because (i) there is no prospect of a confirmable plan, despite substantial resources and competent

representation, (ii) the case is administratively insolvent, such that further administrative costs will

accrue to the detriment of creditors and the estate, and (iii) unsecured creditors stand to recover

nothing even under the proposed plan.

There is cause to appoint an examiner.  CSAME apparently allowed insurance coverage to lapse

on three of its properties.  The circumstances of this lapse are unclear, but whatever they are, the lapse

is reason to appoint an examiner to monitor the existence and continuance of insurance coverage.  Also,

CSAME's accounting standards and practices have left something to be desired in this case.  While the

church is entitled to its own standards for its own internal purposes—and I do not find that its records,

in combination with Rev. Adams's familiarity with them and the peculiar needs of CSAME and the

denomination, are inadequate for internal purposes—the Court and creditors are entitled to more

---

[22] Although § 1112(b)(1) refers to a determination to appoint an examiner "under section 1104(a)," the
appointment of an examiner is governed entirely by § 1104(c), not § 1104(a); the latter governs the appointment
of a trustee.

reliability and clarity.  Therefore, especially as CSAME's cash reserves have dwindled to nothing, it would

be useful for an examiner to review CSAME's MORs going forward.

These limited duties would not require the examiner to cross boundaries protecting the

religious liberty interests of CSAME.  They fit comfortably within parameters that CSAME has indicated

would be acceptable.  The order for appointment of an examiner would include express limitations to

protect these interests.

I further find that the interests of creditors and the estate are better served by *not* dismissing

the case.  It has not been established that CSAME cannot reorganize and confirm a plan.  The current

plan cannot be confirmed, but others, especially of more modest ambition, could well succeed.  Any

number of proposals would supply to both OneUnited and to unsecured creditors substantially more

value than each would receive from CSAME outside of bankruptcy.  Outside of bankruptcy, the

unsecureds would likely receive nothing; OneUnited would receive, at best, the liquidation value of its

collateral, and probably not for quite some time; OneUnited's litigation with CSAME and FEDAME would

continue; Tremont might bring a marshaling complaint against OneUnited; Thomas would seek to

establish the priority of its claim as against the RRC; and a 200-year-old congregation of 1400 members

with the ability and willingness to repay a substantial portion of its debt might well be foreclosed out of

existence, a needless loss to its members, denomination, and community.

It may be that OneUnited would object to *any* plan that CSAME might propose, regardless of its

merits, preferring evidently to be able to use a threat of foreclosure on CSAME's most necessary

properties as leverage against FEDAME.  During closing arguments, the Court inquired of counsel to

OneUnited:  "What's [OneUnited] going to do [if the case is dismissed] that I can take into account in

deciding whether it's in the best interests of creditors and the estate?"  Counsel had no answer other

than that OneUnited has mortgages and powers of sale, armed with which it would attempt to

negotiate with FEDAME and CSAME.  It conceded that unsecured creditors—virtually every creditor

other than OneUnited—would get nothing and that litigation would continue, possibly on multiple

fronts.  In essence, OneUnited wants dismissal in order to be able to threaten foreclosure against

CSAME as leverage in negotiations with FEDAME—to treat CSAME as a pawn or hostage on a claim

against a third party.  As against CSAME itself, however, dismissal would not be in the best interest of

any constituency in this case, not even OneUnited.  All stand to get more from CSAME—the appropriate

focus of this analysis—through a chapter 11 plan.

This analysis gets to the very core of chapter 11. The Bankruptcy Code offers a collective action

that preserves the going concern of the debtor while preventing undue damage to creditors.  Dismissing

this case would serve no purpose.  It would launch CSAME into a destructive spiral from which it might

well not recover.  Moreover, despite judicial probing, even OneUnited could not explain how it would be

advantaged by dismissal.

The appointment of an examiner requires payment of the examiner's fee as an administrative

expense.  In view of the limited resources available in this case for that purpose, the examiner's fees

should be kept to a minimum, and the examiner's charge shall be narrow and limited.  Accordingly, by

separate order, the Court will deny dismissal and order the appointment of an examiner.

**CONCLUSION**

For the reasons set forth above, the Court will enter separate orders denying confirmation of

the Plan and dismissal of the case and ordering the appointment of an examiner.

Date:  October 2, 2013

_____
Frank J. Bailey
United States Bankruptcy Judge